**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | | |
|---|---|---|
| **CASEY A. McWHORTER,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 4:13-CV-02150-RDP** |
| | ) | |
| **JEFFERSON S. DUNN,** | ) | |
| **Commissioner, Alabama** | ) | |
| **Department of Corrections,**[1] | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

Petitioner Casey A. McWhorter has petitioned for a writ of habeas corpus under 28 U.S.C. § 2254, challenging his 1994 capital murder conviction and death sentence in Alabama state court. McWhorter alleges that a variety of constitutional violations require reversal of his conviction and/or sentence. The parties have fully briefed McWhorter's claims. (Docs. 14, 20). After careful consideration of the record, the pleadings, and the applicable provisions of 28 U.S.C. § 2254, the court finds that McWhorter has not shown that he is due an evidentiary hearing, and he is not entitled to habeas relief. Accordingly, and for the reasons stated below, his petition for a writ of habeas corpus is due to be denied.

---

[1] Since this action was filed, Jefferson S. Dunn has become the Commissioner of the Alabama Department of Corrections. Therefore, pursuant to Fed. R. Civ. P. 25(d), The Clerk of the Court is **DIRECTED** to **SUBSTITUTE** Jefferson S. Dunn for Kim T. Thomas as Commissioner of the Alabama Department of Corrections.

# Table of Contents

I. PROCEDURAL HISTORY ................................................................................. 6

II. THE OFFENSE OF CONVICTION.............................................................. 8

III. THE SENTENCE............................................................................................. 9

IV. THE SCOPE OF FEDERAL HABEAS REVIEW ............................... 12

    A.   **Exhaustion of State Court Remedies: The First Condition Precedent to Federal Habeas Review** ............................................................................................. 12

    B.   **The Procedural Default Doctrine: The Second Condition Precedent to Federal Habeas Review** ................................................................................... 14

        1.   General principles................................................................................ 14

        2.   Overcoming procedural default....................................................... 17

            a.   The "cause and prejudice" standard........................................ 18

               i.   "Cause" .................................................................................. 19

               ii.   "Prejudice" .......................................................................... 20

            b.   The "fundamental miscarriage of justice" standard ........................................... 21

    C.   **The Statutory Overlay: The Effect of the Antiterrorism and Effective Death Penalty Act of 1996 on Habeas Review** .............................. 21

        1.   28 U.S.C. § 2254(e)(1) ..................................................................... 22

        2.   28 U.S.C. § 2254(d)........................................................................... 23

            a.   The meaning of § 2254(d)(1)'s "contrary to" clause ........................................... 25

            b.   The meaning of § 2254(d)(1)'s "unreasonable application" clause ................... 26

      c.      **The meaning of § 2254(d)(2)'s clause addressing an "unreasonable determination of the facts in light of the evidence presented in the state court proceeding"** ................................................................... **28**

      d.      **Evaluating state court factual determinations under 28 U.S.C. §§ 2254(d)(2) and (e)(1)** ................................................................... **29**

  **D.**   **The Burden of Proof and Heightened Pleading Requirements for Habeas Petitions** ................................................................... **30**

  **E.**   **Ineffective Assistance of Counsel Claims** ................................................................... **32**

     **1.**   **The performance prong** ................................................................... **34**

     **2.**   **The prejudice prong** ................................................................... **36**

     **3.**   **Deference accorded state court findings of historical fact and decisions on the merits when evaluating ineffective assistance of counsel claims** ................................................................... **37**

**V.  McWHORTER'S CLAIMS** ................................................................... **39**

  **A.**   **McWhorter's Claim That He Was Denied the Right to an Impartial Jury Because a Juror Intentionally Hid Critical Facts During** *Voir Dire* ................................................................... **39**

     **1.**   **The Parties' Arguments** ................................................................... **39**

     **2.**   **Analysis** ................................................................... **40**

  **B.**   **McWhorter's Claim That He Was Sentenced to Death Based on Extraneous Evidence** ................................................................... **53**

     **1.**   **The Parties' Arguments** ................................................................... **53**

     **2.**   **Analysis** ................................................................... **57**

  **C.**   **McWhorter's Claim That He Was Denied His Constitutional Right to Effective Assistance of Counsel** ................................................................... **58**

     **1.**   **Inadequate Investigation and Failure to Present Mitigating Evidence** ................................................................... **59**

a.    The Parties' Arguments ................................................................ 61

b.    Analysis .................................................................................... 65

2.    **Failure to Object to McWhorter's Being Transported to and from the Courtroom in Handcuffs** ........................................................... 87

a.    The Parties' Arguments ................................................................ 87

b.    Analysis .................................................................................... 91

3.    **Failure to Object to the Trial Court's Preparation of a Sentencing Order Prior to the Sentencing Hearing** ................................................ 92

a.    The Parties' Arguments ................................................................ 92

b.    Analysis .................................................................................... 93

4.    **The Rule 32 Court's Exclusion of Evidence Does Not Warrant an Evidentiary Hearing in this Court** .............................................. 95

a.    The Parties' Arguments ................................................................ 95

b.    Analysis .................................................................................... 97

D.    **McWhorter's Claim That the State Failed to Disclose Evidence Directly Relevant to Mitigation in Violation of *Brady v. Maryland*, 373 U.S. 83 (1963)** ........ 100

1.    **The Parties' Arguments** ............................................................ 100

2.    **Analysis** ................................................................................ 101

a.    Procedural Default ..................................................................... 101

b.    Merits ....................................................................................... 106

E.    **McWhorter's Claim That the Trial Court Erred by Failing to Instruct the Jury on Lesser Included Offenses** ............................................. 108

4

      1.     The Parties' Arguments ................................................................ **109**

      2.     Analysis ........................................................................................ **128**

**F.   McWhorter's Claim That the Trial Court Improperly Excluded a Venireperson from Serving on the Jury in Violation of** *Witherspoon v. Illinois***, 391 U.S. 510 (1968)** .......................................................... **139**

      1.     The Parties' Arguments ................................................................ **140**

      2.     Analysis ........................................................................................ **145**

**G.   McWhorter's Claim That the Trial Court Improperly Coerced the Jury into Returning a Death Sentence after the Jury Was Deadlocked** ................................... **148**

      1.     The Parties' Arguments ................................................................ **148**

      2.     Analysis ........................................................................................ **156**

**H.   McWhorter's Claim That the Trial Court Improperly Directed Prospective Jurors to Give a Specific Answer to a Crucial** *Voir Dire* **Question** .......................... **161**

      1.     The Parties' Arguments ................................................................ **161**

      2.     Analysis ........................................................................................ **164**

**VI.  CONCLUSION** ............................................................................................ **166**

# I. PROCEDURAL HISTORY

In May 1993, McWhorter was indicted in the Marshall County Circuit Court on one count of capital murder for the shooting death of Edward Lee Williams. (Vol. 1, Tab 1 at 10).[2] The indictment charged that McWhorter intentionally killed Mr. Williams by shooting him with a rifle during the course of a robbery, in violation of § 13A-5-40(a)(2). (*Id*.). McWhorter was represented at trial by Thomas E. Mitchell and James R. Berry. (Vol. 3, Tab 8 at 98-99).

The guilt phase of the trial began on March 17, 1994. (Vol. 6 at 706; Vol. 7, Tab 11 at 921). On March 22, 1994, the jury found McWhorter guilty as charged. (Vol. 11, Tab 20 at 1758). After a brief recess, the penalty phase of the trial began. (*Id*., Tab 21 at 1764). Later that day, the jury recommended by a vote of 10-2 that McWhorter be sentenced to death. (Vol. 1, Tab 1 at 9; Vol. 12, Tab 30 at 1852). At the May 13, 1994 sentencing hearing, the trial court followed the jury's recommendation and sentenced McWhorter to death. (Vol. 12, Tab 32 at 1872).

Mitchell and Berry continued to represent McWhorter on direct appeal. (Vol. 14, Tab 37). McWhorter raised a variety of issues on appeal, including claims that the trial court erred by (1) failing to instruct the jury on lesser included offenses, (2) excluding a venireperson from serving on the jury, (3) coercing the jury into returning a death sentence after the jury was deadlocked, and (4) directing prospective jurors to give a specific answer to a crucial *voir dire* question. (*Id*.).

---

[2] References to the record are designated "(Vol. _ )." The court will list any page number associated with the court record by reference to the number in the upper right hand corner of the page, if available. Otherwise, the page number will correspond with the number at the bottom of the page. Additionally, citations to the record will include an easily identifiable tab number close to the cited material where available.

The Alabama Court of Criminal Appeals affirmed McWhorter's conviction and sentence on August 27, 1999, and denied his application for rehearing on December 3, 1999. *McWhorter v. State*, 781 So. 2d 257 (Ala. Crim. App. 1999). On August 11, 2000, the Alabama Supreme Court affirmed the judgment of the Alabama Court of Criminal Appeals. *Ex parte McWhorter*, 781 So. 2d 330 (Ala. 2000). The United States Supreme Court denied McWhorter's petition for a writ of certiorari on April 16, 2001. *McWhorter v. Alabama*, 532 U.S. 976 (2001).

On April 11, 2002, McWhorter, through new counsel,[3] timely filed a Rule 32 petition in the Marshall County Circuit Court. (Vol. 19, Tab 49). McWhorter filed an amended petition on February 28, 2005.[4] (Vol. 21, Tab 56). On October 19, 2006, the trial court summarily dismissed a number of McWhorter's claims. (Vol. 36, Tab 80). On August 26-28, 2009, an evidentiary hearing was held on the remaining claims.[5] (Vol. 25, Tab 66 - Vol. 29). On March 29, 2010, the trial court entered a final order denying McWhorter's Rule 32 petition. (Vol. 36, Tab 81).

McWhorter appealed the denial of his Rule 32 petition to the Alabama Court of Criminal Appeals. That court affirmed the trial court on September 30, 2011, and denied his application for rehearing on February 10, 2012. *McWhorter v. State*, 142 So. 3d 1195 (Ala. Crim. App. 2011).[6] On November 22, 2013, the Alabama Supreme Court denied McWhorter's petition for a writ of certiorari and affirmed the judgment. *Id.*

---

[3] Hoyt L. Baugh, Jr., Laura R. Johnson, Robert C. Newman, Kafahni Nkrumah, and Colleen Q. Brady represented McWhorter when his original Rule 32 petition was filed. (Vol. 19, Tab 49 at 81-82).

[4] The amended petition was filed by Hoyt L. Baugh, Jr. and Robert C. Newman as counsel for McWhorter. (Vol. 21, Tab 56 at 554).

[5] McWhorter was represented at the evidentiary hearing by Robert C. Newman, Benjamin E. Rosenberg, Colleen Q. Brady, and David M. Bigge. (Vol. 25, Tab 66 at 1).

[6] McWhorter was represented on appeal by Colleen Q. Brady, Michael Z. Goldman, Robert C. Newman, and Benjamin E. Rosenberg. (*Id*. at 1202).

On November 25, 2013, McWhorter, through counsel,[7] filed a § 2254 petition in this court. (Doc. 1). Respondent filed an answer and brief on February 10, 2014. (Docs. 14, 15). McWhorter filed a reply brief on April 11, 2014. (Doc. 20).

## II. THE OFFENSE OF CONVICTION

In its opinion on direct appeal, the Alabama Court of Criminal Appeals quoted the trial court's sentencing order setting out the facts of the crime:

> The court finds beyond a reasonable doubt that approximately three weeks before February 18, 1993, the 18-year-old defendant conspired with 15 and 16 year old codefendants (the 15-year-old codefendant being the son of the victim) to kill the victim in order to rob him of a substantial sum of money and to obtain other property from his home. This conspiracy was discussed from time to time until February 18, 1993. On that date a fourth party, who was aware of the plot, dropped the defendant and the 16-year-old codefendant off on a highway a few blocks from the victim's home at about 3:00 p.m. The fourth party and the 15-year-old son of the victim rode around until they met the defendant and the other codefendant at a pre-arranged spot at 8:00 o'clock that evening.

> The defendant and the 16-year-old proceeded on foot to the victim's home and let themselves in the unlocked empty house. They knew that the victim was not expected home for approximately three to four hours. They spent this three-to four-hour period of time in the home going through it, gathering up various items that they wanted to keep and making silencers for two .22 rifles which were there in the home. One silencer was made out of a plastic jug and filled with napkins and attached to the rifle by duct tape. The other was made by wrapping a pillow around the barrel of the second rifle and holding it in place with duct tape and electrical wire. The rifles were 'test-fired' into a mattress to see if the silencers were accomplishing the desired effect. When the victim arrived home, he first saw the 16-year-old, grabbed the rifle he was holding and began to struggle over it. At that point, the defendant fired the first shot into the victim's body. Between the two conspirators on the scene, the victim was shot at least 11 times. After the victim was down on the floor, the defendant fired at least one more round into his head to assure that he was dead. They took his wallet and various other items from the home and left in the victim's pickup truck. They met the other two parties at the pre-arranged spot, took the victim's truck out into the woods and

---

[7] McWhorter is represented in this court by Samuel H. Franklin, Benjamin E. Rosenberg and Robert C. Newman.

stripped it. The spoils were divided between the four individuals. The toxicologist testified that the victim died of multiple gunshot wounds, there being 11 entrance wounds and 2 exit wounds. The aorta and another major blood vessel were pierced, causing approximately half a gallon of blood to accumulate in the chest cavity and at least one bullet was removed from the brain.

The defendant's guilt was evidenced not only by his confession but by the testimony of the fourth party who drove the defendant to the area near the victim's home and met him again at 8:00 p.m. and by the testimony of a friend to whose home the defendant carried part of the spoils and to whom the defendant confessed the substance of his guilt. All of the physical evidence was consistent with the above account.

*McWhorter v. State*, 781 So. 2d 257, 265-66 (Ala. Crim. App. 1999).

## III.  THE SENTENCE

The following excerpts are taken from the written order of the sentencing court:

### C.  The Aggravating Circumstances.

In regard to the aggravating circumstances the Court finds the following:

(1) The defendant was not under a sentence of imprisonment when he committed the capital offense. This aggravating circumstance under Section 13A-5-49(1) of the Code of Alabama is not found to exist and is not considered.

(2) The defendant has not been convicted of another capital offense or of a felony involving the use or threat of violence. Therefore, the Section 13A-5-49(2) aggravating circumstance does not exist and is not considered.

(3) The defendant did not knowingly create a great risk of death to many persons. Therefore, the Section 13A-5-49(3) aggravating circumstance does not exist and is not considered.

(4) The capital offense was committed while the defendant was engaged in the commission of or an attempt to commit or flight after committing or attempting to commit robbery within the meaning of Section 13A-5-49(4). Therefore, the Section 13A-5-49(4) aggravating circumstance does exist and is considered.

(5) The capital offense was not committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody within the meaning

of 13A-5-49(5). Therefore, the Section 13A-5-49(5) aggravating circumstance does not exist and is not considered.

(6) The capital offense was not committed for pecuniary gain within the meaning of Section 13A-5-49(6). Therefore, the Section 13A-5-49(6) aggravating circumstance does not exist and is not considered.

(7) The capital offense was not committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws. Therefore, the Section 13A-5-49(7) aggravating circumstance does not exist and is not considered.

(8) The capital offense was not especially heinous, atrocious or cruel compared to other capital offenses within the narrow meaning of Section 13A-5-49(8) and within the narrow meaning of *Kyser v. State*, 398 So. 2d 330 (Ala. 1981). Therefore, the Section 13A-5-49(8) aggravating circumstance does not exist and is not considered.

The Court considers only the aggravating circumstance contained in Section 13A-5-49(4) of the *Code*, that is the capital offense was committed by a person during the commission of or attempt to commit or flight after committing or attempting to commit robbery, for the purposes of sentencing.

## D. The Mitigating Circumstances.

The defendant presented some evidence of mitigating circumstances at the sentencing phase of the trial. The Court has thoroughly and conscientiously considered all statutorily enumerated mitigating circumstances as well as any non-statutory mitigating circumstances which might reasonably appertain to this case.

In regard to mitigating circumstances, the Court finds the following:

(1) The defendant does not have a significant history of prior criminal activity within the meaning of Section 13A-5-51(1). Therefore, the Section 13A-5-51(1) mitigating circumstance does exist and is considered.

(2) The capital offense was not committed while the defendant was under the influence of extreme mental or emotional disturbance. Therefore, the Section 13A-5-51(2) mitigating circumstance does not exist and is not considered.

(3) The victim was not a participant in the defendant's conduct and he did not therefore consent to it. Therefore, the Section 13A-5-51(3) mitigating circumstance does not exist and is not considered.

10

(4) The defendant was the principal, or at least one of them, who actually shot the victim and therefore his participation in the capital offense was not relatively minor. Therefore, the Section 13A-5-51(4) mitigating circumstance does not exist and is not considered.

(5) The defendant did not act under extreme duress or under the substantial domination of another person when he committed the capital offense. Therefore, the Section 13A-5-51(5) mitigating circumstance does not exist and is not considered.

(6) The capacity of the defendant to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was not substantially impaired at the time he committed the capital offense. Therefore, the Section 13A-5-51(6) mitigating circumstance does not exist and is not considered.

(7) The defendant was 18 years of age at the time he committed the capital offense. Therefore, the Section 13A-5-51(7) mitigating circumstance does exist and is considered.

The Court is unaware of any non-statutory mitigating circumstances which exist or should be considered other than a far less than perfect childhood following the divorce of his parents, a good reputation with at least some individuals and a substantially good work record for a person of his age[,] all of which has [sic] been considered by the Court as non-statutory mitigating circumstances.

### E.  The Jury's Recommendation.

The jury's advisory verdict recommended a sentence of death. The jury's vote was two for life without parole and ten for death by electrocution.

### F.  The Sentence.

Having weighed the one statutory aggravating circumstance against all of the statutory and non-statutory mitigating circumstances, and having given careful consideration to the jury's advisory recommendation, the court finds that the aggravating circumstance in this case far outweighs the mitigating circumstances and that the punishment should be death.

It is therefore **ordered, adjudged and decreed** that the defendant Casey A. McWhorter is guilty of Code of Alabama 1975 Section 13A-5-40(a)(2) Capital Murder as charged in the indictment.

It is further **ordered, adjudged and decreed** that the defendant Casey A. McWhorter is sentenced to death by electrocution.

(Vol. 2 at 388-94).

## IV. THE SCOPE OF FEDERAL HABEAS REVIEW

"The habeas statute unambiguously provides that a federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or law or treaties of the United States.'" *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (quoting 28 U.S.C. § 2254(a)). As such, this court's review of claims seeking habeas relief is limited to questions of federal constitutional and statutory law. Claims that turn solely upon state law principles fall outside the ambit of this court's authority to provide relief under § 2254. *See Alston v. Department of Corrections*, 610 F. 3d 1318, 1326 (11th Cir. 2010) (holding that a claim addressing either "an alleged defect in a collateral proceeding," or a state court's "interpretation of its own law or rules," does not provide a basis for federal habeas relief) (citations omitted).

## A. Exhaustion of State Court Remedies: The First Condition Precedent to Federal Habeas Review

A habeas petitioner is required to present his federal claims to the state court and to exhaust all of the procedures available in the state court system before seeking relief in federal court. 28 U.S.C. § 2254(b)(1); *Medellin v. Dretke*, 544 U.S. 660, 666 (2005) (holding that a petitioner "can seek federal habeas relief only on claims that have been exhausted in state court"). That requirement ensures that state courts are afforded the first opportunity to address federal questions affecting the validity of state court convictions and, if necessary, correct violations of a state prisoner's federal constitutional rights. As the Eleventh Circuit has explained:

> In general, a federal court may not grant habeas corpus relief to a state prisoner who has not exhausted his available state remedies. 28 U.S.C. §

2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ."). "When the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction. . . . The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials." *Smith v. Newsome*, 876 F.2d 1461, 1463 (11th Cir. 1989) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983)).

Exhaustion of state remedies requires that the state prisoner "fairly presen[t][8] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (citing *Picard v. Connor*, 404 U.S. 270, 275-76 (1971) (internal quotation marks omitted). The Supreme Court has written these words:

> [T]hat the federal claim must be fairly presented to the state courts . . . . it is not sufficient merely that the federal habeas applicant has been through the state courts. . . . Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies.

*Picard*, 404 U.S. at 275, 92 S. Ct. at 512. *See also Duncan*, 513 U.S. at 365, 115 S. Ct. at 888 ("Respondent did not apprise the state court of his claim that the evidentiary ruling of which he complained was not only a violation of state law, but denied him the due process of law guaranteed by the Fourteenth Amendment.").

Thus, to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues. "It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 5-6, 103 S. Ct. 276, 277, 74 L. Ed. 2d 3 (1982) (citations omitted).

---

[8] The phrases "fairly presented" and "properly exhausted" are synonymous. *O'Sullivan v. Boerckel,* 526 U.S. 838, 848 (1999) (observing that the question is "not only whether a prisoner has exhausted his state remedies, but also whether he has *properly exhausted* those remedies, *i.e.*, whether he has *fairly presented* his claims to the state courts") ("properly" emphasized in original, all other emphasis added).

*Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) (first and third alterations and redactions in original) (footnote added).

## B. The Procedural Default Doctrine: The Second Condition Precedent to Federal Habeas Review

### 1. General principles

It is well established that if a habeas petitioner fails to raise his federal claim in the state court system at the time and in the manner dictated by the state's procedural rules, the state court can decide the claim is not entitled to a review on the merits. Stated differently, "the petitioner will have *procedurally defaulted* on that claim." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2009) (emphasis added). The so-called "procedural default" doctrine was explained by the Supreme Court in *Woodford v. Ngo,* 548 U.S. 81 (2006), as follows:

> In habeas, the sanction for failing to exhaust properly (preclusion of review in federal court) is given the separate name of procedural default, although the habeas doctrines of exhaustion and procedural default "are similar in purpose and design and implicate similar concerns," *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 7 (1992). *See also Coleman v. Thompson*, 501 U.S. 722, 731–732, 111 S. Ct. 2546 (1991). In habeas, state-court remedies are described as having been "exhausted" when they are no longer available, regardless of the reason for their unavailability. See *Gray v. Netherland*, 518 U.S. 152, 161, 116 S. Ct. 2074, 135 L. Ed. 2d 457 (1996). Thus, if state-court remedies are no longer available because the prisoner failed to comply with the deadline for seeking state-court review or for taking an appeal, those remedies are technically exhausted, *ibid.*, but exhaustion in this sense does not automatically entitle the habeas petitioner to litigate his or her claims in federal court. Instead, if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding. *Id.*, at 162, 116 S. Ct. 2074; *Coleman*, *supra*, at 744–751, 111 S. Ct. 2546.

*Woodford,* 548 U.S. at 92-93.

Generally, if the last state court to examine a claim states clearly and explicitly that the claim is barred because the petitioner failed to follow state procedural rules, and that procedural

bar provides an adequate and independent state ground for denying relief, then federal review of the claim also is precluded by federal procedural default principles. *See Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Cone v. Bell*, 556 U.S. 449, 465 (2009) ("[W]hen a petitioner fails to raise his federal claims in compliance with relevant state procedural rules, the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review.").

> The federal courts' authority to review state court criminal convictions pursuant to writs of habeas corpus is severely restricted when a petitioner has failed to follow applicable state procedural rules in raising a claim, that is, where the claim is procedurally defaulted. *Federal review of a petitioner's claim is barred by the procedural default doctrine if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar*, Harris v. Reed, 489 U.S. 255, 263, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989), *and that bar provides an adequate and independent state ground for denying relief*. *See Id.* at 262, 109 S. Ct. at 1042-43; *Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S. Ct. 1981, 1987, 100 L. Ed. 2d 575 (1988). The doctrine serves to ensure petitioners will first seek relief in accordance with state procedures, *see Presnell v. Kemp*, 835 F.2d 1567, 1578-79 (11th Cir. 1988), *cert. denied*, 488 U.S. 1050, 109 S. Ct. 882, 102 L. Ed. 2d 1004 (1989), and to "lessen the injury to a State that results through reexamination of a state conviction on a ground that a State did not have the opportunity to address at a prior, appropriate time." *McCleskey v. Zant*, 499 U.S. 467, 111 S. Ct. 1454, 1470, 113 L. Ed. 2d 517 (1991).

*Johnson v. Singletary*, 938 F.2d 1166, 1173 (11th Cir. 1991) (emphasis added).[9]

Federal deference to a state court's clear finding of procedural default under its own rules is strong:

---

[9] When the last state court rendering judgment affirms without an explanation, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale," and "should then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The state can "rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed." *Id.*

"[A] state court need not fear reaching the merits of a federal claim in an *alternative* holding. Through its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law." *Harris*, 489 U.S. at 264 n.10, 109 S. Ct. 1038 (emphasis in original). *See also Alderman v. Zant*, 22 F.3d 1541, 1549-51 (11th Cir. 1994) (where a Georgia habeas corpus court found that the petitioner's claims were procedurally barred as successive, but also noted that the claims lack merit based on the evidence, "this ruling in the alternative did not have an effect . . . of blurring the clear determination by the [Georgia habeas corpus] court that the allegation was procedurally barred"), *cert. denied*, 513 U.S. 1061, 115 S. Ct. 673, 130 L. Ed. 2d 606 (1994).

*Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (alterations and emphasis in original).

The Supreme Court defines an "adequate and independent" state court decision as one that "'rests on a state law ground that is *independent* of the federal question and *adequate* to support the judgment.'" *Lee v. Kemna,* 534 U.S. 362, 375 (2002) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)) (emphasis in *Lee*). The questions of whether a state procedural rule is "independent" of the federal question and "adequate" to support the state court's judgment, so as to have a preclusive effect on federal review of the claim, "'is itself a federal question.'" *Id*. (quoting *Douglas v. Alabama*, 380 U.S. 415, 422 (1965)).

To be considered "independent" of the federal question, "the state court's decision must rest solidly on state law grounds, and may not be 'intertwined with an interpretation of federal law.'" *Judd v. Haley,* 250 F.3d 1308, 1313 (11th Cir. 2001) (quoting *Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990)). An example of intertwining would be when "the State has made application of the procedural bar depend on an antecedent ruling on federal law, that is, on the determination of whether federal constitutional error has been committed." *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985). Stated differently, if "the state court must rule, either explicitly or implicitly,

on the merits of the constitutional question" before applying the state's procedural rule to a federal constitutional question, then the rule is *not* independent of federal law. *Id.*

To be considered "adequate" to support the state court's judgment, the state procedural rule must be both "'firmly established and regularly followed.'" *Lee v. Kemna,* 534 U.S. at 375 (quoting *James v. Kentucky*, 466 U.S. 341, 348 (1984)). In other words, the rule must be "clear [and] closely hewn to" by the state for a federal court to consider it as adequate. *James*, 466 U.S. at 346. That does not mean that the state's procedural rule must be rigidly applied in every instance, or that occasional failure to do so will render the rule inadequate. "To the contrary, a [state's] discretionary [procedural] rule can be 'firmly established' and 'regularly followed' — even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Beard v. Kindler*, 558 U.S. 52, 60-61 (2009). Rather, the adequacy requirement means only that the procedural rule "must not be applied in *an arbitrary or unprecedented fashion*." *Judd*, 250 F.3d at 1313 (emphasis added).

Thus, in summary, if the procedural rule is not firmly established, or if it is applied in an arbitrary, unprecedented, or manifestly unfair fashion, it will not be considered adequate, and the state court decision based upon such a rule can be reviewed by a federal court. *Card*, 911 F.2d at 1517. Conversely, if the rule is deemed adequate, the decision will not be reviewed by this court.

### 2. Overcoming procedural default

Generally, there are three circumstances in which an otherwise valid state-law ground will *not* bar a federal habeas court from considering a constitutional claim that was procedurally defaulted in state court: (1) where the petitioner demonstrates that he had good "cause" for not following the state procedural rule, *and*, that he was actually "prejudiced" by the alleged

constitutional violation; *or* (2) where the state procedural rule was not "firmly established and regularly followed"; *or* (3) where failure to consider the petitioner's claims will result in a "fundamental miscarriage of justice." *See Edwards v. Carpenter*, 529 U.S. 446, 455 (2000) (Breyer, J., concurring); *see, e.g.*, *Coleman*, 501 U.S. at 749-50 (holding that a state procedural default "will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice") (citations and internal quotation marks omitted); *Murray v. Carrier*, 477 U.S. 478, 496 (1986) ("[W]here a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."); *Smith v. Murray*, 477 U.S. 527, 537 (1986) (same); *Davis v. Terry*, 465 F.3d 1249, 1252 n.4 (11th Cir. 2006) ("It would be considered a fundamental miscarriage of justice if 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'") (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (in turn quoting *Murray*, 477 U.S. at 496)).

### a.     The "cause and prejudice" standard

"A federal court may still address the merits of a procedurally defaulted claim if the petitioner can show cause for the default *and* actual prejudice resulting from the alleged constitutional violation." *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010) (citing *Wainwright v. Sykes*, 433 U.S. 72, 84-85 (1977)) (emphasis added). This so-called "cause *and* prejudice" standard is clearly framed in the conjunctive; therefore, a petitioner must prove both parts.

### i. "Cause"

To show "cause," a petitioner must prove that "some objective factor external to the defense impeded counsel's efforts" to raise the claim in the state courts. *Carrier*, 477 U.S. at 488; *see also Amadeo v. Zant*, 486 U.S. 214, 221-22 (1988).

> Objective factors that constitute cause include "'interference by officials'" that makes compliance with the State's procedural rule impracticable, and "a showing that the factual or legal basis for a claim was not reasonably available to counsel." In addition, constitutionally "[i]neffective assistance of counsel . . . [on direct review] is cause." Attorney error short of ineffective assistance of counsel [on direct review], however, does not constitute cause and will not excuse a procedural default.

*McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991) (citations omitted) (first alteration in original, all other alterations added).

While "[a]ttorney error [on direct review] that constitutes ineffective assistance of counsel" has long been accepted as "cause" to overcome a procedural default, the constitutional ineffectiveness of post-conviction counsel on collateral review generally will not support a finding of cause and prejudice to overcome a procedural default. *Coleman*, 501 U.S. at 754. This is the case because "[t]here is no right to counsel in state post-conviction proceedings." *Id.* at 752 (citing *Pennsylvania v. Finley*, 481 U.S. 551 (1987); *Murray v. Giarratano*, 492 U.S. 1 (1989)).

Even so, in two recent landmark cases, the Supreme Court extended its prior decision in *Coleman* by deciding that, as a matter of equity, and, under specific, limited circumstances, errors by counsel on post-conviction collateral review could establish the necessary "cause" to overcome a procedurally defaulted claim. In the first such case, *Maples v. Thomas*, 565 U.S. 266 (2012), the Supreme Court found that post-conviction counsel's gross professional misconduct (*e.g.*, abandonment of the petitioner) severed the agency relationship between counsel and the

petitioner and, thus, established the necessary "cause" to overcome a procedural default. *Id.* at 281.

In the second case, *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court held that post-conviction counsel's failure to raise an ineffective assistance of trial counsel claim at an initial review collateral proceeding could serve as the necessary "cause" to overcome the procedural default of that type of claim when the state prohibits it from being raised during the direct review process. *Id.* at 11-12.

### ii. "Prejudice"

In addition to proving the existence of "cause" for a procedural default, a habeas petitioner must show that he was actually "prejudiced" by the alleged constitutional violation. He must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and *substantial* disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis added); *see also McCoy v. Newsome*, 953 F.2d 1252, 1261 (11th Cir. 1992) (per curiam). If the "cause" is of the type described in *Martinez v. Ryan*, then the reviewing court should consider whether the petitioner can demonstrate "that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 566 U.S. at 12-15 (citing for comparison *Miller-El v. Cockrell*, 537 U.S. 322 (2003) (describing standards for certificates of appealability to issue)).

### b. The "fundamental miscarriage of justice" standard

In a "rare," "extraordinary," and "narrow class of cases," a federal court may consider a procedurally defaulted claim in the absence of a showing of "cause" for the default if *either*: (a) a fundamental miscarriage of justice "has probably resulted in the conviction of one who is actually innocent," *Smith*, 477 U.S. at 537-38 (quoting *Carrier*, 477 U.S. at 496); *or* (b) the petitioner shows "by *clear and convincing* evidence that[,] but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup*, 513 U.S. at 323-27 & n.44 (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)) (emphasis in *Schlup*); *see also, e.g.*, *Smith*, 477 U.S. at 537-38.

### C. The Statutory Overlay: The Effect of the Antiterrorism and Effective Death Penalty Act of 1996 on Habeas Review

The writ of habeas corpus "has historically been regarded as an extraordinary remedy." *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993). That is especially true when federal courts are asked to engage in habeas review of a state court conviction pursuant to 28 U.S.C. § 2254.

> Direct review is the principal avenue for challenging a conviction. "When the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction and sentence. The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, *is secondary and limited. Federal courts are not forums in which to relitigate state trials.*"

*Id.* (emphasis added) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983)). "Those few who are ultimately successful [in obtaining federal habeas relief] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation." *Fay v. Noia*, 372 U.S. 391, 440-41 (1963).

"Accordingly, . . . an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *Brecht*, 507 U.S. at 634. That is due to the fact that, under the federal system of governments created by the United States Constitution,

> [t]he States possess primary authority for defining and enforcing the criminal law. In criminal trials they also hold the initial responsibility for vindicating constitutional rights. Federal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights.

*Engle v. Isaac*, 456 U.S. 107, 128 (1982).[10]

Congress legislated these principles in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which amended preexisting habeas law.[11] Indeed, several provisions of AEDPA require federal courts to give even greater deference to state court determinations of federal constitutional claims than before.

### 1.    28 U.S.C. § 2254(e)(1)

Section 2254(e)(1) requires district courts to presume that a state court's factual determinations are correct, unless the habeas petitioner rebuts the presumption of correctness with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *see also, e.g.*, *Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001) (observing that § 2254(e)(1) provides "a highly deferential

---

[10] "The reason most frequently advanced in our cases for distinguishing between direct and collateral review is the State's interest in the finality of convictions that have survived direct review within the state court system." *Brecht*, 507 U.S. at 635 (citing *Wright v. West*, 505 U.S. 277, 293 (1992); *McCleskey*, 499 U.S. at 491; and *Wainwright*, 433 U.S. at 90).

[11] The Antiterrorism and Effective Death Penalty Act ("AEDPA") was signed into law by President Clinton on April 24, 1996. *See* Pub. L. No. 104-132, 110 Stat. 1214 (1996). The present petition was filed after that date. Accordingly, the habeas statutes as amended by AEDPA apply to the claims asserted in this case. *See Id*. § 107(c), 110 Stat. at 1226; *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005) (applying AEDPA to habeas petitions filed after Act's effective date); *Hightower v. Schofield*, 365 F.3d 1008, 1013 (11th Cir. 2004) (same). *See also Martin v. Hadix*, 527 U.S. 343, 356 (1999) (discussing retroactivity of AEDPA amendments to § 2254). *Cf. Lindh v. Murphy*, 521 U.S. 320, 327 (1997) (holding that AEDPA's amendments do not apply to habeas petitions filed prior to the Act's effective date); *Johnson v. Alabama*, 256 F.3d 1156, 1169 (11th Cir. 2001) (same); *Thompson v. Haley*, 255 F.3d 1292, 1295 (11th Cir. 2001) (same).

standard of review for factual determinations made by a state court"). Section 2254(e)(1) "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 403-04 (2000)).

The deference that attends state court findings of fact pursuant to Section 2254(e)(1) applies to all habeas claims, regardless of their procedural stance. Thus, a presumption of correctness must be afforded to a state court's factual findings, even when the habeas claim is being examined *de novo*. *See Mansfield v. Secretary, Department of Corrections*, 679 F.3d 1301, 1313 (11th Cir. 2012) (acknowledging the federal court's obligation to accept a state court's factual findings as correct, if unrebutted by clear and convincing evidence, and proceeding to conduct a *de novo* review of the habeas claim).

The presumption of correctness also applies to habeas claims that were adjudicated on the merits by the state court and, therefore, those claims are subject to the standards of review set out in 28 U.S.C. § 2254(d)(1) or (d)(2) discussed in the following section.

**2.      28 U.S.C. § 2254(d)**

"By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). It does not matter whether the state court decision contains a lengthy analysis of the claim, or is a summary ruling "unaccompanied by explanation." *Id.*

Further, the "backward-looking language" of the statute requires an examination of the state court decision on the date it was made. *Cullen v. Pinholster*, 563 U.S. 170 (2011). That is,

"[s]tate court decisions are measured against [the Supreme] Court's precedents as of 'the time the state court renders its decision.'" *Id.* at 182 (quoting *Lockyer v. Andrade*, 588 U.S. 63, 71-72 (2003)).

Finally, "review under § 2254(d)(1) [and (d)(2)] is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.* at 181. Therefore, a federal habeas court conducting 2254(d) review should not consider new evidence "in the first instance effectively *de novo*." *Id.* at 182.

A closer look at the separate provisions of 28 U.S.C. § 2254(d)(1) and (d)(2) reveals that when a state court has made a decision on a petitioner's constitutional claim, habeas relief cannot be granted unless it is determined that the state court's adjudication of the claim either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).[12]

The "contrary to" and "unreasonable application" clauses of § 2254(d) have been interpreted as "independent statutory modes of analysis." *Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006) (citing *Williams,* 529 U.S. at 405-07).[13] When considering a state court's

---

[12] Section 2254(d)(1)'s reference to "clearly established federal law, as determined by the Supreme Court of the United States" has been interpreted by the Supreme Court as referencing only "the *holdings*, as opposed to the *dicta*, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412 (O'Connor, J., majority opinion) (emphasis added); *see also, e.g., Carey v. Musladin*, 549 U.S. 70, 74 (2006) (same); *Osborne v. Terry*, 466 F.3d 1298, 1305 (11th Cir. 2006) (same); *Warren v. Kyler*, 422 F.3d 132, 138 (3rd Cir. 2005) ("[W]e do not consider those holdings as they exist today, but rather as they existed as of the time of the relevant state-court decision.") (internal quotation marks and citation omitted).

[13] *See also Williams*, 529 U.S. at 404 (O'Connor, J., majority opinion) ("Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on

adjudication of a petitioner's claim, therefore, the habeas court must not conflate the two modes of analysis.

### a.    The meaning of § 2254(d)(1)'s "contrary to" clause

A state court determination can be "contrary to" clearly established Supreme Court precedent in at least two ways:

> First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.

*Williams*, 529 U.S. at 405. *See also, e.g.*, *Brown v. Payton*, 544 U.S. 133, 141 (2005) (same); *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam) (same); *Putman v. Head*, 268 F.3d 1223, 1240-41 (11th Cir. 2001) (same).

As the Eleventh Circuit has noted, the majority opinion in *Williams* does not limit the construction of § 2254(d)(1)'s "contrary to" clause to the two examples set forth above.[14] Instead,

---

the merits in state court. Under the statute, a federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) *'contrary to* . . . clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) *'involved an unreasonable application of* . . . clearly established Federal law, as determined by the Supreme Court of the United States.'") (emphasis added).

[14] Indeed, as one commentator has observed, the possible permutations are not just two, but at least four in number:

> The word "contrary" denotes incompatibility or logical inconsistency. Two propositions are incompatible with one another if both cannot be true or correct. Thus, a state court decision is contrary to federal law if that decision and the applicable federal law cannot both be true or correct. Given this premise, there appear to be four possible combinations of state court adjudications and resulting decisions that are pertinent to this textual inquiry:
>
> •    the state court applies the correct federal standard and arrives at a correct outcome;
>
> •    the state court applies an incorrect federal standard and arrives at an incorrect outcome;
>
> •    the state court applies an incorrect federal standard and arrives at a correct outcome; and,

the statutory language "simply implies that 'the state court's decision must be substantially different from the relevant precedent of [the Supreme] Court.'" *Alderman*, 468 F.3d at 791 (quoting *Williams*, 529 U.S. at 405).

### b. The meaning of § 2254(d)(1)'s "unreasonable application" clause

A state court's determination of a federal constitutional claim can result in an "unreasonable application" of clearly established Supreme Court precedent in either of two ways:

> First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Williams*, 529 U.S. at 407. *See also, e.g.*, *Putman*, 268 F.3d at 1240-41 (same).

It is important to note that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410 (emphasis in original). A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law *erroneously* or *incorrectly*. Rather, that application must also be unreasonable." *Id.* at 411 (emphasis added).

In other words, the question that should be asked is not whether the state court "correctly" applied Supreme Court precedent when deciding the federal constitutional issue, but whether the

---

•       the state court applies the correct federal standard and arrives at an incorrect outcome.

Allan Ides, *Habeas Standards of Review Under 28 U.S.C. § 2254(d)(1): A Commentary on Statutory Text and Supreme Court Precedent*, 60 WASH. & LEE L. REV. 677, 685 (2003) (footnotes omitted).

state court's determination was "unreasonable." *Id.* at 409 ("[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable."). *See also, e.g.*, *Bell*, 535 U.S. at 694 (observing that the "focus" of the inquiry into the reasonableness of a state court's determination of a federal constitutional issue "is on whether the state court's application of clearly established federal law is objectively unreasonable," and stating that "an unreasonable application is different from an incorrect one"); *Harrington v. Richter*, 562 U.S. 86, 100-103 (2011) (same).[15]

In order to demonstrate that a state court's application of clearly established federal law was "objectively unreasonable," the habeas petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87. Stated another way, if the state-court's resolution of a claim is debatable among fairminded jurists, it is not objectively unreasonable.

"By its very language, [the phrase] 'unreasonable application' refers to mixed questions of law and fact, when a state court has 'unreasonably' applied clear Supreme Court precedent to the facts of a given case." *Neelley v. Nagle*, 138 F.3d 917, 924 (11th Cir. 1998) (citation and footnote omitted). Mixed questions of constitutional law and fact are those decisions "which require the

---

[15] The Eleventh Circuit has observed that § 2254(d)(1)'s "unreasonable application" provision is the proper statutory lens for viewing the "run-of-the-mill state-court decision applying the correct legal rule." *Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006).

> In other words, if the state court identified the correct legal principle but unreasonably applied it to the facts of a petitioner's case, then the federal court should look to § 2254(d)(1)'s "unreasonable application" clause for guidance. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was *objectively* unreasonable."

*Id.* (quoting *Williams*, 529 U.S. at 409).

application of a legal standard to the historical-fact determinations." *Townsend v. Sain*, 372 U.S. 293, 309 n.6 (1963).

### c. The meaning of § 2254(d)(2)'s clause addressing an "unreasonable determination of the facts in light of the evidence presented in the state court proceeding"

Title 28 U.S.C. § 2254(d)(2) "imposes a 'daunting standard – one that will be satisfied in relatively few cases.'" *Cash v. Maxwell*, 565 U.S. 1138, 132 S. Ct. 611, 612 (2012) (Sotomayor, J., respecting denial of certiorari) (quoting *Maxwell v. Roe*, 628 F.3d 486, 500 (9th Cir. 2010)). As the Supreme Court has noted,

> in related contexts, "[t]he term 'unreasonable' is no doubt difficult to define." *Williams v. Taylor,* 529 U.S. 362, 410, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). It suffices to say, however, that a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance. *Cf. Id.,* at 411, 120 S. Ct. 1495.

*Wood v. Allen,* 558 U.S. 290, 301 (2010). Therefore, "even if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination." *Id.* (quoting *Rice v. Collins,* 546 U.S. 333, 341-42 (2006)) (alteration in original). Conversely, "when a state court's adjudication of a habeas claim result[s] in a decision that [i]s based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, this Court is not bound to defer to unreasonably-found facts or to the legal conclusions that flow from them." *Adkins v. Warden, Holman Correctional Facility*, 710 F.3d 1241, 1249 (11th Cir. 2013) (quoting *Jones v. Walker*, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008) (en banc) (alterations in original).

**d. Evaluating state court factual determinations under 28 U.S.C. §§ 2254(d)(2) and (e)(1)**

As set out previously, 28 U.S.C. § 2254(d)(2) regulates federal court review of state court findings of fact. That provision limits the availability of federal habeas relief on any claims by a state prisoner that are grounded in a state court's factual findings, unless the state court's findings were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Moreover, it must be remembered that 28 U.S.C. § 2254(e)(1) provides that factual determinations made by a state court are "presumed to be correct," and that the habeas petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *See* 28 U.S.C. § 2254(e)(1); *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010) (holding that the presumption of correctness attending a state court's findings of fact can be overcome only by clear and convincing evidence).

Nevertheless, there is Eleventh Circuit authority which indicates that the manner in which subsections 2254(d)(2) and (e)(1) relate to one another remains an open question. *See Cave v. Secretary for Department of Corrections*, 638 F.3d 739, 744-45 (11th Cir. 2011) ("'[N]o court has fully explored the interaction of § 2254(d)(2)'s 'unreasonableness' standard and § 2254(e)(1)'s 'clear and convincing evidence' standard.") (quoting *Gore v. Secretary for Department of Corrections*, 492 F.3d 1273, 1294 n.51 (11th Cir. 2007)).

Even so, the Eleventh Circuit's earlier opinion in *Ward v. Hall* clearly held that federal habeas courts "must presume the state court's factual findings to be correct unless the petitioner rebuts that presumption by clear and convincing evidence." *Id.* at 1177 (citing § 2254(e)(1); *Parker v. Head*, 244 F.3d 831, 835-36 (11th Cir. 2001)). That same opinion also observed that 28

U.S.C. § 2254(e)(1) "commands that for a writ to issue because the state court made an 'unreasonable determination of the facts,' the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'" *Ward*, 592 F.3d at 1155 (alteration in original).

### D. The Burden of Proof and Heightened Pleading Requirements for Habeas Petitions

Federal habeas "exists only to review errors of constitutional dimension." *McFarland v. Scott*, 512 U.S. 849, 856 (1994); *see also* 28 U.S.C. § 2254(a).[16] Further, "[w]hen the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction and sentence." *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983). Two consequences flow from those fundamental propositions.

First, the habeas petitioner bears the burden of overcoming the presumption of "legality" that attaches to the state court conviction and sentence, and of establishing a factual basis demonstrating that federal post-conviction relief should be granted. *See, e.g.*, 28 U.S.C. §§ 2254(d) and (e)(1);[17] *Hill v. Linahan*, 697 F.2d 1032, 1036 (11th Cir. 1983) ("The burden of

---

[16] Title 28 U.S.C. § 2254(a) provides that the "Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." It follows that claims pertaining solely to questions of state law fall outside the parameters of this court's authority to provide relief under § 2254.

[17] As discussed previously, Section 2254(d) provides that the state courts' adjudication of a habeas petitioner's claims can be overturned only if the petitioner carries the burden of demonstrating that a particular determination *either* (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," *or* (2) that the ruling "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Further, § 2254(e)(1) provides that:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

proof in a habeas proceeding is always on the petitioner.") (citing *Henson v. Estelle*, 641 F.2d 250, 253 (5th Cir. 1981)).

Second, the habeas petitioner must meet "heightened pleading requirements." *McFarland v. Scott*, 512 U.S. 849, 856 (1994); *Borden v Allen*, 646 F.3d 785, 810 (11th Cir. 2011) (holding that Section 2254 requires "fact pleading," and not merely "notice pleading"). The mere assertion of a ground for relief, without sufficient factual detail, does not satisfy either the petitioner's burden of proof under 28 U.S.C. § 2254(e)(1), or the requirements of Rule 2(c) of the *Rules Governing Section 2254 Cases in the United States District Courts*, which requires a state prisoner to "specify all the grounds for relief available to the petitioner," and to then "state the facts supporting each ground." Rule 2(c)(1) and (2), *Rules Governing Section 2254 Cases in the United States District Courts*. *See also* 28 U.S.C. § 2242 (stating that an application for writ of habeas corpus "shall allege the facts concerning the applicant's commitment or detention").

In short, a habeas petitioner must include in his statement of each claim sufficient supporting facts to justify a decision for the petitioner if the alleged facts are proven true. *See, e.g.*, *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (observing that a habeas petition must "state facts that point to a 'real possibility of constitutional error'") (quoting Advisory Committee Notes to Rule 4 of the *Rules Governing Section 2254 Cases in the United States District Courts*). *Cf. Diaz v. United States*, 930 F.2d 832, 835 (11th Cir. 1991) (holding in a case premised upon 28 U.S.C. § 2255 that, despite the liberal construction due a *pro se* petitioner's allegations, dismissal was appropriate because the movant did not allege "facts that, if proven, would entitle him to relief").[18]

---

[18] *Cf. Hill v. Lockart*, 474 U.S. 52, 60 (1986) ("Petitioner did not allege in his habeas petition that, had counsel correctly informed him about his parole eligibility date, he would have pleaded not guilty and insisted on

In addition, "[c]itation of the controlling constitutional, statutory, or other bases for relief for each claim also should be stated." 1 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 11.6, at 654 (5th ed. 2005). As another district court has held:

> It is not the duty of federal courts to try to second guess the meanings of statements and intentions of petitioners. Rather the duty is upon the individual who asserts a denial of his constitutional rights to come forth with a statement of sufficient clarity and sufficient supporting facts to enable a court to understand his argument and to render a decision on the matter.

*Nail v. Slayton*, 353 F. Supp. 1013, 1019 (W.D. Va. 1972).

E.      **Ineffective Assistance of Counsel Claims**[19]

Federal ineffective assistance of counsel claims are specifically limited to the performance of attorneys who represented a state prisoner at trial, or on direct appeal from the conviction. *See* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."). *See also Coleman v. Thompson*, 501 U.S. 722, 752 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings.").

The Supreme Court's "benchmark" standard for determining ineffective assistance is well established. The question is whether a trial or appellate attorney provided representational

_____

going to trial. He alleged no special circumstances that might support the conclusion that he placed particular emphasis on his parole eligibility in deciding whether or not to plead guilty.").

[19] An introduction to ineffective assistance of counsel claims is included here because of the relationship between such claims – which are governed by a highly deferential standard of constitutional law – and 28 U.S.C. § 2254(d), which is itself an extremely deferential standard of habeas review.

assistance to a state prisoner that was so professionally incompetent as to create issues of federal constitutional proportions. In other words, the court asks "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). If an objective answer to that question is "yes," then counsel was constitutionally ineffective. *Strickland* requires that the issue be approached in two steps:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. *First, the defendant must show that counsel's performance was deficient*. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *Second, the defendant must show that the deficient performance prejudiced the defense*. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id*. at 687 (emphasis added); *see also, e.g.*, *Williams*, 529 U.S. at 390 (same); *Grayson v. Thompson*, 257 F.3d 1194, 1215 (11th Cir. 2001) (same).

Both parts of the *Strickland* standard must be satisfied: that is, a habeas petitioner bears the burden of proving, by "a preponderance of competent evidence," that (1) the performance of his trial or appellate attorney was *deficient*; *and* (2) that such deficient performance *prejudiced his defense*. *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc). Thus, a federal court is not required to address both parts of the *Strickland* standard when the habeas petitioner makes an insufficient showing on one of the prongs. *See, e.g.*, *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.") (citation to *Strickland* omitted).

### 1.     The performance prong

"The burden of persuasion is on the petitioner to prove by a preponderance of the evidence that counsel's performance was unreasonable." *Stewart v. Secretary, Department of Corrections*, 476 F.3d 1193, 1209 (11th Cir. 2007) (citing *Chandler*, 218 F.3d at 1313). To satisfy the performance prong of the *Strickland* test, a defendant must prove that counsel made errors so serious that he or she was not functioning as the counsel guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. The standard for gauging attorney performance is "reasonableness under prevailing professional norms." *Id*. at 688; *see also, e.g.*, *Williams*, 529 U.S. at 390-91 (same); *Darden v. Wainwright*, 477 U.S. 168, 184 (1986) (same); *Chandler*, 218 F.3d at 1313 (same). "The test of reasonableness is not whether counsel could have done something more or different," but whether counsel's performance "fell within the broad range of reasonable assistance at trial." *Stewart*, 476 F.3d at 1209 (citing *Chandler*, 218 F.3d at 1313). Furthermore, courts must "recognize that 'omissions are inevitable, but, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" *Id*. (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)). The Sixth Amendment does not guarantee a defendant the very best counsel or the most skilled attorney, but only an attorney who performed reasonably well within the broad range of professional norms. "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992).

The reasonableness of counsel's performance is judged from the perspective of the attorney at the time of the alleged error and in light of all the circumstances. *See, e.g.*, *Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001) (giving lawyers "the benefit of the doubt for 'heat of the battle' tactical decisions"); *Mills v. Singletary*, 161 F.3d 1273, 1285-86 (11th Cir. 1998) (noting that *Strickland* performance review is a "deferential review of all of the circumstances from the perspective of counsel at the time of the alleged errors").

> Under this standard, there are no "absolute rules" dictating what reasonable performance is or what line of defense must be asserted. [*Chandler*, 218 F.3d] at 1317. Indeed, as we have recognized, "[a]bsolute rules would interfere with counsel's independence — which is also constitutionally protected — and would restrict the wide latitude counsel have in making tactical decisions." *Putman v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001).

*Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005) (first alteration added, second alteration in original). Judicial scrutiny of counsel's performance must be "highly deferential," because representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another. *See Strickland*, 466 U.S. at 697. Indeed, reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689.

> It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; *that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy*. There are countless ways to provide effective assistance in any

given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland*, 466 U.S. at 689 (emphasis added) (citations and internal quotation marks omitted); *see also, e.g.*, *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994) ("When reviewing whether an attorney is ineffective, courts should always presume strongly that counsel's performance was reasonable and adequate.") (internal quotation marks omitted).

"Based on this strong presumption of competent assistance, the petitioner's burden of persuasion is a heavy one: '*petitioner must establish that no competent counsel would have taken the action that his counsel did take*.'" *Stewart*, 476 F.3d at 1209 (quoting *Chandler*, 218 F.3d at 1315) (emphasis added). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds *unless it is shown that no reasonable lawyer*, *in the circumstances*, *would have done so*." *Rogers*, 13 F.3d at 386 (emphasis added).

## 2.     The prejudice prong

"A petitioner's burden of establishing that his lawyer's deficient performance prejudiced his case is also high." *Van Poyck v. Florida Department of Corrections*, 290 F.3d 1318, 1322 (11th Cir. 2002). *See also, e.g.*, *Gilreath v. Head*, 234 F.3d 547, 551 (11th Cir. 2000) (holding that a habeas petitioner "must affirmatively prove prejudice, because '[a]ttorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial'") (quoting *Strickland*, 466 U.S. at 693) (alteration in original). "It is not enough for the [habeas petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693; *see also Harrington*, 562 U.S. at 111-112 ("The

likelihood of a different result must be *substantial*, not just conceivable.") (emphasis added) (citing *Strickland*, 466 U.S. at 693).

Instead, to prove prejudice, the habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Williams*, 529 U.S. at 391 (same). When that standard is applied in the context of the death sentence itself, "'the question is whether there is a reasonable probability that, absent the errors, the sentencer [*i.e.*, in Alabama, the trial court judge] . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Stewart*, 476 F.3d at 1209 (quoting *Strickland*, 466 U.S. at 695).

That is a high standard, and in order to satisfy it a petitioner must present competent evidence proving "that trial counsel's deficient performance deprived him of 'a trial whose result is reliable.'" *Brown v. Jones*, 255 F.3d 1272, 1278 (11th Cir. 2001) (quoting *Strickland*, 466 U.S. at 687). In other words, "[a] finding of prejudice requires proof of unprofessional errors so egregious that the trial was rendered unfair and the verdict rendered suspect." *Johnson*, 256 F.3d at 1177 (quoting *Eddmonds v. Peters*, 93 F.3d 1307, 1313 (7th Cir. 1996) (in turn quoting *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986))) (internal quotation marks omitted).

### 3. Deference accorded state court findings of historical fact and decisions on the merits when evaluating ineffective assistance of counsel claims

State court findings of historical fact made in the course of evaluating a claim of ineffective assistance of counsel are subject to a presumption of correctness under 28 U.S.C. § 2254(d)(2) and (e)(1). *See, e.g.*, *Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001). To

overcome a state-court finding of fact, the petitioner bears the burden of proving contrary facts by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Additionally, under AEDPA, a federal habeas court may grant relief on a claim of ineffective assistance of counsel *only if* the state-court determination involved an "unreasonable application" of the *Strickland* standard to the facts of the case. *Strickland* itself, of course, also requires an assessment of whether counsel's conduct was professionally unreasonable. Those two assessments cannot be conflated into one. *See Harrington,* 562 U.S. at 101-02. Thus, habeas relief on a claim of ineffective assistance of counsel can be granted with respect to a claim actually decided by the state courts only if the habeas court determines that it was "objectively unreasonable" for the state courts to find that counsel's conduct was not "professionally unreasonable." As the *Harrington* Court explained:

> "Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. [356], [371-372], 130 S. Ct. 1473, 1485, 176 L. Ed. 2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690, 104 S. Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S. Ct. 2052; see also *Bell v. Cone*, 535 U.S. 685, 702, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S. Ct. 2052.

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and §

2254(d) are both "highly deferential," *Id.*, at 689, 104 S. Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*], 556 U.S., at [125], 129 S. Ct. at 1420 [(2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at [123], 129 S. Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 105; *see also Premo v. Moore*, 562 U.S. 115, 121-23 (2011).

## V. McWHORTER'S CLAIMS

McWhorter asserts a number of claims in his petition. The court addresses each of them below.

### A. McWhorter's Claim That He Was Denied the Right to an Impartial Jury Because a Juror Intentionally Hid Critical Facts During *Voir Dire*

During *voir dire*, defense counsel presented the potential jurors with a questionnaire. In question 21, the veniremembers were asked: "Have you or any member of your family or anyone you know ever been the victim of a crime?" (Doc. 1 at 11). Anyone answering "yes" to that question was directed to identify the type of crime, their relationship to the victim, and whether there was an arrest or conviction. (*Id.*). Juror Linda Burns answered "no" to question 21. (*Id.*). The defense later learned that Ms. Burns' father had drowned when she was a child, and there was some confusion as to whether it was an accident or the result of a crime. (*Id.* at 12-15).

### 1. The Parties' Arguments

McWhorter alleges that Juror Burns intentionally hid critical facts from the defense during *voir dire*, violating his right to a fair trial by a panel of "indifferent jurors," in violation of *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) and *McDonough Power Equip., Inc. v. Greenwood*, 464

U.S. 548 (1984). (Vol. 1 at 10-26). McWhorter unsuccessfully raised this claim in his Rule 32 petition and on appeal from the denial of his Rule 32 petition. The Rule 32 court denied the claim after conducting an evidentiary hearing at which Juror Burns testified extensively. (Vol. 25, Tab 60 at 40-90; Vol. 26 at 110-26).

Respondent counters that McWhorter is not entitled to relief because, in addressing this claim on appeal from the denial of his Rule 32 petition, the Alabama Court of Criminal Appeals properly applied clearly established federal law and denied the claim. (Doc. 14 at 11-15).

### 2. Analysis

McWhorter argues that the decision of the Alabama Court of Criminal Appeals was contrary to and involved an unreasonable application of *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) and *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548 (1984). In *Irvin*, the Court held that "[i]n essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." 366 U.S. 717, 722 (citing *In re Oliver*, 333 U.S. 257 (1948) and *Tumey v. State of Ohio*, 273 U.S. 510 (1927)).

In *McDonough*, the Court concluded that "[v]oir dire examination serves to protect that right by exposing possible biases, both known and unknown, on the part of potential jurors." 464 U.S. at 554. "[T]o obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *Id*. at 556.

The first prong requires a determination of whether the juror answered honestly, "that is, whether he was *aware* of the fact that his answers were false." *United States v. Perkins*, 748 F.2d

1519, 1531 (11th Cir.1984). The second prong – whether a correct response would have provided a valid basis for a cause challenge – requires the party seeking a new trial because of a juror's nondisclosure during *voir dire* to show actual bias. *Id.* at 1532.

During the Rule 32 evidentiary hearing, Juror Burns testified extensively about the death of her father:

> [POSTCONVICTION COUNSEL:] [Juror L.B.], once again, could you tell us what happened to your father, and could you indicate, you know, what, if anything, is based on things you saw and what is based on what you heard?
>
> [JUROR L.B.:] Okay. My mother and my two brothers and I were woke up one morning about 2:00 o'clock in the morning.
>
> This is still hard for me.
>
> [POSTCONVICTION COUNSEL:] I understand.
>
> [JUROR L.B.:] And we was told that my father and two other men were at a rock mine pond. And my mother went and got my uncle up, which was my daddy's brother. And he took us up there. And they would not let us go down there.
>
> And about 11:00 o'clock that morning, a police officer came to our house and told us that they were fixing to blow the dam, and that they believed that my father was—had run. There was another man that was killed there that day. He was beat to death.
>
> And so they told us that they were going to send a diver down one more time and if they didn't find anything then they were going to blow the dam. When they sent a diver down, they found my father. And he was dead, naturally.
>
> We were told that there were bruises around his neck, but when the autopsy came back it was said that he was drowned. The other man was beaten to death. And there was a trial. The other man that was there, he went and got the – his family and then went to the police station and got them and brought them back. Or they went out to the scene is all I know.
>
> I had just always thought that my father was killed because the other man was killed, and he was good friends with him, so I thought that he had been killed. And being a kid you always think that. You don't ever know. And so that's why I always thought my father was killed.

41

[POSTCONVICTION COUNSEL:] Now, you said that someone told you that your father had bruises on his neck. Who told you that?

[JUROR L.B.:] My uncles. My daddy's brothers.

[POSTCONVICTION COUNSEL:] Now, at the time, you were about 12 years old, right?

[JUROR L.B.:] Yes.

. . . .

[POSTCONVICTION COUNSEL:] Your memories of what happened to your father were and still are traumatic, something that's hard for you to talk about, isn't it?

[JUROR L.B.:] Yes.

[POSTCONVICTION COUNSEL:] And isn't it true that at some point along the way you have got emotional closure when someone told you that he worked on the case, and even though he couldn't get enough evidence to prove your father was murdered, that having worked on the case he did believe it?

[JUROR L.B.:] Believe that my father was murdered or that he drowned?

[POSTCONVICTION COUNSEL:] That your father was murdered?

[JUROR L.B.:] No. You got it backwards.

[POSTCONVICTION COUNSEL:] Okay. Well, you were – at the time that you – in 1994, at the time that you served on the jury in Casey McWhorter's case, did you believe that your father had been murdered?

[JUROR L.B.:] No.

[POSTCONVICTION COUNSEL:] You did not?

[JUROR L.B.:] No.

[POSTCONVICTION COUNSEL:] What was it, if anything, that happened between the time you were at trial, when you say you did [sic] believe he was murdered, and the time of Casey McWhorter's trial that led you to change your mind?

[JUROR L.B.:] I dated a guy that was going to law school, and he looked into the case of my father, and he told me that my father had drowned; that the autopsy had showed that my father had drowned.

[POSTCONVICTION COUNSEL:] Yes. And did he explain that because the autopsy showed that your father had drowned they were unable to prove that he had been murdered?

[JUROR L.B.:] No.

[POSTCONVICTION COUNSEL:] And isn't it true that the man we're talking about, the lawyer, said that because the autopsy couldn't prove the murder because it said drowned, that he still believed, based on all the evidence he knew about, that it was a murder?

[JUROR L.B.:] No.

. . . .

On cross-examination, Juror L.B. testified:

[STATE:] And do you remember that Question Number 21 he showed you, the question that says, '[W]ere you or anybody in your family a victim of a crime'?

[JUROR L.B.:] Uh-huh. Right.

[STATE:] And you did not answer that your father was a victim of a crime, right?

[JUROR L.B.:] Right. Did not.

[STATE:] Is it fair to say that you did not answer that your father was a victim of a crime because no one, in fact, had been charged with a crime in the death of your father?

[JUROR L.B.:] That's right.

[STATE:] And no one had ever been convicted in the death of your father, correct?

[JUROR L.B.:] That's right.

[STATE:] And you had personal knowledge that the autopsy officially said that he drowned?

[JUROR L.B.:] Right.

[STATE:] And that there was no indication other than what you had just heard through family rumors that he actually had been murdered?

[JUROR L.B.:] Yes.

[STATE:] So far as you were concerned, you were being completely honest and truthful when you answered that question?

[JUROR L.B.:] Yes, I was.

. . . .

[STATE:] Just to be clear, [Juror L.B.], you did not deliberately hide the story of your father's death when you were answering the jury questionnaire?

[JUROR L.B.:] No.

[STATE:] The way the question was worded on the jury questionnaire was, were you or any of your family members the victim of a crime, not just a victim?

[JUROR L.B.:] Right, yes.

[STATE:] And that there must have – without a criminal charge, without a criminal conviction, even, that you cannot have a family member who was a victim of a crime?

[JUROR L.B.:] Yes.

. . . .

[POSTCONVICTION COUNSEL:] Did you – but you believed, after hearing what everything that you heard about the incident, that your father had been killed, didn't you?

[JUROR L.B.:] Yes.

. . . .

[JUROR L.B.:] Okay. Is because I had always been told as a child that my father was killed by his family because they were the big bad boys, okay? And I'd always believed that. You know, because you don't think of your father as

drowning. You just don't think of that. And I just always thought that my father was killed.

I knew the man, and I knew his family, and I just thought that if he killed one, he'd kill both.

[POSTCONVICTION COUNSEL:] And is that what you thought in 1994 at the time that you served on the jury?

[JUROR L.B.:] I still believed that the man had something to do with my father's death. Whether he directly killed him or not, I do not know. Only God knows that. But I think he had something indirectly to do with it, yes.

[POSTCONVICTION COUNSEL:] You do. And was that a strong feeling on your part?

[JUROR L.B.:] Yes.

. . . .

[POSTCONVICTION COUNSEL:] [Juror L.B.], can you tell us what you said to your fellow jurors regarding the death of your father?

[JUROR L.B.:] That the man that had killed my father – I thought that had killed my father and another man did not serve the full time that he was in there. I don't even know how many years that he gave him. I thought it was ten and he only served like three or four and that he should have served more.

. . . .

[JUROR L.B.]: No. I didn't think he had killed my father. I think he had something to do with the death of my father. Whether or not he individually killed him, I do not know.

[POSTCONVICTION COUNSEL:] Well, did you believe that he, together with someone else, played a part in the killing?

[JUROR L.B.:] Well, when you say killing, the other man was killed. My father was drowned. Now, whether or not he was drowned on purpose, I do not know.

[POSTCONVICTION COUNSEL:] Did you –

[JUROR L.B.:] But I do know that he did play a part in the other death because he told him he did. He pled guilty to the other death.

[POSTCONVICTION COUNSEL:] And did you believe at that time that there was that it's quite possible that your father had been intentionally drowned?

[JUROR L.B.:] Yes. He could have been.

[POSTCONVICTION COUNSEL:] And that was your belief at that time in 1994?

[JUROR L.B.:] Well, that's been my belief all my life.

[POSTCONVICTION COUNSEL:] So you believed it all your life and up through and including the trial?

[JUROR L.B.:] Yeah.

*McWhorter*, 142 So. 3d 1195, 1214-17 (2011).

The circuit judge who heard her testimony found that:

She explained that she did not know how her father died. It was apparent from [Juror L.B.'s] testimony why she did not answer in the affirmative when asked whether she had a family member who had been the "victim of a crime." [Juror L.B.] testified that a friend, a law student, investigated the death and found an autopsy report that attributed her father's death to drowning, and she testified that, because no one ever was charged with a crime related to her father's death, much less convicted of one, that her father could not have been "the victim of a crime."

. . . .

Because [Juror L.B.] knew that her father's autopsy report indicated that he died by drowning and because she knew that no one ever had been charged with any crime related to her father's death, she reasonably did not disclose the story of her father's death in response to the defense's question of whether she or a member of her family had been the "victim of a crime." Thus, [Juror L.B.] did not commit juror misconduct.

*Id.* at 1218.

The Alabama Court of Appeals gave "great weight" to the trial court's credibility determination, concluding that McWhorter failed to prove that Juror Burns intentionally failed to answer question 21 honestly:

The record on direct appeal reveals that Juror L.B. did not indicate on her juror questionnaire or during *voir dire* that her father was a victim of a crime. She, however, indicated at all times when she was questioned at trial that she could be fair and impartial. At the postconviction evidentiary hearing, postconviction counsel questioned Juror L.B. extensively about her father's death. Although at times Juror L.B. appeared to waver in her responses to postconviction counsel's questioning or seemed confused about his questioning, as we indicated above, we cannot say that Juror L.B. failed to respond truthfully to the question posed on the juror questionnaire and by McWhorter's trial counsel during *voir dire* examination, especially in light of Juror L.B.'s testimony on cross-examination that established that she knew her father's death was the result of a drowning and that she did not believe he was a victim of a crime. Thus, based on these facts, this Court cannot conclude that the circuit court abused its discretion in denying McWhorter's claim because he failed to prove by a preponderance of the evidence that Juror L.B. was guilty of juror misconduct.

*Id.* at 1218-19.

The circuit judge also found that McWhorter failed to establish that Juror Burns' answer to question 21 prejudiced him in any way:

Even if [Juror L.B.]'s failure to disclose the story of her father's death constitutes juror misconduct, McWhorter has failed to establish prejudice. This claim is denied, in the alternative, for that reason.

Under Alabama law, the standard for determining whether juror misconduct warrants a new trial is "whether the misconduct might have prejudiced, not whether it actually did prejudice, the defendant." *Ex parte Dobyne*, 805 So.2d 763, 771 (Ala. 2001). "[T]he question whether the jury's decision might have been affected is answered not by a bare showing of juror misconduct, but rather by an examination of the circumstances particular to the case." *Ex parte Apicella*, 809 So.2d 865, 871 (Ala. 2001) (emphasis in original).

In determining whether a criminal defendant might have been prejudiced by a veniremember's failure to respond appropriately to a question, the Supreme Court of Alabama and the Alabama Court of Criminal Appeals have looked at the following factors: "temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective juror's inadvertence or willfulness in falsifying or failing to answer, the failure of the juror to recollect, and the materiality of the matter inquired about." *Dobyne*, 805 So.2d at 772; *Tomlin v. State*, 695 So.2d 157, 170 (Ala.Crim.App. 1996).

[Juror L.B.] was unequivocal that her father's death did not affect her role as a juror in McWhorter's capital murder trial. The following testimony occurred during the State's cross-examination of [Juror L.B.]:

> ASSISTANT ATTORNEY GENERAL: [Juror L.B.], is it fair to say that when—that when you voted for guilty for Mr. McWhorter you based that on the evidence at trial?
>
> [JUROR L.B.]: Yes.
>
> ASSISTANT ATTORNEY GENERAL: And when you voted for death, you based that on the evidence presented during the guilt phase?
>
> [JUROR L.B.]: Yes, sir, I did.

This Court believes [Juror L.B.]; therefore. McWhorter cannot show that [Juror L.B.]'s decisions as a juror 'might have been affected' by her father's death.

Looking to the factors listed in *Dobyne*, [Juror L.B.]'s role as a juror likely was not affected by her father's death. First, as to "temporal remoteness," [Juror L.B.] was an 11-year-old child when her father died, but McWhorter's trial did not take place until she was an adult, approximately 30 years later. (E.H. 77, 118.) Second, as for "the ambiguity of the question propounded," the question itself was straightforward enough, but [Juror L.B.]'s lack of certainty over how her father died made the story of his death less likely to have affected her role as a juror. Third, as to [Juror L.B.]'s "inadvertence or willfulness in falsifying or failing to answer," she affirmed that her father was not "at all in her mind" when she answered the questionnaire and that she "did not have an ax to grind" or want to "vindicate the death of her father through this trial." (E.H. 116, 119.)

[Juror L.B.]'s testimony during the evidentiary hearing establishes not only that she did not commit juror misconduct by failing to respond appropriately to questions asked by defense counsel during *voir dire* but also that she based her decisions as a juror in this case solely on the facts presented, and not at all on her father's death. As such, this claim is denied.

*Id.* at 1220-22.

The Alabama Court of Criminal Appeals likewise found McWhorter was not prejudiced

by Juror Burns' answer to question 21:

Here, Juror L.B. testified at the evidentiary hearing that she based her verdict on the testimony presented and on the trial court's instructions. More importantly, she said that the events surrounding her father's death had no bearing on her guilt-phase or penalty-phase verdict in McWhorter's case. We, like the circuit court, find no indication that McWhorter might have been prejudiced by Juror L.B.'s failure to respond that her father was a victim of a crime on the juror questionnaire or to a *voir dire* question. Accordingly, McWhorter is due no relief on this claim.

*Id*. at 1221.

The appellate court's findings – that McWhorter failed to prove that Juror Burns intentionally gave an answer she knew to be false, and failed to prove that Ms. Burns' answer prejudiced him in any way – are consistent with both *Irvin* and *McDonough*. McWhorter has not shown that the decision of the Alabama Court of Criminal Appeals was contrary to, or an unreasonable application of either case.

McWhorter also argues that the trial court's "virtually verbatim" adoption of the state's proposed order denying his Rule 32 petition was unreasonable. (Doc. 1 at 21). He points out that "[s]uch adoption has been criticized by the U.S. Supreme Court. *See Anderson v. Bessemer City*, 470 U.S. 564, 572 (1985)." (Doc. 1 at 21). He maintains that "[t]he consequence of the Court's verbatim adoption of the State's proposed order is most evident in the fact that the Court's opinion (like the State's proposed order) made no mention of the testimony cited above by Juror L.B. and Juror Stonecypher concerning the statements made by Juror L.B. to her fellow jurors during penalty-phase deliberations." (*Id.*).

When McWhorter presented this claim on appeal from the denial of his Rule 32 petition, the Alabama Court of Criminal Appeals denied it:

We also feel compelled to address a claim McWhorter presents in his brief and in his reply to this Court in a two-sentence argument. McWhorter argues that "it was apparent that [the circuit court] adopted the State's proposed findings of fact,

almost verbatim . . . only five phrases differed in any way from the State's proposed order." (McWhorter's brief, p. 18.) He appears to argue that the circuit court erred in adopting, with only minor modifications, the State's proposed order denying his Rule 32 petition. Specifically, in his reply, McWhorter asserts that because the circuit court's order was "largely a wholesale adoption of the State's proposed findings of facts and conclusions of law" it was not entitled to deference on the juror-misconduct claim. (McWhorter's reply, p. 9.)

Both McWhorter and the State submitted proposed orders. Shortly thereafter, the circuit court entered an order denying McWhorter's postconviction petition, adopting the State's previously submitted proposed order, with only minor modifications. McWhorter filed an objection on the grounds that the circuit court had adopted the State's proposed order, which the circuit court overruled by notation on the case action summary.

    . . . .

In this case, the circuit judge who denied McWhorter's postconviction petition did not preside at McWhorter's trial; however, in the order denying McWhorter's postconviction petition the court did not profess to have personal knowledge of the performance of McWhorter's trial counsel. Further, the circuit court in this case did not base its order denying McWhorter's postconviction petition upon the State's initial answer to the postconviction petition. Instead, after numerous pleadings, and after the postconviction evidentiary hearing on McWhorter's Rule 32 claims, the court allowed submission of briefs. Both the State and McWhorter submitted proposed orders, and McWhorter submitted a post-hearing brief. McWhorter did not object in his post-hearing brief to the possibility of the circuit court's adopting the State's proposed order. The circuit court did not issue its final order until several weeks after both the State and McWhorter had submitted their proposed orders and McWhorter had filed his post-hearing brief.

Consequently, in light of these facts, we conclude that the circuit court's order is its own and not merely an unexamined adoption of a proposed order submitted by the State. Moreover, for the reasons set forth above in regard to the juror-misconduct claims and below as to the other claims McWhorter raises on appeal, we hold that the circuit court's findings are not "clearly erroneous."

*McWhorter*, 142 So. 3d at 1224-29.

Although in *Anderson v. City of Bessemer*, 470 U.S. at 572, the Supreme Court criticized the trial court's verbatim adoption of findings of fact prepared by prevailing parties, it ultimately held "that even when the trial judge adopts proposed findings verbatim, the findings are those of

the court and may be reversed only if clearly erroneous." *Anderson*, 470 U.S. at 572. In reviewing McWhorter's claim on appeal from the denial of his Rule 32 petition, the Alabama Court of Criminal Appeals noted that McWhorter claimed in a "two-sentence argument," that "it was apparent that [the circuit court] adopted the State's proposed findings of fact, almost verbatim . . . only five phrases differed in any way from the State's proposed order." *McWhorter*, 142 So. 3d at 1224-25 (quoting McWhorter's appellate brief, Vol. 33, Tab 71 at 18). The court specifically found that "the circuit court's order is its own and not merely an unexamined adoption of a proposed order submitted by the State," and that the circuit court's findings were not "clearly erroneous." *Id.* at 1229.

McWhorter has failed to demonstrate that the appellate court's holding on this claim (that the Rule 32 court's findings of fact were not "clearly erroneous"), as it was presented in the state courts, is contrary to or an unreasonable determination of clearly established Federal law, or that it was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

McWhorter further argues that by ignoring this evidence, the Rule 32 hearing court failed to fulfill its obligation to make independent findings and conclusions, as required by *Jefferson v. Upton*, 560 U.S. 284 (2010). In *Jefferson*, the Court applied the pre-AEDPA version of § 2254, holding that the state court had denied the death-penalty petitioner a full, fair, and adequate hearing, because: (1) the state court had adopted factual findings drafted exclusively by the state's attorneys, pursuant to an ex parte request from the state court judge; (2) the state court did not notify the petitioner of the request made to opposing counsel; and (3) the findings proposed

by the state recounted evidence from a non-existent witness. *See* 560 U.S. at 292. But McWhorter's case is both legally and factually distinguishable from *Jefferson*.

In rejecting a similar claim in *Jones v. GDCP Warden*, the Eleventh Circuit held:

First, *Jefferson* never could have held, nor did it presume to hold, that this kind of adopted order is not entitled to AEDPA deference. *Jefferson* addressed a claim arising under the pre-AEDPA version of § 2254; the *Jefferson* Court was therefore operating under a different statute than the one controlling this case. Moreover, even absent that legal distinction, the facts of this case are critically different from *Jefferson*. There, the state court adopted a proposed order that it had obtained *ex parte* from the State, without notice to Jefferson. Here, notably, the state court requested that both Jones and the State prepare proposed orders. The court conducted an evidentiary hearing in August and September 2004, at which Jones was represented ably by his habeas counsel, who presented several witnesses and 125 exhibits spanning about 5,000 pages. The state court then took a year and a half to consider the party's submissions and only issued its order denying habeas relief in March 2006. In stark contrast to *Jefferson*, the circumstances here demonstrate that Jones received a full and fair hearing on all of his habeas claims.

*Jones*, 815 F.3d 689, 715 (11th Cir. 2016). Simply put, *Jones* concluded that the legal analysis in *Jefferson* does not apply to the post-AEDPA version of § 2254.

This case is also factually distinct from *Jefferson*. *See Jones*, 815 F. 3d at 715 (declining to apply *Jefferson* because "the facts of this case are critically different from *Jefferson*"). Specifically, in this case, as in *Jones*, the Rule 32 court requested that both McWhorter and the state submit briefs or proposed opinions after receiving transcripts of the evidentiary hearing. (Vol. 29 at 726-27; Vol. 32, Tab 70 at 116). Similarly, the Rule 32 court conducted an evidentiary hearing on McWhorter's petition on August 26-28, 2009. (Vol. 25, Tab 66 - Vol. 29). At that hearing, McWhorter was represented by counsel, who presented sixteen witnesses and a variety of exhibits. (Vol. 25, Tab 66 - Vol. 32). McWhorter submitted his memorandum of law to the court on December 2, 2009. (Vol. 32, Tab 70 at 117-193).

On February 23, 2010, the state submitted its proposed final order denying McWhorter's petition. (Vol. 24, Tab 65 at 1037-1114). The Rule 32 court issued its order denying the petition on March 29, 2010. (Vol. 24, Tab 65 at 1115-91). Thus, like the petitioner in *Jones*, and in contrast to the petitioner in *Jefferson*, the circumstances here demonstrate that McWhorter received a full and fair hearing on his petition. The *Jefferson* decision does not entitle McWhorter to relief.

## B. McWhorter's Claim That He Was Sentenced to Death Based on Extraneous Evidence

### 1. The Parties' Arguments

McWhorter next claims that juror Linda Burns "infected all the other jurors with her obvious bias against what she perceived to be a convicted killer getting too light a sentence." (Doc. 1 at 28). More specifically, he contends that:

> In the jury room, Juror L.B. relived her experiences when her father was killed. She did so in dramatic and memorable fashion, when the jurors were deadlocked on whether to impose death, and after they had received an *Allen* charge. Juror L.B. related that when the man who killed her father was paroled, he returned to the community where Juror L.B. lived, and she also told her fellow jurors that she knew how hard it was for the families of victims to see the killers of their loved ones walk the streets. She asked the other jurors if they could live with themselves if McWhorter were paroled in seven years as her father's killer was.

(*Id.*). He argues that this "extraneous evidence improperly introduced into the jury room actually and severely prejudiced" him, because immediately after she shared her story, several jurors changed their votes, resulting in the recommended death sentence. (*Id.* at 29). According to McWhorter, Juror Burns' remarks during deliberations, about her father's death, deprived him of his rights to due process, confrontation, a fair trial, and an impartial jury, in violation of *Turner v. Louisiana*, 379 U.S. 466 (1965). (Doc. 1 at 27-29).

Respondent first argues that this claim is procedurally defaulted because McWhorter failed to "fairly present" it to the Alabama Court of Criminal Appeals on appeal from denial of his Rule 32 petition. (Doc. 14 at 15-17). Specifically, Respondent maintains that "[a] review of McWhorter's merits brief to the Alabama Court of Criminal Appeals will reflect that he relied on state law and that he cited neither federal cases nor the Constitution of the United States in support of his argument. (Vol. 33, Tab # R-71, pp. 38-41)." (Doc. 14 at 15-16).

In his brief to the Alabama Court of Criminal Appeals, McWhorter argued the hearing court improperly dismissed his extraneous evidence claim without a hearing:

> The Amended Petition alleges that the killing of Ms. Burns's father gave rise not only to the biased juror claim (V-A), but, because Ms. Burns discussed that killing during the jury's sentencing deliberations with the other jurors, it also gave rise to a claim that McWhorter's federal and state constitutional rights were violated because the jury considered extraneous evidence during its deliberations – namely, Ms. Burns's account of her father's death and its aftermath.

(Vol. 33, Tab 71 at 38). In light of this language, it is at least arguable that McWhorter's allegation that his "federal and state constitutional rights were violated because the jury considered extraneous evidence during its deliberations" was sufficient to "fairly present" this claim to the appellate court. Therefore, the court will consider this claim on the merits.

Respondent alternatively argues that McWhorter is not entitled to relief because the Alabama Court of Criminal Appeals correctly denied the claim on the merits. (Doc. 14 at 17). In addressing this claim, the appellate court held:

> McWhorter argues that the circuit court erred in summarily dismissing claim V(B) of his amended petition in which he alleged that the jury considered "extraneous evidence" during deliberations. . . . [H]e claims that Juror L.B.'s information about her fathers's death was "extraneous evidence" and that the circuit court erred in denying [this] claim. . . . The State responds that claim V(B) of McWhorter's petition failed to state a material issue of fact or law because, it

says, McWhorter "failed to plead admissible evidence or evidence that, if true, would establish that he suffered prejudice."

. . . .

It is well settled that "matters that the jurors bring up in their deliberations are simply not improper under Alabama law, because the law protects debates and discussions of jurors and statements they make while deliberating their decision." *Sharrief v. Gerlach*, 798 So.2d 646, 653 (Ala. 2001). "Rule 606(b), Ala. R. Evid., recognizes the important 'distinction, under Alabama law, between "extraneous facts," the consideration of which by a jury or jurors may be sufficient to impeach a verdict, and the "debates and discussions of the jury," which are protected from inquiry.'" *Jackson v. State*, 133 So.3d 420, 431 (Ala.Crim.App. 2009) (quoting *Sharrief*, 798 So.2d at 652). "[T]he debates and discussions of the jury, without regard to their propriety or lack thereof, are not extraneous facts." *Sharrief*, 798 So.2d at 653. Thus, "affidavit[s or testimony] showing that extraneous facts influenced the jury's deliberations [are] admissible; however, affidavits concerning 'the debates and discussions of the case by the jury while deliberating thereon' do not fall within this exception." *CSX Transp., Inc. v. Dansby*, 659 So.2d 35, 41 (Ala. 1995) (quoting *Alabama Power Co. v. Turner*, 575 So.2d 551, 557 (Ala. 1991)).

In terms of this claim of juror misconduct, the statements allegedly made by Juror L.B. and the impact those statements may have had on the jury in its deliberations are not extraneous facts. Juror L.B.'s story about her father does not qualify under the exception for "extraneous information." *See* Rule 606(b), Ala. R. Evid. *But see Taite v. State*, 48 So.3d 1 (Ala.Crim.App. 2009). Therefore, it is insulated from inquiry and cannot form the basis of a valid claim for postconviction relief under Rule 32.

As this Court stated in addressing a similar issue in *Jones v. State*, 753 So.2d 1174 (Ala.Crim.App. 1999):

> [W]e reject Jones's claim that his "death sentence was the result of coercive influences brought into the jury deliberations which were outside the scope of the evidence and judicial control." (Appellant's brief at p. 97.) Specifically, he argues that a juror's statement that 'if we give him life that maybe in a few years that he would be up for parole' improperly persuaded others to sentence him to death. (R. 275-76.)
>
> Testimony at the Rule 32 hearing indicated that before reaching its 12-0 advisory verdict recommending a sentence of death, the jury voted several times. Several ballots resulted in a 10-2

determination to recommend death. One of the two individuals who initially voted against death testified that she changed her vote in favor of death after J.M. made the statement regarding parole.

"A juror cannot impeach his verdict by later explaining why or how the juror arrived at his or her decision." *Adair v. State*, 641 So.2d 309, 313 (Ala.Cr.App. 1993).

Moreover, Rule 606(b), Ala. R. Evid., provides, in pertinent part:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify in impeachment of the verdict or indictment as to any matter or statement occurring during the course of the jury's deliberations or the effect of anything upon that or any other juror's mind or emotions as influencing the juror as to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

We find no merit to Jones's claim because it was based on prohibited testimony. A consideration of the claim would destroy the integrity of the jury system, encourage the introduction of unduly influenced juror testimony after trial, and discourage jurors from freely deliberating, and inhibit their reaching a verdict without fear of post-trial harassment, publicity, or scrutiny. *See Ex parte Neal*, 731 So.2d 621 (Ala. 1999); and *Barbour v. State*, 673 So.2d 461, 469-470 (Ala.Cr.App. 1994), *aff'd*, 673 So.2d 473 (Ala. 1995), *cert. denied*, 518 U.S. 1020, 116 S.Ct. 2556, 135 L.Ed.2d 1074 (1996)."

753 So.2d at 1203-04 (footnote omitted). Similarly, here, a consideration of this claim of juror misconduct – which is based entirely on the debate and deliberations of the jury – "would destroy the integrity of the jury system, encourage the introduction of unduly influenced juror testimony after trial, and discourage jurors from freely deliberating, and inhibit their reaching a verdict

without fear of post-trial harassment, publicity, or scrutiny." *Jones*, 753 So.2d at 1204. Therefore, this claim fails to state a material issue of fact or law upon which relief could be granted, and dismissal was proper under Rule 32.7(d).

*McWhorter v. State*, 142 So. 3d 1195, 1221-24 (Ala. Crim. App. 2011) (footnotes omitted) (alterations in original).

### 2. Analysis

McWhorter argues that the appellate court's decision was contrary to and an unreasonable application of *Turner v. Louisiana*, 379 U.S. 466 (1965). (Doc. 1 at 27, 29). He claims that the decision was "contrary to federal law because the State court drew the 'extraneous evidence' line based on where the statements were made, rather than on the nature of the statements and thus held the statements were 'therefore . . . insulated from inquiry.'" (Doc. 20 at 23) (quoting *McWhorter*, 142 So. 3d at 1223) (omission in original). He claims that the appellate court "unreasonably applied clearly established federal law by holding that Juror L.B.'s statements about her personal experiences did not qualify as 'extraneous evidence.'" (*Id.*) (citing *McWhorter*, 142 So. 3d at 1222-23).

In *Turner*, the Court held that a jury must base its verdict only on evidence coming "from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." 379 U.S. at 472-73. The Alabama Court of Criminal Appeals' discussion of the rule of evidence prohibiting a juror from testifying about the process of deliberation was grounded in the salient point that Juror Burns' comments to the jury were not "extraneous evidence" injected into the deliberations. Ms. Burns' comments about how she felt seeing the man possibly involved with her father's death walking the streets after being released from jail were part of the deliberative process itself, not something

"extraneous" to the jury's deliberations. As such, the appellate court correctly concluded that the evidence offered on this issue was nothing more than prohibited juror testimony about the debate and deliberations of the jury.

The Alabama Court of Criminal Appeals' determination that Juror Burns's comments during the jury's deliberations were not "extraneous evidence" was neither contrary to nor an unreasonable application of *Turner*.

## C. McWhorter's Claim That He Was Denied His Constitutional Right to Effective Assistance of Counsel

In introducing this claim, McWhorter has made clear that he "asserts a single ineffective assistance of counsel claim and does not present multiple, separate claims." (Doc. 1 at 30). He argues that he "should be permitted to prove each of the alleged facts as part of the overall ineffective assistance claim" because when considered together, they "easily satisfy the ineffectiveness standard." (*Id.*).

McWhorter made this same argument on appeal from the denial of his Rule 32 petition. (Vol. 33, Tab 71 at 41-44). After initially questioning whether the argument was properly before it,[20] the court denied the claim on the merits:

> McWhorter's argument is flawed in that he fails to demonstrate that a series of individual allegations of deficient performance – although found not to be deficient in themselves – could nevertheless be deficient when considered collectively. Further, an aggregate weighing is not required by Alabama law. *See Taylor*, ––– So.3d at ––––, and the cases cited therein. Therefore, even if the claim is properly before this Court for review, McWhorter is not entitled to any relief on this claim.

*McWhorter*, 142 So. 3d at 1235.

---

[20] The court noted that McWhorter did not "raise his cumulative-effect claim in his postjudgment motion." *McWhorter*, 142 So. 3d at 1234.

McWhorter does not allege that the appellate court's decision was contrary to or an unreasonable application of clearly established federal law. However, as the Eleventh Circuit Court of Appeals has recognized, where individual claims of error or prejudice are without merit, a cumulative error claim must fail because "we have nothing to accumulate." *Morris v. Sec'y, Dep't. of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012). Thus, the court must address McWhorter's ineffective assistance of counsel claims individually to see if they present any constitutionally deficient performance.

### 1.    Inadequate Investigation and Failure to Present Mitigating Evidence

In the penalty phase of McWhorter's trial, counsel called four witnesses to testify on McWhorter's behalf: Vonnie Salee, Van Reid, Elsie Garrison, and Carolyn Rowland. Vonnie Salee testified that she had worked at Food World when McWhorter was a bag boy there. (Vol. 11, Tab 25 at 1772). She testified that he was a hard worker, while many of the other "kids goofed off"; he was nice to the customers; she felt like she was a mother figure to McWhorter; and that the "whole store was in absolute shock" when McWhorter was charged with murder. (*Id.* at 1772-76).

Van Reid, the owner of Reid's Restaurant, testified that McWhorter worked for him as a busboy for "a month or so." (*Id.* at 1776-77). He described McWhorter as a dependable worker who did a good job. (*Id.* at 1777-78).

McWhorter's aunt, Elsie Garrison, asked the jury to spare his life. (*Id.* at 1786). She testified that McWhorter's parents divorced when he was almost two years old. (*Id.* at 1780). After the divorce, McWhorter's mother remarried and she, her new husband, and McWhorter moved out of state for four to five years. (*Id.*). Garrison had no contact with McWhorter while he

was living out of state, but she had regular contact with him after he returned to Alabama. (*Id.* at 1780-81). McWhorter came to live with her when he was almost sixteen years old because he was unhappy, unsure what he wanted to do with his life, and felt like he was not being treated fairly at home. (*Id.* at 1781). Garrison took McWhorter for a drug test after he was accused of using drugs in school, and the results were negative for drugs. (*Id.* at 1782). McWhorter began to miss his mother while he was living with Garrison, so he returned home in December 1992. (*Id.* at 1782-83). During that December, McWhorter became "antsie" because it was Christmas time and he was still a child at heart. (*Id.* at 1783). A few months after McWhorter moved out of Garrison's house, Daniel Miner, McWhorter's codefendant, apparently followed McWhorter to her house. (*Id.* at 1783-85). Garrison ended her testimony by telling the jury that McWhorter had a "very disturbed childhood," but is a "very bright, a very intelligent young man" who had a lot of tough breaks; that McWhorter got involved with the wrong people but is not a "bad boy at heart"; and that McWhorter is one of the most compassionate young men she has ever known. (*Id.* at 1785-86).

Finally, McWhorter's mother, Carolyn Rowland, also asked the jury to spare McWhorter's life. (*Id.* at 1794). She testified that her divorce from McWhorter's father was not particularly bitter or troublesome; she married David Rowland after the divorce; they moved to Tennessee for four or five years; McWhorter and Rowland had a "pretty good relationship" at the time, but McWhorter was not aware that Rowland was not his birth father until they moved back to Alabama; the discovery that Tommy McWhorter was his birth father did not seem to affect McWhorter at the time, but McWhorter hardly ever saw Tommy McWhorter; Tommy McWhorter told McWhorter that he did not have to listen to his stepfather, which caused

problems for McWhorter; McWhorter was a "pretty good kid" until he became friends with Daniel Miner, Marcus Carter, and Lee Williams; when McWhorter got to know Miner, Carter, and Williams, he "got worse" about listening to his parents, and no longer cared about his appearance; and McWhorter is a good boy who respects people, but got in with the wrong friends. (*Id*. at 1788-97).

### a.    The Parties' Arguments

McWhorter alleges that trial counsel were constitutionally ineffective for failing to uncover crucial mitigating evidence concerning his life, character, and mental health. (Doc. 1 at 34-45). Specifically, he claims that:

> Trial counsel conducted only the most rudimentary pre-trial factual investigation consisting of 40 hours of work. Aside from speaking with McWhorter, trial counsel conducted only one interview session. In that single session, McWhorter's mother (Carolyn Rowland), aunt (Elsie Garrison), and 16-year-old half sister (Melinda Rowland) were interviewed together (the "Triple Interview"). The Triple Interview was brief (approximately two hours), late (11 days before trial began), and joint (three people at once). *See* Hearing Transcript at R139/24-25, R145/18-24 (T. Mitchell). Allotting two hours to witness interviews in a death penalty case is plainly insufficient, and in this case prevented counsel from uncovering numerous facts essential to McWhorter's trial. Because the Triple Interview occurred so late [ ] in the process, trial counsel could not pursue leads generated during the interview. Because trial counsel conducted the Triple Interview jointly, the witnesses were reluctant to speak freely. *See, e.g.*, Hearing Transcript at R265/8-11, R266/7-14 (E. Garrison) (describing how Ms. Garrison did not feel comfortable talking with trial counsel about McWhorter's difficult relationship with his mother while his mother was present in the room).

> At the Triple Interview, counsel used only a standard mitigation questionnaire that asked general background questions about McWhorter. This stock questionnaire should have been the start – not the entirety – of counsel's mitigation investigation, and should have been administered months earlier. *See Williams v. Taylor*, 529 U.S. 362, 395 (2000) (faulting trial counsel for failing to "begin to prepare for th[e] [sentencing] phase of the proceeding until a week before the trial"); *Jackson v. Herring*, 42 F.3d 1350, 1367 (11th Cir. 1995) ("In cases where sentencing counsel did not conduct enough investigation to formulate an accurate

life profile of a defendant, we have held the representation beneath professionally competent standards." (citations omitted)).

Trial counsel failed to seek McWhorter's medical records, school records, juvenile offender records, social services records, or any other easily accessible records from authorities. Trial counsel failed to obtain the criminal records of McWhorter's family members. Hearing transcript at 140-42 (Mitchell), 556-57 (Berry). Trial counsel failed to interview anyone outside of the Triple Interview – not teachers, friends, coaches or neighbors – who could provide evidence about McWhorter. Trial counsel failed to hire a mitigation specialist or investigator.

(Doc. 1 at 34-36) (footnote omitted).

McWhorter maintains that counsel could have uncovered and presented an array of evidence that would have "deepened and sharpened trial counsel's theory of the case so that the jury could not simply disregard it." (*Id.* at 31). He claims that the evidence counsel should have discovered and presented at trial would have established that:

(a) [ ] McWhorter's father, a lifelong criminal who was convicted of, among other crimes, statutory rape for a sexual assault on a 15-year-old girl, *see* Hearing Exhibit 23, ROA Supplement 1-2, at C318,[21] had abandoned McWhorter when McWhorter was a baby, *see* Hearing Transcript R228/23-230/8 (E. Garrison Testimony);[22]

(b) [ ] McWhorter spent most weekends of his youth at the home of his maternal grandfather, see Hearing Transcript at R 390/3-9 (L. Evans),[23] a man who dominated McWhorter's mother's family and was convicted of homicide for shooting and killing the boyfriend of one of his daughters in front of the Evans

---

[21] Exhibit 23 pertains to Tommy McWhorter's 1990 DUI conviction. There is no mention of statutory rape. (*See* Vol. 31, Tab 68 at 318-33).

[22] Elsie Garrison, McWhorter's aunt, testified at the evidentiary hearing that McWhorter's parents were "around 20" when McWhorter was born; Tommy McWhorter was an alcoholic; McWhorter's parents divorced when McWhorter was about two years old; and McWhorter and his father had very little contact with each other after the divorce. (Vol. 26 at 222-30).

[23] Larry Evans, McWhorter's uncle, testified that his father, Jessie Evans (McWhorter's grandfather), was an abusive alcoholic. Evans stated that while he lived with Jesse Evans, McWhorter came over every other weekend, that he "probably stayed over sometimes", and that he and McWhorter huffed gasoline two or three times. (Vol. 27 at 385-391).

family, *see* Hearing Transcript at R387/7-24, Hearing Exhibit 22, at ROA Supplement 1-2, at C288;[24]

(c) [W]hippings, administered by both his mother and stepfather, were a standard form of punishment in McWhorter's childhood home. *See, e.g.*, Hearing Transcript at R230/14-20 (E. Garrison);[25] R363/23 (D. Rowland);[26]

(d) [W]hen McWhorter was just ten years old, his aunt took him to the Department of Human Resources ("DHR") to report dark bruises she found on McWhorter's legs and buttocks, due to the whipping by his mother and stepfather. Hearing Transcript at R233/4-10 (E. Garrison).[27] The DHR report of the incident included pictures of the resulting abuse. *See* DHR Records, Hearing Exhibit 11, ROA Supplement 1-1 at C49;[28]

(e) [ ] McWhorter's family was so unsupportive of him that he was forced to live with his aunt's family, and thus to change schools, *see* Hearing Transcript R240/21-241/8 (E. Garrison);[29]

(f) [ ] McWhorter regularly sniffed gasoline and freon from the age of eight, and continued until he was at least 14 years old. *See* Hearing Transcript at R401/1 –

---

[24] Jessie Evans pled guilty to first degree manslaughter on December 7, 1979, when McWhorter was 5 years old. (Vol. 31 at 288-317).

[25] McWhorter's aunt Elsie Garrison testified that although she did not "know a lot about what happened at their house during that time," McWhorter told her that his stepfather was mean to him, his mother and stepfather "whipped" him; and they did not let him watch television. (Vol. 26 at 230).

[26] McWhorter's step-father, David Rowland, testified that he once found McWhorter sniffing gasoline, so he took him to his mother, and she "g[a]ve him a whipping, put him in the tub." (Vol. 27 at 363-64).

[27] Elsie Garrison testified that when McWhorter was about ten years old, she found out he had bruises on his "backside." McWhorter told her he fell out of a window, but she took photographs and reported it to DHR. She testified that McWhorter told her son that his step-father had beaten him. (Vol. 26 at 323-34).

[28] The social service report indicates that Elsie Garrison reported the bruises on July 18, 1985, when McWhorter was 10 years old. Social services interviewed McWhorter's mother, Carolyn Rowland, who admitted to "whipping" him because he broke the window out of their trailer, but stated she did not realize she had whipped him that hard. Ms. Rowland admitted that she and her husband whipped McWhorter at times because he was difficult to manage and had been in constant trouble at school due to behavioral problems. When the caseworker followed up with McWhorter later, he reported that he had not "gotten anymore [sic] whippings." The case was eventually closed. (Vol. 33 at 44-51).

[29] Elsie Garrison testified that when McWhorter was sixteen years old, he stole his stepfather's truck. Shortly afterwards, McWhorter moved in with Ms. Garrison for "around four months." McWhorter had to change schools while he lived with her. McWhorter did not follow Ms. Garrison's rules while he lived with her. He got drunk at times, and eventually stole his stepfather's truck again. (Vol 26 at 239-47).

403/19 (M. Evans);[30] R390/10 – 392/8 (L. Evans);[31] R363/3 – 365/5 (D. Rowland);[32]

(g) [I]n later teenage years, McWhorter was so significantly disturbed that several times he played Russian roulette with real pistols and bullets, *see* Hearing Transcript at R510/4-13 (A. Barnes),[33] and regularly drank and used illegal drugs, including marijuana, acid, and cocaine, *see* Hearing Transcript at R507/12-13, R507/23-25 (A. Barnes).[34]

(h) [N]otwithstanding the unsupportive environment in which he was raised, through junior high school McWhorter was a dedicated student and athlete, capable of working hard and doing what was expected of him in order to fit into the school environment. *See* Hearing Transcript at R434/23 – 435/4 (K. Burns);[35] R424/22-425/24 (F. Baker).[36] Notably, one of McWhorter's teachers (Burns) testified that McWhorter's behaved noticeably worse on Monday mornings, lending credence to the fact that McWhorter was visibly affected by the horrors that he witnessed during weekends with his maternal grandfather's family. *See Id.* at R435/20-21;[37]

---

[30] Michael Evans, McWhorter's cousin, testified that he and McWhorter huffed gasoline and sometimes freon, at McWhorter's house, two or three times a day on weekends when he saw McWhorter. He indicated that this began when McWhorter was eight or nine years old and went on for two or three years, until they "finally got caught." (Vol. 27 at 401-03).

[31] Larry Evans, McWhorter's uncle, testified that he and McWhorter huffed gasoline two or three times. (Vol. 27 at 390-91).

[32] David Rowland, McWhorter's stepfather, testified that he caught McWhorter sniffing gasoline on one occasion, and at other times, he noticed there was no freon in the air conditioner in his car. (Vol. 27 at 363-65).

[33] McWhorter's friend, Abraham Barnes, testified that he and McWhorter played Russian roulette on several occasions. (Vol. 28 at 510).

[34] Abraham Barnes also testified that he and McWhorter drank a lot, and used a variety of drugs including pot, cocaine, and acid on occasion. (Vol. 27 at 507).

[35] Kenneth Burns, one of McWhorter's teachers, testified that McWhorter was an average student, but worked hard in school to stay qualified to play basketball. He was generally a good kid, but did enjoy a bit of mischief from time to time. (Vol. 27 at 434-35).

[36] Frank Baker, McWhorter's teacher and basketball coach, testified that McWhorter was an average student but did not cause a lot of trouble. He was a follower on the basketball team, but worked hard to improve and be a part of the team. (Vol. 27 at 422-26).

[37] Kenneth Burns testified that there were "a few Mondays when [McWhorter] would come in when he wouldn't be on his best behavior," but by mid-morning he would be "back on track." (Vol. 27 at 435-36).

(i) [N]otwithstanding all of his problems and travails, McWhorter remained a kind and loyal friend, even after he was imprisoned. *See* R440/3-11; *Id.* R448/16-20; *Id.* 450/6-20 (A. Battle).[38]

(Doc. 1 at 38-41) (footnotes in original omitted).

McWhorter further argues that counsel could have called expert witnesses in the penalty phase, who would have testified to evidence collected from McWhorter's family; he was genetically predisposed to substance abuse, given the alcoholism of his father and grandfather and the early onset of his own substance abuse; the same "mental condition" that predisposed McWhorter to substance abuse also made it difficult for him to control his behavior; and he "likely" had brain damage as a result of substance abuse. (*Id.* at 41-42).

McWhorter also contends there is a reasonable probability that had trial counsel presented this information in the penalty phase, the jury would not have made the same recommendation. (*Id.* at 42).

Respondent counters that this claim is due to be denied because the Alabama Court of Criminal Appeals denied it on the merits, and McWhorter cannot show that the decision was contrary to, or an unreasonable application of, federal law. (Doc. 14 at 19-42).

### b. Analysis

McWhorter raised his failure to investigate and present mitigating evidence claim in his Amended Rule 32 petition. (Vol. 21, Tab 56 at 521-49). The trial court held an evidentiary hearing from August 26-28, 2009, at which McWhorter presented sixteen witnesses who he claims should have been called by counsel at the penalty phase of his trial. (Vol. 25, Tab 66 - Vol. 29). The trial court entered a final order denying the petition on March 29, 2010. (Vol. 24,

---

[38] Amy Battle, McWhorter's close friend, testified that he was a supportive friend, even when he was in jail. (Vol. 27 at 439-50).

Tab 65 at 1139-91). The Alabama Court of Criminal Appeals affirmed the denial the claim.

*McWhorter*, 142 So. 3d at 1229-50.

In denying this claim, the Alabama Court of Criminal Appeals set out the pertinent law:

Allegations of ineffective assistance of counsel are governed by the principles set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prevail on a claim of ineffective assistance of counsel, the petitioner must establish: (1) that counsel's performance was deficient and (2) that the petitioner was prejudiced by the deficient performance. 466 U.S. at 687; *Ex parte Lawley*, 512 So.2d 1370, 1372 (Ala. 1987).

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *Cf. Engle v. Isaac*, 456 U.S. 107, 133-34, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *See Michel v. Louisiana*, [350 U.S. 91], at 101 [76 S.Ct. 158, 100 L.Ed. 83 (1955) ]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland*, 466 U.S. at 689 (citations omitted). As the United States Supreme Court further stated:

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations

unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."

*Strickland*, 466 U.S. at 690-91.

. . . .

The purpose of ineffectiveness review is not to grade counsel's performance. *See Strickland* [*v. Washington* ], [466 U.S. 668,] 104 S.Ct. [2052] at 2065 [ (1984) ]; *see also White v. Singletary*, 972 F.2d 1218, 1221 (11th Cir. 1992) ("We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately."). We recognize that "[r]epresentation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another." *Strickland*, [466 U.S. at 693,] 104 S.Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or "what is prudent or appropriate, but only what is constitutionally compelled." *Burger v. Kemp*, 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987).

*Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir.2000) (footnote omitted).

"As the Supreme Court explained in Strickland, the issue of what investigation decisions are reasonable 'depends critically' on the defendant's instructions. . . ." *Cummings v. Secretary, Dep't of Corr.*, 588 F.3d 1331, 1357 (11th Cir. 2009).

Moreover,

there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the

> alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.

*Strickland*, 466 U.S. at 697. "It is firmly established that a court must consider the strength of the evidence in deciding whether the *Strickland* prejudice prong has been satisfied." *Buehl v. Vaughn*, 166 F.3d 163, 172 (3d Cir. 1999).

In *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), the United States Supreme Court addressed a claim that counsel was ineffective for failing to adequately investigate and present mitigation evidence. The *Wiggins* Court found that counsel's performance was ineffective because counsel failed to investigate and present evidence that Wiggins had a dysfunctional and bleak upbringing, that he suffered from substantial physical and sexual abuse, and that he had mental deficiencies. The Court stated:

> Petitioner thus has the kind of troubled history we have declared relevant to assessing a defendant's moral culpability. *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse"); *see also Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) (noting that consideration of the offender's life history is a "part of the process of inflicting the penalty of death"); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (invalidating Ohio law that did not permit consideration of aspects of a defendant's background).

539 U.S. at 535. The Court further stated:

> In finding that [trial counsel's] investigation did not meet *Strickland*'s performance standards, we emphasize that *Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does *Strickland* require defense counsel to present mitigating evidence at sentencing in every case. Both conclusions would interfere with the "constitutionally protected independence of counsel" at the heart of *Strickland*, 466 U.S., at 689. We base our conclusion on the much

68

more limited principle that "strategic choices made after less than complete investigation are reasonable" only to the extent that "reasonable professional judgments support the limitations on investigation." *Id.*, at 690-691. A decision not to investigate thus "must be directly assessed for reasonableness in all the circumstances." *Id.*, at 691.

Counsel's investigation into Wiggins' background did not reflect reasonable professional judgment. Their decision to end their investigation when they did was neither consistent with the professional standards that prevailed in 1989, nor reasonable in light of the evidence counsel uncovered in the social services records – evidence that would have led a reasonably competent attorney to investigate further.

539 U.S. at 533–34.

In *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the United States Supreme Court found that counsel's performance was deficient because counsel did not begin to investigate mitigation evidence until a week before trial and counsel "failed to conduct an investigation that would have uncovered extensive records graphically describing Williams's nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records." 529 U.S. at 395.

*McWhorter*, 142 So. 3d at 1229-32.

The Alabama Court of Criminal Appeals also summarized trial counsel's actions:

In examining this ineffectiveness claim, the circuit court described what McWhorter's attorneys did during the penalty phase. The court's findings were based primarily on the testimony of the attorneys – Mitchell and Berry. As set out above, the testimony at the evidentiary hearing indicated that to prepare for the penalty phase, Mitchell and Berry interviewed McWhorter, his mother Rowland, his aunt Garrison, and his half sister Melinda Rowland. They interviewed the latter three in what McWhorter refers to in the postconviction proceeding as the "triple interview." During this interview, counsel completed a document entitled "Client Background Information," which included McWhorter's family history, his medical and mental-health history, his substance-abuse history, his criminal history, and his education history. An investigator was not hired for the penalty-phase preparation because, according to McWhorter's attorneys, a strategy could be formulated with McWhorter and his family's assistance.

McWhorter's trial attorneys hired Dr. Douglas Robbins, a neuropsychologist, to evaluate McWhorter for any mental disease, mental disorder, or any evidence of psychopathology. As stated above, Dr. Robbins's evaluation provided no useful mitigation evidence.

Counsel obtained some hospital records. Counsel was aware that DHR had once investigated an allegation of physical abuse involving McWhorter. Additionally, as set out above, counsel had documentation of McWhorter's IQ scores, which indicated he had an IQ of 88.

Mitchell and Berry testified that they thought McWhorter would have had to climb out of a "deep hole" to persuade the judge and jury to spare his life. The two codefendants had pleaded guilty, and the jury had heard evidence of gang activity. McWhorter's attorneys decided that "about the only thing" McWhorter had "going for him" was that he was "clean cut" and "a good-looking young man" who had fallen in with the wrong crowd and had made a terrible mistake but did not deserve the death penalty.

As indicated above, counsel presented the testimony of Rowland, Garrison, Reid, and Salee during the penalty phase. Counsel testified as to why each was chosen to testify in accordance with counsel's strategy. The circuit court found that this strategy was a reasonable one and that counsel had conducted a reasonable investigation.

*Id*. at 1233-34.

The Alabama Court of Criminal Appeals issued a detailed opinion denying McWhorter's

failure-to-investigate claim:

The circuit court found as follows regarding McWhorter's ineffective-assistance-of-counsel claim:

As an initial matter, McWhorter's trial counsel both testified at length to their strategy for the penalty phase. The Court sets out that strategy below and finds it to be reasonable under *Strickland*. All of the remaining independent claims contained in Claim XII of McWhorter's amended Rule 32 petition are meritless because they contend that trial counsel should have investigated and presented evidence that either would have been cumulative to evidence presented or would have been inconsistent with evidence presented to support trial counsel's reasonable strategy. In his amended Rule 32 petition, McWhorter failed to mention, much less challenge, the trial strategy that trial counsel actually used.

The testimony of McWhorter's trial counsel, Thomas Mitchell and James Berry, at the evidentiary hearing indicates that they rendered effective assistance of counsel during the penalty and sentencing phases of his trial. Mitchell and Berry both testified that, to prepare McWhorter's mitigation case, they interviewed McWhorter, his mother, Carolyn Rowland, his aunt, Elsie Garrison, and his half sister, Melinda Rowland. (E.H. 139, 143, 154, 176, 190–91, 553, 557.) McWhorter and his family were fully cooperative and supportive, according to both counsel's testimony. (E.H. 191, 193, 557.)

During a pre-trial interview with McWhorter's family, Mr. Mitchell completed a document titled 'Client Background Information' based on the information he learned from that interview. (E.H. 145.) The document was admitted into evidence at the evidentiary hearing as McWhorter's Exhibit 7. (E.H. 146.) Exhibit 7 contains questions and answers covering myriad topics, like McWhorter's early childhood development, his environmental factors; such as, living conditions, medical issues as a youth, and relationship information; his institutional data; such as, education history, his medical and mental health history, his substance abuse history, his criminal history, and his family history. Mr. Mitchell decided not to hire an investigator for the penalty-phase preparation because he reasonably could formulate a strategy for the penalty phase without an investigator and with McWhorter and his family's assistance. (E.H. 193.)

In addition to the information provided by McWhorter and his family, trial counsel hired a neuropsychologist to evaluate McWhorter for any "mental disease," "mental disorder," or "any evidence of psychopathology" to use in McWhorter's defense. (E.H. 155, 171.) Trial counsel hired Dr. Douglas Robbins. Mitchell testified that he specifically was interested in learning from Dr. Robbins whether McWhorter exhibited "diminished capacity" and "susceptibility to influence" from others. (E.H. 171.) And, if McWhorter had brain damage, trial counsel wanted to use that fact in his defense. (E.H. 160.) However, Dr. Robbins's evaluation provided no useful mitigation evidence. (E.H. 175, 305.)

Trial counsel also considered various records. They obtained McWhorter's hospital records from his attempted suicide. (E.H. 557.) Mitchell testified that he was aware that Garrison once reported Carolyn Rowland to DHR because Garrison found bruises

on McWhorter from a "whipping" that Carolyn Rowland gave him. (E.H. 158; McWhorter's Exhibit 7, page 5.) Trial counsel also had documentation of McWhorter's IQ scores, which indicated that he has an IQ of 88. (E.H. 140, 181.)

As Berry explained during the evidentiary hearing, McWhorter would have had to climb from a "deep hole" to persuade the judge and jury to spare his life. (E.H. 571-72.) Two codefendants already had pleaded guilty to charges stemming from the same crime. (*Ibid.*) The jury had heard evidence of gang activity. (E.H. 573.) Trial counsel believed that McWhorter had very little in his favor going into the penalty phase. "About the only thing we had going for Casey was a young man. He was a good-looking young man. And his youth was basically the only thing we had going for us," said Berry. (E.H. 576.) Mitchell's testimony reflected a similar opinion. Mitchell thought the main circumstances McWhorter had in his favor were his youth, that he was "clean cut," and that "he looked like Opie grown up a little bit from the Andy Griffith Show." Mitchell also remembered first meeting McWhorter and how he thought that McWhorter must have been 'crazy' to commit the crime with which he was charged. (E.H. 185–86.) Mitchell hoped that that the jury would think that, too, though he knew there was no evidence to support a mitigation case based on McWhorter's mental disorders because McWhorter had none. (*Ibid.*)

Both counsel previously had represented defendants at capital murder trials. (E.H. 170, 544.) Mitchell, who served as McWhorter's lead counsel, had extensive relevant experience over his 11-year legal career. (E.H. 169.) Mitchell testified that he had represented defendants during approximately 25 felony jury trials, 8 to 10 of which were murder trials, prior to representing McWhorter. (E.H. 169-70.) The overwhelming majority of Berry's practice around the time of McWhorter's trial was criminal work, and Mitchell testified that about half of his practice was criminal around 1994. (E.H. 169, 566.)

Experienced trial counsel collected the comprehensive background information reflected in McWhorter's Exhibit 7, Dr. Robbins's evaluation, and other documents, and formulated a reasonable strategy that they believed could save McWhorter's life: McWhorter was a good boy, who fell in with the wrong crowd, and he made a terrible mistake but does not deserve the death penalty. (E.H. 186, 571.) The trial transcript reflects that strategy in the

testimony trial counsel presented during the penalty and sentencing phases.

After conducting a reasonable investigation and forming a reasonable trial strategy, trial counsel decided to present the testimony of four witnesses during the penalty phase: Carolyn Rowland, Elsie Garrison, Van Reid, and Vonnie Salee. Carolyn Rowland, McWhorter's mother, and Garrison, his aunt, were selected because they knew McWhorter well and because their pain felt over McWhorter's capital murder trial was "obvious," and trial counsel hoped to evoke sympathy from the jury. (E.H. 190.) Garrison testified during the penalty phase that McWhorter once was wrongly accused of using drugs, so she had him drug tested. The test confirmed that there were no drugs in McWhorter's system. (R. 1782.) She also testified that McWhorter was "compassionate," but that he got caught up with the wrong crowd, including Daniel Miner, a codefendant in this case. (R. 1784-85.) Carolyn Rowland also testified that McWhorter had been a "good kid" until he started spending time with Daniel Miner, Lee Williams, and Marcus Carter, all of whom were codefendants in this case. (R. 1792-93.)

Garrison recommended Van Reid. (E.H. 189.) Reid knew McWhorter around the time of the murder because McWhorter worked as a busboy at Reid's restaurant, and Reid knew McWhorter to be a young man who did his job well. (E.H. 190; R. 1176–77.) Vonnie Salee was picked to testify partly because she was "very likable." (E.H. 188.) Salee, like Reid, also knew McWhorter to be a good worker. (R. 1772.) McWhorter bagged groceries at the grocery store where Salee was a cashier. (*Ibid.*) She recalled that McWhorter once had rubbed the shoulders of an older lady cashier who complained that her shoulders and back were hurting. (R. 1773.)

Trial counsel's "good boy, wrong crowd" strategy also was applied to the sentencing phase before Judge Gullahorn. Trial counsel presented additional testimony from Garrison and Carolyn Rowland, along with Janice Miller, McWhorter's aunt by marriage. The trial transcript and the evidentiary hearing transcript show that trial counsel presented meaningful testimony during the penalty and sentencing phases that was consistent with their strategy, and they refrained from presenting additional evidence that would have detracted from their strategy.

Specifically, as to the "triple interview," and the timeliness of the mitigation investigation, the primary cases on which McWhorter relies are *Correll v. Ryan*, 539 F.3d 938, 945 (9th Cir. 2008), and *State v. Gamble*, 63 So.3d 707 (Ala.Crim.App. 2010). Those cases are clearly distinguishable from this case. Although the "triple interview" in *Correll* is somewhat similar to the "triple interview" in this case, *Correll* is distinguishable because in that case trial counsel put on no evidence during the penalty phase – he did not call a single witness, and he waived the presentation of mitigating evidence. Additionally, there was evidence indicating the trial counsel in *Correll* spent a total of five minutes interviewing the defendant in *Correll* regarding mitigation evidence. In McWhorter's case, his trial counsel introduced the evidence described above and did substantially more than did trial counsel in *Correll*. Likewise, in *Gamble*, no witnesses were called to testify in Gamble's behalf during the penalty phase. As mentioned above, McWhorter's attorneys called several witnesses to testify during the penalty phase of his capital-murder trial and adhered to their trial strategy as discussed with McWhorter and his family.

Regarding the records documenting McWhorter's family history and his medical and school records, the circuit court denied relief on these claims for several reasons. First, as to the records of McWhorter's family history, the records related to his father, and social-services records, the court found that McWhorter failed to meet the specificity requirements of Rule 32.6(b), Ala. R.Crim. P., because he failed to identify what records counsel should have obtained. Regarding his parents' divorce records, the circuit court also concluded that McWhorter pleaded "only vaguely what those records would have proved." (C. 1181.) The circuit court also denied relief because, it found, McWhorter failed to meet his burden of proving that his trial counsel's performance was deficient in regard to information on his family history, specifically, information about his father, and information contained in his educational and medical records. The circuit court also denied relief on the educational-records claim, the medical-records claim, and the records-related-to-his-father claim because, the court found, McWhorter had failed to establish that he was prejudiced by his trial counsel's penalty-phase performance. Specifically, when denying relief on these claims, the postconviction court stated:

> *xiii. The Claim That Trial Counsel Should Have Obtained Records Documenting McWhorter's Family History*
>
> McWhorter's claim that his trial counsel were ineffective for failing to obtain records documenting his family history is contained in paragraph 193 of his amended Rule 32 petition.

This claim is denied because it fails to meet Rule 32.6(b)'s "clear and specific" pleading requirement. McWhorter first does not identify what records trial counsel allegedly was ineffective for failing to obtain other than "divorce records." As for the divorce records, McWhorter pleads only vaguely what those records would have proved, stating those records would have "corroborated the disintegration of Casey's parents' union and Tommy McWhorter's subsequent two marriages." But McWhorter does not plead how he was prejudiced when it is clear from the pleading itself that these records only would have "corroborated" some unidentified witness's testimony. As such, this claim is denied because it is insufficiently pleaded.

In the alternative, this claim is denied because McWhorter failed to meet his burden of proof. Concerning divorce records, trial counsel conducted an interview of McWhorter's mother, Carolyn Rowland, where they learned of McWhorter's parents' divorce. There was no need for trial counsel to obtain documentation verifying the divorce when Carolyn Rowland, for example, could and did testify to facts related to the divorce. Carolyn Rowland told trial counsel during that pre-trial Interview with McWhorter's family that her divorce with Tommy McWhorter was not "bitter." (E.H. 181-82.) She testified to that fact during the penalty phase, too. (R. 1789.) Because records were not necessary to establish facts relevant to McWhorter's parents' divorce, trial counsel were not ineffective for failing to obtain them. As such, this claim is denied.

*xiv. The Claim That Trial Counsel Should Have Obtained Educational Records*

McWhorter's claim that his trial counsel were ineffective for failing to obtain educational records is contained in paragraphs 194 through 195 of his amended Rule 32 petition.

This claim is denied because McWhorter failed to meet his burden of proof. McWhorter asserts in his petition that educational records would have shown school transfers and his "declining academic performance." As discussed at length above, McWhorter's family, including his mother and aunt, fully cooperated with trial counsel's mitigation investigation. Trial counsel did not need to obtain educational records in order to show that McWhorter's grades were poor at times or that he transferred schools. In fact, Elsie Garrison testified to McWhorter's high

school transfers. (R. 1786-87.) McWhorter does not allege what additional information educational records would have uncovered. Trial counsel's performance, therefore, was not deficient, and McWhorter did not suffer prejudice. As such, this claim is denied.

*xv. The Claim That Trial Counsel Should Have Obtained Medical Records*

McWhorter's claim that his trial counsel were ineffective for failing to obtain medical records is contained in paragraphs 196 through 198 of his amended Rule 32 petition.

This claim is denied because McWhorter failed to meet his burden of proof. McWhorter asserts in his petition that medical records would have established that "before age three, Casey had an unusually high number of accidents and medical problems," that he was involved in a life [sic].

McWhorter's claim that his trial counsel were ineffective for failing to obtain DHR records is contained in paragraphs 199 through 202 of his amended Rule 32 petition.

This claim is denied because it fails to meet Rule 32.6(b)'s "clear and specific" pleading requirement. McWhorter first does not plead specifically what the DHR records would contain. Instead, the petition states, "Most likely, from what counsel have learned, the document relates to an allegation that Petitioner was an abused or neglected child." (Pet. at para. 200.) Because McWhorter does not plead what was in the DHR records, this claim is insufficiently pleaded.

In the alternative, this claim is denied because McWhorter failed to meet his burden of proof. Though McWhorter asserts, in conclusory fashion, that the DHR records contain that he was an "abused or neglected child," the evidence presented at the evidentiary hearing did not support that allegation. Plus, trial counsel did not need to obtain the records from DHR because Garrison, who cooperated fully with trial counsel, filed the DHR report on Carolyn Rowland for leaving bruises on McWhorter after "whipping" him. (McWhorter's Exhibit 7, page 5.) Garrison's complaint was the only document in the DHR records presented at the evidentiary hearing. (McWhorter's Exhibit 11.) No further action was taken by DHR. (McWhorter's Exhibit 7, page 5; E.H. 158.) DHR records would not have changed trial counsel's

reasonable mitigation strategy. Trial counsel's performance, therefore, was not deficient, and McWhorter did not suffer prejudice. As such, this claim is denied.

*xvii. The Claim That Trial Counsel Should Have Obtained Records Related To Tommy McWhorter*

McWhorter's claim that his trial counsel were ineffective for failing to obtain records related to his father, Tommy McWhorter, is contained in paragraphs 203 through 204 of his amended Rule 32 petition.

This claim is denied because it fails to meet Rule 32.6(b)'s "clear and specific" pleading requirement. McWhorter does not plead specifically what agency's records trial counsel should have obtained. Therefore, this claim is insufficiently pleaded.

In the alternative, this claim is denied because McWhorter failed to meet his burden of proof. Trial counsel did not need records to learn of Tommy McWhorter's past. Trial counsel discussed with McWhorter's family facts related to Tommy McWhorter. But, according to McWhorter's family, McWhorter and his father "did not have much contact." (E.H. 181.) Carolyn Rowland also told trial counsel that her divorce with Tommy McWhorter was not "bitter." (E.H. 181-82.) She testified to that fact during the penalty phase, too. (R. 1789.) Trial counsel, therefore, decided that Tommy McWhorter's life did not impact McWhorter enough to be pertinent to the penalty phase.

In addition, the facts that trial counsel knew about Tommy McWhorter would have been inconsistent with their mitigation strategy. Trial counsel knew that Tommy McWhorter was a violent alcoholic and a criminal, but they did not want those facts presented to the jury because they feared that the jury would infer that "the apple doesn't fall far from the tree" and that McWhorter, therefore, was a "bad seed." (E.H. 158-59, 579-80.) Plus, trial counsel thought the jury would be interested in hearing mitigation evidence related to McWhorter's life, and not his father's. (E.H. 579-80.) Strategic decisions are "virtually unassailable, especially when they are made by experienced criminal defense attorneys," like McWhorter's counsel. *Williams v. Head*, 185 F.3d [1223] at 1242 (11th Cir. 1999).

Thus, Tommy McWhorter's records would not have changed trial counsel's reasonable mitigation strategy. Trial counsel's performance, therefore, was not deficient, and McWhorter did not suffer prejudice. As such, this claim is denied.

(C. 1181-87.)

The circuit court's findings are supported by the record and law. McWhorter's claim that his attorneys failed to adequately present mitigating evidence is essentially a claim that his attorneys should have presented more mitigating evidence. As this Court has stated:

> "[F]ailure to investigate possible mitigating factors and failure to present mitigating evidence at sentencing can constitute ineffective assistance of counsel under the Sixth Amendment." *Coleman* [*v. Mitchell* ], 244 F.3d [533] at 545 [(6th Cir. 2001)]; *see also Rompilla v. Beard*, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005); *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Our circuit's precedent has distinguished between counsel's complete failure to conduct a mitigation investigation, where we are likely to find deficient performance, and counsel's failure to conduct an adequate investigation where the presumption of reasonable performance is more difficult to overcome:
>
>> [T]he cases where this court has granted the writ for failure of counsel to investigate potential mitigating evidence have been limited to those situations in which defense counsel have totally failed to conduct such an investigation. In contrast, if a habeas claim does not involve a failure to investigate but, rather, petitioner's dissatisfaction with the degree of his attorney's investigation, the presumption of reasonableness imposed by *Strickland* will be hard to overcome.
>
> *Campbell v. Coyle*, 260 F.3d 531, 552 (6th Cir. 2001) (quotation omitted) . . .; *see also Moore v. Parker*, 425 F.3d 250, 255 (6th Cir. 2005). In the present case, defense counsel did not completely

fail to conduct an investigation for mitigating evidence. Counsel spoke with Beuke's parents prior to penalty phase of trial (although there is some question as to how much time counsel spent preparing Beuke's parents to testify), and presented his parents' testimony at the sentencing hearing. Defense counsel also asked the probation department to conduct a presentence investigation and a psychiatric evaluation. While these investigatory efforts fall far short of an exhaustive search, they do not qualify as a complete failure to investigate. *See Martin v. Mitchell*, 280 F.3d 594, 613 (6th Cir. 2002) (finding that defense counsel did not completely fail to investigate where there was "limited contact between defense counsel and family members," "counsel requested a presentence report," and counsel "elicited the testimony of [petitioner's] mother and grandmother"). Because Beuke's attorneys did not entirely abdicate their duty to investigate for mitigating evidence, we must closely evaluate whether they exhibited specific deficiencies that were unreasonable under prevailing professional standards. *See Dickerson v. Bagley*, 453 F.3d 690, 701 (6th Cir.2006).

*Beuke v. Houk*, 537 F.3d 618, 643 (6th Cir.2008). "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying heavy measure of deference to counsel's judgments." *Wiggins*, 539 U.S. at 521-22. "A defense attorney is not required to investigate all leads. . . ." *Bolender v. Singletary*, 16 F.3d 1547, 1557 (11th Cir. 1994). "A lawyer can almost always do something more in every case. But the Constitution requires a good deal less than maximum performance." *Atkins v. Singletary*, 965 F.2d 952, 960 (11th Cir. 1992). "The attorney's decision not to investigate must not be evaluated with the benefit of hindsight, but accorded a strong presumption of reasonableness." *Mitchell v. Kemp*, 762 F.2d 886, 889 (11th Cir. 1985).

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant

79

and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.

*Strickland v. Washington*, 466 U.S. at 691. "The reasonableness of the investigation involves 'not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.'" *St. Aubin v. Quarterman*, 470 F.3d 1096, 1101 (5th Cir. 2006), quoting in part *Wiggins*, 539 U.S. at 527.

*Ray*, 80 So.3d at 984. In addition,

[W]e "must recognize that trial counsel is afforded broad authority in determining what evidence will be offered in mitigation." *State v. Frazier* (1991), 61 Ohio St.3d 247, 255, 574 N.E.2d 483. We also reiterate that post-conviction proceedings were designed to redress denials or infringements of basic constitutional rights and were not intended as an avenue for simply retrying the case. [*Laugesen*] *v. State*, [(1967), 11 Ohio Misc. 10, 227 N.E.2d 663]; *State v. Lott*, [(Nov. 3, 1994), Cuyahoga App. Nos. 66338, 66389, 66390]. Further, the failure to present evidence which is merely cumulative to that which was presented at trial is, generally speaking, not indicative of ineffective assistance of trial counsel. *State v. Combs* (1994), 100 Ohio App.3d 90, 105, 652 N.E.2d 205.

*Jells v. Mitchell*, 538 F.3d 478, 489 (6th Cir.2008).

"[C]ounsel is not required to present all mitigation evidence, even if the additional mitigation evidence would not have been incompatible with counsel's strategy. Counsel must be permitted to weed out some arguments to stress others and advocate effectively." *Haliburton v. Sec'y for the Dep't of Corr.*, 342 F.3d 1233, 1243-44 (11th Cir. 2003) (quotation marks and citations omitted); *see Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1348-50 (11th Cir. 2005) (rejecting ineffective assistance claim where defendant's mother was only mitigation witness and counsel did not introduce evidence from hospital records in counsel's possession showing defendant's brain damage and mental retardation or call psychologist who evaluated defendant pre-trial as having dull normal

intelligence); *Hubbard v. Haley*, 317 F.3d 1245, 1254 n. 16, 1260 (11th Cir. 2003) (stating this Court has "consistently held that there is 'no absolute duty . . . to introduce mitigating or character evidence' " and rejecting claim that counsel were ineffective in failing to present hospital records showing defendant was in "borderline mentally retarded range") (brackets omitted) (quoting *Chandler* [*v. United States*], 218 F.3d [1305] at 1319 [(11th Cir.2000)] ).'

*Wood v. Allen*, 542 F.3d 1281, 1306 (11th Cir. 2008). "The decision of what mitigating evidence to present during the penalty phase of a capital case is generally a matter of trial strategy." *Hill v. Mitchell*, 400 F.3d 308, 331 (6th Cir. 2005).

*Dunaway*, [198] So.3d at [547].

. . . .

In this case, the trial court found that the evidence McWhorter offered at the postconviction evidentiary hearing was either inconsistent with the "good boy, wrong crowd" theory or would have been cumulative to evidence already offered during the penalty phase. In *State v. Gamble*, 63 So.3d 707 (Ala.Crim.App. 2010), a case on which McWhorter relies, this Court specifically distinguished both types of cases:

This is not a case in which the omitted mitigating evidence was cumulative to evidence that was presented, *see Ferguson v. State*, 13 So.3d 418 (Ala.Crim.App. 2008), or in which counsel investigated and made an informed strategic decision not to present evidence concerning Gamble's upbringing, *see Waldrop v. State*, 987 So.2d 1186 (Ala.Crim.App. 2007). Here, counsel's investigation was so inadequate that they failed to discover any mitigation evidence to present at the penalty phase – although the Rule 32 evidentiary hearing clearly showed that there was a plethora of evidence that could have been presented on Gamble's behalf.

*Gamble*, 63 So.3d at 721.

In two sentences in McWhorter's brief to this Court, citing *Gamble*, he also claims error because his trial counsel failed to hire a mitigation specialist. (McWhorter's brief, p. 52.) *Gamble*, however, is distinguishable from this case in

regard to the hiring of a mitigation investigator. In *Gamble*, counsel failed to present any mitigation evidence during the penalty phase. 63 So.3d at 721. In this case, counsel conducted an interview with McWhorter and his family, presented the testimony of four witnesses, and hired a neuropsychologist to evaluate McWhorter for any mental disease or disorder.

Moreover, although the evidence about McWhorter's childhood is indeed disturbing, it does not necessarily mean that trial counsel was ineffective for failing to offer the additional evidence. This Court in *Davis v. State*, 44 So.3d 1118 (Ala.Crim.App. 2009), stated the following in evaluating a similar claim alleging the ineffective assistance of counsel:

> "As a matter of trial strategy, counsel could well decide not to call family members as witnesses because family members can be easily impeached for bias." *Bergmann v. McCaughtry*, 65 F.3d 1372, 1380 (7th Cir. 1995).
>
>> Once counsel conducts a reasonable investigation of law and facts in a particular case, his strategic decisions are "virtually unchallengeable." [*Strickland v. Washington*, 466 U.S. 668] at 690, 104 S.Ct. 2052 [(1984)]. Tactical or reasonable professional judgments are not deficient but a failure to investigate a material matter due to inattention may be deficient. When the claim is that counsel failed to present a sufficient mitigating case during sentencing, the inquiry "is not whether counsel should have presented a mitigation case" but "whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . was itself reasonable." *See Wiggins* [*v. Smith*], 539 U.S. [510] at 523, 123 S.Ct. 2527 [(2003)] (internal citations omitted).
>
> *Powell v. Kelly*, 562 F.3d 656, 670 (4th Cir. 2009). *See also Villegas v. Quarterman*, 274 Fed.Appx. 378, 382 (5th Cir. 2008). Evidence of a difficult childhood has been characterized as a "double-edged" sword. *See Bacon v. Lee*, 225 F.3d 470, 481 (4th Cir. 2000). "[E]mphasizing a client's deprived childhood does not have a very beneficial impact on a northwest Florida jury, given the fact that many jurors have had difficult lives, but have not turned to criminal conduct." *Card v. Dugger*, 911 F.2d 1494, 1511 (11th Cir. 1990). What one juror finds to be mitigation another juror may find aggravating. "[M]itigation may be in the eye of the

beholder." *Stanley v. Zant*, 697 F.2d 955, 969 (11th Cir. 1983). *See also Ford v. Schofield*, 488 F.Supp.2d 1258, 1346 (N.D. Ga. 2007) ("The Supreme Court has stated that the reasonableness of counsel's actions should be evaluated based on 'strategic choices made by the defendant and on information supplied by the defendant.' *Burger v. Kemp*, 483 U.S. 776, 795, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987). . . ."); *Carroll v. State*, 815 So.2d 601, 615 (Fla. 2002) ("By failing to respond to counsel's requests to provide trial counsel with the names of witnesses who could assist in presenting mitigating evidence, Carroll may not now complain that trial counsel's failure to pursue such mitigation was unreasonable."); *Rose v. State*, 617 So.2d 291, 295 (Fla. 1993) ("In light of the harmful testimony that could have been adduced from Rose's brother and the minimal probative value of the cousins' testimony, we are convinced that the outcome would not have been different had their testimony been presented at the penalty phase.").

Copeland testified that he made a strategic decision to rely on a plea for mercy. It is clear from both attorneys' testimony that they conducted an investigation and were aware of Davis's background and upbringing. Copeland stated that he did not believe evidence of Davis's performance in school would have had any value because of the nature of the murders. Based on the unique circumstances presented in this case we cannot say that counsel's actions were unreasonable. Moreover, the testimony at the evidentiary hearing was neither strong nor compelling. Davis was over the age of 25 at the time of the murders. One of Davis's brothers who testified at the postconviction proceedings was 14 years of age at the time of Davis's trial. Another brother who testified was in prison at the time of Davis's trial. Davis's mother painted a different picture of Davis's childhood than did Davis's siblings. Many witnesses admitted that they knew that Davis was selling drugs from his home in Gibbs Village. Other witnesses had not seen Davis for many years. The testimony offered at the postconviction hearing would have been entitled to little weight.

*Davis*, 44 So.3d at 1141-42.

Furthermore, this is not a situation where McWhorter's trial counsel conducted no investigation like counsel in *Porter v. McCollum*, 130 S.Ct. 447, 453-54 (2009), where counsel failed to uncover evidence of the defendant's mental health, family background, and serious drinking problem and did not obtain certain records; or like counsel in *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), where counsel had information that alluded

to the defendant's troubled and difficult childhood but failed to conduct a more thorough investigation; or like counsel in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), where counsel did not begin to investigate mitigation evidence until a week before trial and failed to uncover critical records about the defendant.

Given the particularly egregious facts of the underlying crime – for example, McWhorter's planning the crime for three weeks, lying in wait for several hours, and methodically creating homemade silencers and test-firing them beforehand, etc. – and given that McWhorter admitted to much of the crime, McWhorter has failed to demonstrate that his attorneys rendered ineffective assistance by not offering the additional evidence described above. Evidence of a difficult childhood and drug and alcohol abuse is a two-way street. Such evidence can be helpful in mitigation but it can also be harmful to the defense's case. Additionally, given the methodical, deliberate manner in which McWhorter committed the crime, expert testimony indicating that McWhorter had difficulty in preventing impulsive decisions would not have made any difference. Accordingly, we find no error in the circuit court's conclusion that counsel's performance was not deficient.

### D.

McWhorter also argues that the circuit court erred in finding that trial counsel's performance did not prejudice him. He contends that if evidence of the physical abuse he suffered, the violence to which he was exposed, his sniffing gasoline and freon from a young age, and his emotional state in the period preceding the crime, had been presented to the trial court, he might have been sentenced to life imprisonment without parole.

In assessing claims of ineffective assistance of counsel in the penalty phase of a capital trial, we apply the standard discussed in *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003):

> In *Strickland* [*v. Washington*, 466 U.S. 668 (1984)], we made clear that, to establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, at 694. In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.

539 U.S. at 534.

In sentencing McWhorter to death, the trial court found one aggravating circumstance – that the capital offense was committed while McWhorter was engaged in the commission of or an attempt to commit or flight after committing or attempting to commit a robbery. *See* § 13A-5-49(4), Ala.Code 1975. Here, the circuit court found that the omitted mitigating evidence presented at the postconviction evidentiary hearing would not have outweighed the aggravating circumstance. This Court has also reviewed the mitigating evidence trial counsel allegedly failed to discover and present against the aggravating circumstances presented. After a complete review, we are confident that the mitigating evidence presented at the postconviction hearing – but omitted from the penalty phase of McWhorter's capital-murder trial – would have had no impact on the sentence in this case. *See Wiggins*, 539 U.S. at 534. Consequently, McWhorter was due no relief on his claim that his trial counsel was ineffective for not presenting the additional mitigating evidence in the penalty phase of his capital-murder trial.

*McWhorter*, 142 So. 3d at 1238-50.

McWhorter argues that the appellate court's adjudication of this claim was contrary to and an unreasonable application of *Strickland*. (Doc. 20 at 35-38). To establish a violation of *Strickland*, McWhorter must show that counsel's failure to present the additional mitigation evidence was unreasonable, and that but for counsel's failure to present this evidence, he would not have been sentenced to death. McWhorter has not met this burden.

The appellate court reviewed the actions taken by trial counsel in representing McWhorter. The court noted that counsel interviewed McWhorter, his mother, his aunt and is half-sister, all of whom were cooperative and supportive. Counsel gleaned much information from a "Client Background Information" form completed by McWhorter's family, covering a myriad of topics such as early childhood development, living conditions, medical issues as a child, relationship information, education history, medical and mental health history, substance abuse history, criminal history, and family history; hired a neuropsychologist to evaluate McWhorter for any mental disease or disorder, or any evidence of psychopathology, diminished capacity, susceptibility to influence by others, or brain damage; and obtained and considered a

variety of records, including hospital records from McWhorter's attempted suicide. Trial counsel, experienced criminal attorneys, also were aware that McWhorter's IQ was 88 and that his mother had been reported to DHR for "whipping" him hard enough to leave bruises. Given the information uncovered in their investigation, and because McWhorter's codefendant had already pleaded guilty and the jury had already heard evidence of gang activity during the trial's guilt phase, counsel believed it would be an uphill battle to persuade the jury to spare McWhorter's life. As a result, counsel made a judgment call and formulated the strategy they believed was most likely to save McWhorter's life: to portray McWhorter as a good boy who fell in with the wrong crowd and made a terrible mistake, but did not deserve the death penalty. The state court determined that counsel's investigation and strategic choice aimed at saving McWhorter's life were reasonable, and thus concluded that McWhorter had not met the deficient performance prong of *Strickland*. The state court's determination was not unreasonable.

Similarly, McWhorter is unable to establish that counsel's failure to uncover and present additional evidence in the penalty phase prejudiced him under *Strickland*. McWhorter faults trial counsel for failing to introduce the following evidence: parental abuse and neglect; McWhorter's suicidal behavior, including playing Russian roulette; and McWhorter's significant drug usage, demonstrating that he was maladjusted and indicating that his behavioral problems might have resulted from a genetic predisposition. (Doc. 1 at 42-45). He argues there is a reasonable probability that had this evidence been presented, the jury would have recommended life imprisonment rather than death. That argument misses the mark.

As the appellate court correctly noted:

In *Strickland* [*v. Washington*, 466 U.S. 668 (1984)], we made clear that, to establish prejudice, a "defendant must show that there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, at 694. In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.

*McWhorter*, 142 So. 3d at 1250 (quoting *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)).

After hearing all of the evidence that was not introduced in the guilt phase of his trial, the trial court found that the omitted evidence would not have outweighed the aggravating circumstance that McWhorter killed the victim while committing a robbery. The Alabama Court of Criminal Appeals reweighed that evidence and also concluded that, even if the additional evidence had been presented, it would have had no effect on the death sentence. Given the overwhelming evidence of McWhorter's guilt, the fact that the crime was pre-planned, and the fact that McWhorter and his codefendant waited in the victim's house for several hours, preparing silencers for the guns they intended to use to kill the victim when he returned home, it is not unreasonable to conclude that the additional evidence offered by McWhorter would not have resulted in a different sentence.

Thus, the appellate court's determinations that trial counsel were not deficient and that, in any event, McWhorter was not prejudiced by trial counsel's failure to present additional mitigating evidence, were neither contrary to nor an unreasonable application of *Strickland*.

### 2. Failure to Object to McWhorter's Being Transported to and from the Courtroom in Handcuffs

#### a. The Parties' Arguments

McWhorter next claims that throughout his trial, "authorities transported him to and from the courtroom in handcuffs . . . applying and removing McWhorter's handcuffs . . . in full view of the jury." (Doc. 1 at 45). He argues that this "undermined his presumption of innocence and

likely impacted the jury's impression of him" and the "resulting shame and embarrassment likely endured, burdening his courtroom interactions with counsel and his emotional connection to the jury." (*Id*. at 45-46). He maintains that trial counsel were ineffective for failing to object to the routine shackling without a strategic reason. (*Id*. at 47).

In his amended Rule 32 petition, McWhorter alleged the following:

96. On each day of the trial, the jurors could see [McWhorter] being led into the courtroom manacled, in handcuffs. Jurors could see [McWhorter's] handcuffs being put on and removed.

97. Trial counsel never objected to this procedure.

98. The shackling procedure stripped [McWhorter] of the presumption of innocence that is constitutionally afforded to all defendants. One of the 'basic components of a fair trial is the presumption of innocence.' *Estelle v. Williams*, 425 U.S. 501, 503 (1976). 'To implement the presumption, courts must be alert to factors that may undermine the fairness of the fact-finding process.' *Id*. Shackling tends not only to undermine the defendant's presumption of innocence, but 'is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold.' *Illinois v. Allen*, 397 U.S. 337, 344 (1970).

99. "All of the authorities we have studied are agreed that to bring a prisoner before the bar of justice in handcuffs or shackles, where there is no pretense of necessity, is inconsistent with our notion of a fair trial, for it creates in the minds of the jury a prejudice which will likely deter them from deciding the prisoner's fate impartially." *Clark v. State*, 195 So.2d 786, 787 (Ala. 1967).

100. When shackling occurs, it must be subjected to "close judicial scrutiny," to determine if there was an "essential state interest" furthered by compelling a defendant to wear shackles and whether less restrictive, less prejudicial methods of restraint were considered or could have been employed. *Elledge v. Dugger*, 823 F.2d 1439, 1451 (11th Cir. 1987) (citations omitted). Although "[G]reat weight must be accorded the discretion of the trial court" in determining what security measures are necessary, constitutional limits must be maintained, *Goodwin v. State*, 495 So.2d 731, 733 (Ala.Crim.App. 1986), by balancing the state interest in security with the potential for prejudice to the defendant.

101. [McWhorter] posed no risk to justify his being shackled throughout his trial. His behavior was neither boisterous nor recalcitrant. In fact, he sat quietly

throughout the proceedings. He made no threats at any point during the trial, or leading up to it, and there was therefore no persuasive reason why handcuffs could not be removed before he entered the courtroom, or why he could not have been permitted to exit the courtroom without being shackled.

102. The decision to exhibit [McWhorter] in shackles, each day of the trial, was an uninformed one, and made without considering less-restrictive security measures. It violated [McWhorter's] rights to due process, a fair trial, and a reliable sentencing protected by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, the Alabama Constitution, and Alabama law.

103. By failing to object to the shackling procedure, or to make an appropriate record, trial counsel not only failed to preserve the issue for consideration on direct appeal, they also failed to measure up to an objective standard of reasonableness in their representation of [McWhorter], in that they permitted the fairness of the trial to be undermined and compromised, and permitted [McWhorter's] Alabama and Federal Constitutional rights to be violated as set forth above, without any strategic reason for acting as they did.

*McWhorter*, 142 So. 3d at 1261-62.

The Rule 32 judge stated the following in the final order denying McWhorter's amended

petition:

McWhorter alleges that jurors saw him led to the courtroom wearing handcuffs and that trial counsel did not object. McWhorter does not plead specifically how this prejudiced him, so this claim fails to meet Rule 32.6(b)'s "clear and specific" pleading requirement. Also, this Court holds that McWhorter cannot show prejudice because "it is not ground for mistrial that the accused appeared before the jury in handcuffs when his appearance was only part of going to and from the courtroom." *Dunaway v. State*, [198] So.3d [530, 560] (Ala.Crim.App. 2009) (affirming the dismissal of Dunaway's substantially similar [ineffective assistance of counsel] claim for failure to object where testimony at Dunaway's Rule 32 hearing only showed that an alternate juror saw the handcuffs).

*McWhorter*, 142 So. 3d at 1262-63. The Alabama Court of Criminal Appeals affirmed the

dismissal of this claim. *Id*. at 1263-64.

Respondent argues that the Alabama Court of Criminal Appeals decision on this claim is not contrary to or an unreasonable application of *Strickland*. In dismissing this claim, the appellate court held:

> In order to prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate both that "counsel's performance was deficient" and that this deficiency was so severe that the defendant was deprived of a fair trial. *Strickland*, 466 U.S. at 687. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.

> In Alabama, it has consistently been held that

> "[b]ringing a prisoner before the bar of justice in handcuffs or shackles, where there is no pretense of necessity, is inconsistent with our notion of a fair trial." *Brock v. State*, 555 So.2d 285, 288 (Ala.Crim.App. 1989), *on return to remand*, 580 So.2d 1390 (Ala.Crim.App. 1991). The decision to restrain a defendant rests with the trial judge, and, absent an abuse of discretion, this Court will not disturb his ruling on appeal. *Id.* at 289. "Ultimately, however, it is incumbent upon the defendant to show that less drastic alternatives were available and that the trial judge abused his discretion by not implementing them." *Id.* (internal citation and quotation marks omitted). "It is not always reversible error for a defendant to be handcuffed or shackled in front of the jury." *Perkins v. State*, 808 So.2d 1041, 1079 (Ala.Crim.App. 1999), *aff'd*, 808 So.2d 1143, 1145 (Ala. 2001)."

*McCall v. State*, 833 So.2d 673, 676 (Ala.Crim.App. 2001) (holding that, although the trial judge failed to state his reasons for requiring an inmate witness to testify in shackles and prison clothing, defendant failed to show that he had suffered any prejudice). *See also Brock v. State*, 555 So.2d 285, 289 (Ala.Crim.App. 1989) (holding that, although the facts of that case did not "explicitly indicate a fear by the court that the defendant would attempt to escape, it is not reversible error for a trial court to allow a defendant to be brought into the courtroom handcuffed"). "It is not ground for mistrial that the accused appeared before the jury in handcuffs when his appearance was only a part of going to and from the courtroom." *Justo v. State*, 568 So.2d 312, 318 (Ala.Crim.App. 1990) (quoting *Cushing v. State*, 455 So.2d 119, 121 (Ala.Crim.App. 1984)). Whether a defendant may be handcuffed for purposes of being taken to and from the

courtroom is left to the discretion of the trial court. *McWilliams v. State*, 640 So.2d 982 (Ala.Crim.App. 1991).

> We affirm the circuit court's dismissal of the claims. McWhorter has not presented any facts to support this claim; the claim is based on bare assertions and conclusions. Consequently, McWhorter has not met either the burden of pleading imposed by Rule 32.3 or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P. McWhorter has not shown that trial counsel's performance was outside "the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, nor has McWhorter shown that there is a reasonable probability that, if trial counsel had made an objection to the handcuffs, the result of the trial would have been different. Accordingly, summary dismissal of this claim was proper.

*McWhorter*, 142 So. 3d at 1263-64.

### b.    Analysis

The Alabama Court of Criminal Appeals found that in presenting this claim McWhorter had not met the burden of pleading imposed by Rule 32.3 or the specificity requirements of Rule 32.6(b). *Id*. at 1263. The Eleventh Circuit has held that a Rule 32 dismissal for lack of specificity is a merits determination. *Borden v. Allen*, 646 F.3d 785, 812-13 (11th Cir. 2011). As such, this court must conduct a deferential AEDPA review of the state court's decision pursuant to 28 U.S.C. § 2254(d).

After review, the court concludes that the state appellate court's decision was neither contrary to nor an unreasonable application of *Strickland*. To prevail on a *Strickland* claim, McWhorter must show that counsel's performance was deficient and that he was prejudiced by the deficient performance. 466 U.S. at 687. To prove counsel's performance was deficient, McWhorter must establish that being transported to and from the courtroom in handcuffs violated his right to a fair trial. However, the "well established rule in this circuit is that a 'brief and fortuitous encounter of the defendant in handcuffs is not prejudicial and requires an

affirmative showing of prejudice by the defendant.' *Wright v. Texas*, 533 F.2d 185, 187 (5th Cir. 1976); *United States v. Bankston*, 424 F.2d 714 (5th Cir. 1970); *Hardin v. United States*, 324 F.2d 553 (5th Cir. 1963)." *Allen v. Montgomery*, 728 F.2d 1409, 1414 (11th Cir. 1984).

McWhorter failed to establish that he was prejudiced by being handcuffed while transported to and from the courtroom. Thus, counsel were not deficient for failing to object to the handcuffs. Furthermore, even assuming McWhorter could establish deficient performance by showing that counsel's failure to object to McWhorter being transported in handcuffs was objectively unreasonable (and, to be clear, he has not made that showing), he has not shown prejudice, *i.e.*, that the result of the trial would have been different if counsel had made such an objection. Thus, McWhorter is not entitled to relief on this claim.

### 3. Failure to Object to the Trial Court's Preparation of a Sentencing Order Prior to the Sentencing Hearing

Immediately after the May 13, 1994 sentencing hearing, the trial judge informed McWhorter that he was not going to postpone sentencing him, but would do it "at this time." (Vol. 12, Tab 31 at 1871). The judge stated: "I have prepared and will file a complete order making numerous findings that I incorporate herein into this sentencing." (*Id.*). He then sentenced McWhorter to death. (*Id*. at 1872). The trial judge signed the sentencing order the same day. (Vol. 36, Tab 76).

### a. The Parties' Arguments

McWhorter claims that counsel were ineffective for failing to object to the "trial judge's failure to consider [his] sentencing arguments by drafting his opinion *prior to* the sentencing hearing." (Doc. 1 at 48).

McWhorter unsuccessfully raised this claim in his Rule 32 petition. (Vol. 21, Tab 56 at 512). The trial court denied the claim in its final order denying McWhorter's Rule 32 petition:

> This claim is denied because it fails to meet Rule 32.6(b)'s "clear and specific" pleading requirement. McWhorter does not plead what objection effective trial counsel would have made or how he was prejudiced by Judge Gullahorn's drafting a sentencing order prior to the sentencing hearing. When questioned about this claim at the evidentiary hearing, [trial counsel] said, "I don't know what objection I would make." And, McWhorter failed to show what objection should have been made. It was McWhorter's burden to plead the relevant objection. McWhorter did not do that; therefore, this claim is denied because it is insufficiently pleaded.

> In the alternative, this claim is denied because it fails to state a valid claim for relief or present a material issue of fact or law, under Rule 32.7(d) of the Alabama Rules of Criminal Procedure. Judge Gullahorn's decision to draft a sentencing order prior to the sentencing hearing did not violate any state or federal law, and it did not prejudice McWhorter. McWhorter failed to prove that Judge Gullahorn did not consider the evidence and arguments presented during the sentencing hearing. Judge Gullahorn was free to scrap his draft sentencing order after he heard evidence and arguments during sentencing hearing. Because Judge Gullahorn obviously was not convinced by the evidence and arguments presented, he sentenced McWhorter to death at the conclusion of the sentencing hearing. It is likely that no objection would have been sustained. Trial counsel were not deficient for not raising an objection with no ground to support it, and McWhorter was not prejudiced. Therefore, this claim is without merit and is denied by this Court.

(Vol. 24, Tab 65 at 1150-51). McWhorter did not appeal the denial of this claim to the Alabama Court of Criminal Appeals. (*See* Vol. 33, Tab 71 at 1-89).

Respondent argues that because McWhorter did not raise this claim on appeal from the denial of his Rule 32 petition, it is unexhausted and, therefore, procedurally barred from review in this court. (Doc. 14 at 45-46).

### b.    Analysis

First, and as an initial matter, this court finds McWhorter has failed to satisfy the requirement that a petitioner exhaust his federal claims in state court before presenting them in a

federal habeas petition. *See* 28 U.S.C. § 2254(b)(1)(A). To properly exhaust this claim, McWhorter was required to "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In Alabama, a complete round of the established appellate review process includes an appeal to the Alabama Court of Criminal Appeals, an application for rehearing to that court, and a petition for a writ of certiorari in the Alabama Supreme Court. *See Smith v. Jones*, 256 F.3d 1135, 1140-41 (11th Cir. 2001); *Pruitt v. Jones*, 348 F.3d 1355, 1359 (11th Cir. 2003) (applying the exhaustion requirement to state post-conviction proceedings as well as direct appeals).

After the trial court denied this claim, McWhorter was required to present the claim to the Alabama Court of Criminal Appeals, but he did not. A claim that was not presented to the state court and can no longer be litigated under state procedural rules is procedurally barred from federal review. *See Boerckel*, 526 U.S. at 839-40, 848; *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991). Alabama law does not allow successive collateral petitions and provides a one-year limitations period for filing such petitions. *See* Ala. R. Crim. P. 32.2(b) and (c). Because McWhorter cannot return to state court to file an untimely appeal from the denial of his Rule 32 petition or another postconviction motion, this claim is procedurally defaulted. McWhorter makes no argument that he can show cause for, or prejudice from, the default of this claim. Thus, the claim is barred from review in this court.

Additionally, and in the alternative, the court notes that even if it were to consider this claim on its merits, it would clearly fail. McWhorter cannot show that the Rule 32 court unreasonably denied his ineffective assistance of counsel claim for at least two reasons. First,

McWhorter's trial counsel were not deficient for failing to object to the trial judge's decision to draft his sentencing order prior to his sentencing hearing because no Alabama or federal law forbids that practice. As the Rule 32 court explained, the trial judge remained "free to scrap his draft sentencing order after he heard evidence and arguments during sentencing hearing." (Vol. 24, Tab 65 at 1150-51).

Second, McWhorter was not prejudiced by his counsel's failure to object the pre-drafted sentencing order for the same reason that his trial counsel were not deficient: there is nothing improper about drafting a sentencing order before a sentencing hearing and, therefore, any objection by McWhorter's counsel would have been unavailing. The drafting of such an order does not in any way cabin the judicial officer into a particular ruling. The judge was free to rethink the issue, revise or scrap the draft, or take any of a number of other steps. Under § 2254(d), McWhorter simply cannot show that the state court's decision was contrary to or an unreasonable application of clearly established federal law, as determined by the U.S. Supreme Court.

### 4. The Rule 32 Court's Exclusion of Evidence Does Not Warrant an Evidentiary Hearing in this Court

#### a. The Parties' Arguments

McWhorter also claims that "[a]dditional evidence demonstrating trial counsel's shortcomings was never heard because the Hearing Court improperly excluded it on hearsay grounds." (Doc. 1 at 49). He argues that this court "must" consider that evidence here in determining whether trial counsel were ineffective.

Specifically, McWhorter argues that:

In order to demonstrate to the Hearing Court trial counsel's inadequate investigation and deficient performance at sentencing, McWhorter sought to introduce the testimony of Janet Vogelsang and Dr. Tarter. McWhorter argued that the testimony of Vogelsang and Tarter should have been offered by his counsel at his sentencing. State law gave McWhorter the right to introduce out-of-court statements other than those made by the testifying witness at his sentencing hearing. Ala. R. Evid. 1101(b)(3) (excluding application of the Rules of Evidence from sentencing proceedings). However, the Hearing Court severely limited the testimony of both Vogelsang and Tarter on the ground that state law did not permit hearsay testimony in Rule 32 proceedings, which prevented McWhorter from demonstrating trial counsels' unconstitutionally deficient performance.

The Hearing Court significantly curbed the testimony of Vogelsang, who conducted extensive interviews with McWhorter's family, and was prepared to testify, as she would have at his sentencing, about the remarkable levels of violence and drugs that permeated McWhorter's family and surroundings as he grew up, and the effects this had on McWhorter. Vogelsang would have testified that being surrounded by family members who used alcohol and drugs, as well as abusive persons, would likely have perverted McWhorter's insight, judgment and decision making − thus placing him at risk for serious trouble.

The Hearing Court ruled that Vogelsang could not testify to anything that had not already been presented at the Rule 32 Hearing because under Alabama's evidence law, "[e]xperts without firsthand knowledge generally may not base opinions upon facts or data that have not themselves been admitted into evidence." Hearing Transcript at R526/13-15. As a consequence, Vogelsang was prevented from explaining how the extraordinary circumstances under which McWhorter grew up negatively affected his insight, judgment and decision making, making him a high-risk candidate for trouble. Offer of Proof, Hearing Exhibit 31, ROA Supplement 3, at C106-110. The Hearing Court's erroneous exclusion of this evidence kept the Hearing Court from considering it in assessing McWhorter's ineffective assistance claim.

The Hearing Court's ruling also severely limited the testimony of Dr. Tarter. Without the improper ruling, Dr. Tarter would have drawn on Vogelsang's testimony to explain that McWhorter's genetic risks for substance abuse and related psychological conditions were extremely high, and that it would have taken a very strong and positive environment as well as counseling and other treatment in order to countervail those risks. *Id.* at C110-111.

McWhorter argued that the testimony of Dr. Tarter and Vogelsang was relevant to show trial counsel's inadequate investigation, and therefore should have been admitted. McWhorter was entitled to introduce evidence that trial counsel should have presented at the penalty phase of McWhorter's trial. At the

Rule 32 Hearing, this evidence could have included hearsay. *See* Hearing Transcript at R30-31, R66-71, R253-54, R523-27. Because the Hearing Court erroneously excluded this testimony, it was unable to consider it in evaluating McWhorter's ineffective assistance of counsel claim.

(Doc. 1 at 49-52).

### b.    Analysis

When McWhorter raised this claim on appeal from the denial of his Rule 32 petition, the Alabama Court of Criminal Appeals affirmed, finding that the testimony in question was properly excluded under Alabama law. *McWhorter*, 142 So. 3d at 1253-55. To the extent McWhorter may be challenging the state courts' rulings that this evidence was properly excluded under Alabama law, his claim is foreclosed because a state court's interpretation of its own laws provides no basis for federal habeas relief. *See, e.g.*, *Beverly v. Jones*, 854 F.2d 412, 416 (11th Cir. 1988) (state court construction of state law is binding on federal courts entertaining petitions for habeas relief); *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (same); *Pulley v. Harris*, 465 U.S. 37, 42 (1984) (perceived errors of state law provide no basis for federal habeas relief); *Callahan v. Campbell*, 427 F.3d 897, 932 (11th Cir. 2005) ("It is a fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.").

Rather than raising this claim about the alleged improper exclusion of testimony by Dr. Ralph Tarter and Ms. Janet Vogelsang as an independent claim for relief, McWhorter appears to advance the claim as a basis for seeking an evidentiary hearing in this court. In particular, he makes the following argument in support of an evidentiary hearing on his claim that trial counsel were ineffective because they failed to investigate and present mitigating evidence:

Typically, federal courts may not conduct evidentiary hearings in habeas cases where the applicant has "failed to develop" the factual basis of a claim in state court proceedings. 28 U.S.C. § 2254(e)(2). A petitioner cannot be said to have "failed to develop" relevant facts, however, if he diligently sought, but was denied, the opportunity to present evidence at each stage of his state proceedings. *Williams v. Taylor*, 529 U.S. 420, 437 (2000) (*Williams I*). Where a petitioner was "unable to develop his claim in state court despite diligent effort," a federal court may order an evidentiary hearing. *Id.*

(Doc. 1 at 52).

Section 2254(e)(2) provides as follows:

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –

(A) the claim relies on –

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

The question is whether McWhorter can properly present this claim in this court. Absent certain unique circumstances, a habeas court is barred from holding an evidentiary hearing if the petitioner fails to develop the factual basis of a failure to investigate claim in the state court. *Williams v. Alabama*, 791 F.3d 1267, 1276 (11th Cir. 2015) (citing 28 U.S.C. § 2254(e)(2)). Consistent with its opening clause, § 2254(e)(2) "applies only to prisoners who have 'failed to

develop the factual basis of a claim in State court proceedings.'" *Id.* (quoting *Williams v. Taylor*, 529 U.S. 420, 430 (2000)). "Failure" connotes some "omission, fault or negligence" on the part of the petitioner. *Id.* (quoting *Taylor*, 529 U.S. at 431). Thus, "a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, *attributable to the prisoner or the prisoner's counsel.*" *Id.* (emphasis added) (quoting *Taylor*, 529 U.S. at 432 and citing *Breedlove v. Moore*, 279 F.3d 952, 960 (11th Cir. 2002) ("[A] petitioner cannot be said to have 'failed to develop' relevant facts if he diligently sought, but was denied, the opportunity to present evidence at each stage of his state proceedings.")).

Having said that, McWhorter can only be said to have failed to develop the factual basis of his failure to investigate claim if there is lack of diligence, or some greater fault, attributable to him or his counsel. In assessing this question, the court asks whether McWhorter "made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend . . . upon whether those efforts could have been successful." *Id.* at 1277 (quoting *Taylor*, 529 U.S. at 435).

McWhorter argues that he was diligent because he "sought to present evidence of trial counsel's ineffective assistance at every stage of his state proceedings." (Doc. 1 at 52). He maintains that the trial court refused to allow him to present additional testimony from Dr. Tarter and Ms. Vogelsang on the ground that hearsay testimony is not allowed in Rule 32 proceedings.[39] When McWhorter objected to the Rule 32 court limiting the testimony of Ms.

---

[39] McWhorter did not object on hearsay grounds to any limitations placed on Dr. Tarter's testimony, so it is unclear why he included Dr. Tarter in this claim. (*See* Vol. 28 at 658-709; Vol. 29 at 710-725). However, to the extent McWhorter may be claiming that he would have tried to elicit more testimony from Dr. Tarter, but for the trial court's prior ruling that Ms. Vogelsang was not permitted to testify to conclusions based on facts and data that were not in evidence, the court will assume that McWhorter would seek to elicit additional testimony from Dr. Tarter in an evidentiary hearing in this court.

Vogelsang, the court overruled the objection, noting that under Alabama law, "[e]xperts without firsthand knowledge generally may not base opinions upon facts or data that have not themselves been admitted into evidence." (Vol. 28 at 526-27).

As the Alabama Court of Criminal Appeals pointed out, McWhorter could easily have remedied this by calling as witnesses his family members, friends and others with first-hand knowledge of the facts and data necessary to enable the expert witnesses to provide their complete opinions. *McWhorter*, 142 So. 3d at 1256-57. However, these witnesses were not called, and as a result, the experts were not allowed to provide opinions based upon facts and data provided to those experts outside of court. Under these circumstances, the court cannot say that McWhorter and his Rule 32 counsel acted with diligence in trying to elicit further testimony from either Dr. Tarter or Ms. Vogelsang. Importantly, McWhorter does not allege that his Rule 32 counsel were constitutionally ineffective for failing to call additional witnesses at the evidentiary hearing. McWhorter is not entitled to an evidentiary hearing on his failure-to-investigate claim.

### D. McWhorter's Claim That the State Failed to Disclose Evidence Directly Relevant to Mitigation in Violation of *Brady v. Maryland*, 373 U.S. 83 (1963)

#### 1. The Parties' Arguments

McWhorter contends that the prosecution violated his rights to due process, a fair trial, and a reliable sentencing by failing to inform him of certain exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, he claims that

> less than two months before [his] trial, a jailhouse informant named Timothy Rice disclosed to state prosecutors that McWhorter's co-defendant, Daniel Miner, admitted to firing the shot that killed the victim, Lee Williams. ROA 3, at C503. Rice told the prosecution that McWhorter shot Williams only once in the leg, and that the remaining, and fatal, shots were fired by Miner. McWhorter alleged that

> the prosecution's willful suppression of this evidence precluded McWhorter from ever presenting this information to the jury and resulted in severe prejudice to McWhorter's defense.

(Doc. 1 at 55). McWhorter argues that this evidence was "indisputably highly favorable material evidence of paramount importance to the jury's penalty phase deliberations" and "would tend to reduce [his] culpability and penalty." (*Id.*) (citing *Brady*).

Respondent argues that this claim is procedurally barred from review in this court and that, in any event, the claim fails on the merits.

### 2. Analysis

McWhorter raised his *Brady* claim concerning Timothy Rice's statement for the first time in his Rule 32 petition. The Rule 32 court summarily dismissed the claim pursuant to Rule 32.7(d) of the Alabama Rules of Criminal Procedure. (Vol. 23 at 865; Vol. 24, Tab 65 at 1126). On appeal, the Alabama Court of Criminal Appeals affirmed the Rule 32 court's summary dismissal of the claim because it was procedurally barred and because it was insufficiently pleaded. *McWhorter*, 142 So. 3d at 1257. The court concludes that the claim is procedurally defaulted and that, even were it to consider the claim on the merits, the claim would fail.

### a. Procedural Default

The Alabama Court of Criminal Appeals held that McWhorter's *Brady* claim was procedurally barred under Alabama Rule of Criminal Procedure 32.2(a)(3) and (a)(5) "because it could have been raised at trial and on appeal but was not." *McWhorter*, 142 So. 3d at 1257. Rule 32.2(a) is titled "Preclusion of Grounds" and provides that a petitioner "will not be given relief under this rule based upon any ground" "[w]hich could have been but was not raised at trial" or "[w]hich could have been but was not raised on appeal." Ala. R. Crim. P. 32.2(a)(3), (a)(5). The

Court of Criminal Appeals explained that Rule 32.2(a)(3), (5) bars a petitioner's claim unless the petitioner shows "that the information [forming the basis of his claim] was not known, and could not reasonably have been discovered, at trial or in time to raise the issue in a motion for new trial or on appeal." *McWhorter*, 142 So. 3d at 1261 (alteration in original). The court concluded that Rule 32.2(a)(3) and (a)(5) required McWhorter "to plead that his claim [was] based on newly discovered evidence and could not have been raised at trial or on direct appeal." *Id.* at 1260. The court found that "McWhorter failed to include in his petition any facts indicating that the State's alleged suppression of Rice's statement taken two months before trial continued until such time as the claim could not have been raised in a posttrial motion or on appeal." *Id.* "Because McWhorter did not allege any facts in his Rule 32 petition indicating when he learned of the existence of Rice's alleged statement or indicating that the discovery of the statement did not occur until after the time for filing a motion for a new trial or an appeal had lapsed," the court concluded that his *Brady* claim was "procedurally barred." *Id.*

Under the procedural default doctrine, "[a] state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim." *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001). However, a federal claim rejected on state procedural grounds is procedurally defaulted only "if the state procedural ruling rests upon 'adequate and independent' state grounds." *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010). The court must therefore determine whether the procedural rule the Court of Criminal Appeals applied to bar McWhorter's *Brady* claim – that a Rule 32 Petition must contain allegations negating the preclusive bars of Rule 32.2(a)(3) and (a)(5) to survive

summary dismissal – constitutes an "adequate and independent" state law ground for procedural default purposes.

The Eleventh Circuit applies a three-part test to determine whether a state court's procedural ruling is adequate and independent for purposes of procedural default doctrine: (1) "the last state court rendering a judgment in the case must clearly and expressly state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim"; (2) "the state court's decision must rest entirely on state law grounds and not be intertwined with an interpretation of federal law"; and (3) "the state procedural rule must be adequate, i.e., firmly established and regularly followed and not applied in an arbitrary or unprecedented fashion." *Id.* at 1156-57 (internal quotation marks omitted). There is no question the first two elements are met here. The Court of Criminal Appeals expressly stated that McWhorter's *Brady* claim "was procedurally barred because it could have been raised at trial and on appeal but was not" and cited Rule 32.2(a)(3) and (a)(5) for that proposition. *McWhorter*, 142 So. 3d at 1257. And the state court's procedural ruling rested solely on its finding that McWhorter's Rule 32 petition "did not allege any facts . . . indicating when he learned of the existence of Rice's alleged [exculpatory] statement." *Id.* at 1260. Thus, the only question is whether the procedural rule applied by the state court to bar McWhorter's *Brady* claim was "adequate."

One reason a state procedural bar might be "inadequate" is if the state court erroneously applied the state procedural rule to bar a federal claim that should not in fact be barred under a correct interpretation of the state procedural rule.[40] *See Ward*, 592 F.3d at 1156 (explaining that

---

[40] Candidly, the court has been unable to locate any authority holding that a state court's erroneous application of a state procedural rule to bar a federal claim renders the state ground for denying the claim

103

"adequate" state procedural rules must not be applied "in an arbitrary or unprecedented fashion").

McWhorter contends the Court of Criminal Appeals erroneously applied Rule 32.2(a)(3) and (a)(5) to bar his *Brady* claim because those provisions do not require a habeas petitioner to affirmatively assert, at the pleading stage, that he could not have raised the claim at trial or on appeal. (Doc. 20 at 43). He thus appears to argue that the state procedural bar is not "adequate" to bar his federal claim because the Court of Criminal Appeals committed state-law error in applying the bar.

McWhorter is correct that the procedural rule applied to bar his *Brady* claim – that a Rule 32 Petition must contain affirmative allegations negating the preclusive bars of Rule 32.2(a)(3) and (a)(5) to survive summary dismissal – has since been squarely rejected by the Alabama Supreme Court. *See Ex parte Beckworth*, 190 So. 3d 571, 575 (Ala. 2013) (holding that habeas petitioners have no burden to plead facts negating the preclusive bars of Rule 32.2(a)(3) and (a)(5) to survive summary dismissal of their petition). But the test for deciding if a state procedural rule is "adequate" is whether the rule was "firmly established and regularly followed *at the time it was applied*," not at some later time. *Edwards v. Carpenter*, 529 U.S. 446, 450 (2000) (emphasis added) (internal quotation marks omitted) (describing the holding of *Ford v. Georgia*, 498 U.S. 411, 423-424 (1991)).[41] And there is no question that the rule applied to bar

---

"inadequate." The general rule is that "state-law violations provide no basis for federal habeas relief." *Estelle v. McGuire*, 502 U.S. 62, 68 n.2 (1991). Nevertheless, the court entertains McWhorter's argument on this point out of an abundance of caution.

[41] Alternatively, the relevant time for deciding whether a state procedural rule was firmly established and regularly followed might be the time at which the petitioner "failed to comply with" the rule. *Hurth v. Mitchem*, 400 F.3d 857, 864 (11th Cir. 2005); *see also Ward*, 592 F.3d at 1176 (considering whether Georgia's procedural default rule, which bars claims that could have been but were not raised at trial or on appeal from being raised in state habeas proceedings, was firmly established and consistently followed "at the time of [the petitioner's] trial and direct appeal"). In light of the fact that McWhorter's *Brady* claim was rejected because he failed to comply with a state

McWhorter's *Brady* claim was firmly established and regularly applied, both in 2005 when he filed his Amended Rule 32 Petition and in 2011 when the state appellate court ruled on the claim. *See Beckworth v. State*, 190 So. 3d 527, 541 (Ala. Crim. App. 2009) (holding that a summarily dismissed *Brady* claim was procedurally barred because petitioner "failed to include in his petition any facts indicating when he learned of [the alleged exculpatory statement] or indicating that he did not learn about the statement in time to raise the issue in a posttrial motion or on appeal"); *Bryant v. State*, 181 So. 3d 1087, 1123 (Ala. Crim. App. 2011) (same); *Ray v. State*, 80 So. 3d 965, 973-74 (Ala. Crim. App. 2011) (same); *Davis v. State*, 44 So. 3d 1118, 1143-44 (Ala. Crim. App. 2009) (same); *Windsor v. State*, 89 So. 3d 805, 825 (Ala. Crim. App. 2009) (same); *Smith v. State*, 71 So. 3d 12, 35 (Ala. Crim. App. 2008) (same); *Boyd v. State*, 913 So. 2d 1113, 1142 (Ala. Crim. App. 2003); *Williams v. State*, 782 So. 2d 811, 818 (Ala. Crim. App. 2000) (same). The fact that the Alabama Supreme Court later abrogated that rule in 2013, *see Ex parte Beckworth*, 190 So. 3d at 575, has no bearing on whether the rule was an "adequate" state ground of decision at the time it was applied to bar McWhorter's *Brady* claim. McWhorter's *Brady* claim is procedurally defaulted.

Any doubts about whether McWhorter's *Brady* claim is procedurally defaulted are resolved by binding Eleventh Circuit precedent. In *Boyd*, the Eleventh Circuit considered a *Brady* claim nearly identical to the one at issue here—*i.e.*, that the prosecution failed to turn over exculpatory statements made by the petitioner's codefendants. 697 F.3d at 1334. The state court had rejected the *Brady* claim as procedurally barred for the same reason the Alabama Court of

---

*pleading requirement*, the time at which he failed to comply with the rule was when he filed his Amended Rule 32 Petition. But whether the relevant time is when he filed his Rule 32 Petition or when the Court of Criminal Appeals ruled on his claim, the rule applied to bar McWhorter's *Brady* claim was firmly established and regularly followed in either case.

Criminal Appeals rejected *McWhorter*'s claim here: because the petitioner "did not assert in his petition that the claim was based on newly discovered evidence or that any alleged suppression by the State continued until such time as the claim could not have been raised at [his] trial." *Boyd*, 913 So. 2d at 1142. The Eleventh Circuit held that Boyd's *Brady* claims were procedurally defaulted, *Boyd*, 697 F.3d at 1335, and that holding is controlling here.

McWhorter does not argue that he can show cause or prejudice to excuse his procedural default or that failure to consider his *Brady* claim would result in a "fundamental miscarriage of justice." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). Moreover, as explained below, because McWhorter cannot establish the prejudice necessary to succeed on his *Brady* claim, he also cannot establish prejudice to excuse the procedural default of his *Brady* claim. *See Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). The court also finds that McWhorter has not shown the "fundamental miscarriage of justice" exception to the procedural default doctrine applies.

### b. Merits

Even if McWhorter's *Brady* claim, "somehow, were not procedurally barred," this court's review of the claim would still be governed by § 2254(d)'s deferential standard of review. *Boyd*, 697 F.3d at 1335. And under that standard, the court has no trouble concluding that the state appellate court's rejection of McWhorter's *Brady* claim was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

The Eleventh Circuit has summarized the *Brady* doctrine as follows:

> A *Brady* violation has three components: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L.Ed. 2d 286 (1999). Evidence is not considered to have been suppressed if "the evidence itself . . .

proves that [the petitioner] was aware of the existence of that evidence before trial." *Felker v. Thomas*, 52 F.3d 907, 910 (11th Cir. 1995). The prejudice or materiality requirement is satisfied if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L.Ed. 2d 481 (1985); *see also Kyles v. Whitley*, 514 U.S. 419, 433, 115 S. Ct. 1555, 131 L.Ed. 2d 490 (1995). Materiality is determined by asking whether the government's evidentiary suppression undermines confidence in the guilty verdict. *See Kyles*, 514 U.S. at 434, 436–37 & n. 10, 115 S. Ct. 1555.

*Boyd*, 697 F.3d at 1334-35 (alterations and omission in original).

McWhorter has failed to satisfy the prejudice component with respect to his *Brady* claim. He claims that if the defense had been aware of Rice's statement, "trial counsel would have called Rice as a witness, thereby effectively bolstering the argument that Miner – not McWhorter – fired the fatal shot and was the most vicious participant in the crime." (Doc. 1 at 55). But if the defense had called Rice to testify, any testimony regarding what he had been told by Miner would have been inadmissible hearsay. *See Snyder v. State*, 683 So. 2d 45, 46-47 (Ala. Crim. App. 1996). And suppressed evidence is prejudicial "only if the suppressed information is itself admissible evidence or would have led to admissible evidence." *Spaziano v. Singletary*, 36 F.3d 1028, 1044 (11th Cir. 1994). McWhorter has identified no admissible evidence that may have been gleaned from the disclosure of Rice's inadmissible statement. He therefore cannot establish prejudice. *Id.*

It is true that Rice's testimony regarding Miner's statement could have been admitted to impeach testimony by Miner that McWhorter fired the fatal shots. *Trawick v. State*, 86 So. 3d 1105, 1109 (Ala. Crim. App. 2011). But Miner did not testify at McWhorter's trial, so the court cannot know whether Miner might have offered testimony inconsistent with his alleged prior statement to Rice that would have permitted Rice to testify as an impeachment witness. And

where a witness did not testify at trial, a court cannot speculate about what the witness might have said to determine whether the witness's testimony might have resulted in favorable, admissible evidence sufficient to establish a *Brady* violation. *Wright*, 169 F.3d at 703.

Finally, even if Miner had testified, and even if he had offered testimony inconsistent with his alleged prior statement to Rice that would have enabled Rice to testify as an impeachment witness, the court is still unable to conclude that the production of Rice's statement by the prosecution would have created "a reasonable probability" that the result of McWhorter's guilt- or penalty-phase proceedings would have been different. *Id.* at 701. The evidence of McWhorter's guilt − including his own confession, physical and ballistic evidence, and the testimony of others to whom he confessed − was overwhelming. *McWhorter*, 781 So. 2d at 265-66. The court is not convinced that the hearsay testimony of a jailhouse informant − offered not for its truth but to impeach another witness − would have likely changed the outcome of the guilt or penalty phases of McWhorter's trial. And it certainly cannot say that the state court would have been unreasonable to deny McWhorter's *Brady* claim because he failed to show prejudice. Accordingly, McWhorter is not entitled to relief on this claim.

### E. McWhorter's Claim That the Trial Court Erred by Failing to Instruct the Jury on Lesser Included Offenses

At the conclusion of the guilt phase of the trial, the trial judge instructed the jury on the elements of capital murder during the course of a robbery. (Vol. 11, Tab 19 at 1724-27, 1747-50).[42] The court also instructed the jury that if it found the state failed to prove beyond a reasonable doubt any one or more of the elements of the offense of murder during robbery in the first degree, it would be the jury's duty to find McWhorter not guilty of capital murder. (*Id.* at

---

[42] The trial judge also gave the jury an instruction on voluntary intoxication. (*Id.* at 1732).

1727, 1733, 1750). The trial judge provided the jury with a verdict form listing only two possible verdicts: guilty of capital murder, and not guilty of capital murder. (Vol. 11, Tab 19 at 1733). McWhorter objected to the court's refusal to charge the jury on lesser included offenses. (*Id.* at 1662-64, 1751).

### 1. The Parties' Arguments

Here, McWhorter claims that the trial court's failure to instruct the jury on "any lesser included offenses, particularly the lesser included offense of felony murder (which was not a capital offense at the time)," violated his right to due process, impermissibly enhancing the risk of a guilty verdict on the capital offense. (Doc. 1 at 57, 63) (citing *Wiggerfall v. Jones*, 918 F.2d 1544 (11th Cir. 1990)). He offers the following argument in support of his claim:

> The trial court refused to instruct the jury that McWhorter could be convicted of intentional murder (not requiring an intent to rob), or of manslaughter (not requiring intent to rob or kill). Likewise, the court refused to instruct that McWhorter could not be convicted of capital murder if he "intended only a robbery, not a murder," a refusal that correlated with its refusal to instruct that felony murder was a lesser-included offense. (Felony murder as defined by Alabama Code § 13A-6-2(a)(3) clearly was a lesser-included offense of capital murder in this case under Alabama Code §§ 13A-5-40(b) and 13A-5-41.).

> At McWhorter's trial, the jury heard evidence that McWhorter was intoxicated during the crime. The State relied on a confession McWhorter made to Detective Maze of the Albertville Police Department while recovering in a hospital intensive care unit with an IV and other equipment hooked up to him, on the morning after the crime. In his initial statement, McWhorter stated that his codefendants convinced him to go to the victim's house on a Wednesday night to "take everything out of it," and then on Thursday "I got pretty much drunk and we went and did all this. I don't remember being at the house. I really don't. This I promise to God I don't." Trial Transcript at 1438. McWhorter also stated that he did not remember whether he shot the victim because "I was so drunk." *Id.* at 1438-39.

> The state courts held in part that the jury could not rationally credit this testimony because it came only in the form of McWhorter's own statement. 781 So. 2d at 339. However, this is not a proper legal basis for discrediting the

evidence. The State offered McWhorter's entire statement into evidence, seeking to have the inculpatory portions credited and the exculpatory portions discredited. Both portions were in evidence, and the jury was entitled to credit one portion as much as the other.

The state courts also pointed to internal inconsistencies in McWhorter's statement, and to the absence of corroborating evidence that McWhorter was intoxicated. But the state courts overlooked other evidence, apart from intoxication, raising doubt about McWhorter's intent to kill. The State called two of McWhorter's associates to testify to other inculpatory statements McWhorter had made. One, Abraham Barnes, testified that McWhorter told him that when the victim, Lee Williams Sr., came into the premises, the victim took accomplice Daniel Miner's gun, leading McWhorter to shoot the victim because otherwise the victim would have shot Daniel. And, the State's key witness, Marcus Carter, who described how he essentially orchestrated the robbery from behind the scenes, testified that he believed only a robbery would take place, not a killing; he considered McWhorter's prior talk of killing to be "idle comments." Because of McWhorter's youth at the time of the crime, and the fact that teenagers frequently engage in "idle talk," the jury could have reasonably concluded, as Marcus Carter did, that even if there were some discussions of killing Williams, McWhorter never seriously thought Williams was going to be killed and did not intend to kill him. In its closing argument, the State even argued to the jury, seeking to bolster Carter's credibility, that someone who knew about the robbery plan might not [ ] take the killing aspect of it seriously. Trial Transcript at 1679. Indeed, lack of murderous intent was the only plausible theory against capital murder, as the evidence of McWhorter's participation in a robbery that resulted in death was overwhelming.

Rational jurors considering this evidence, alongside conflicting evidence about which defendant had each of two guns at various points during the incident, could have found that McWhorter may have gone to the victim's house solely to commit robbery, without an intent to kill, and that the killing was done impulsively, during the robbery, with intoxication impairing McWhorter's judgment to the point that he never actually formed an intent to kill. *See McConnico v. State*, 551 So. 2d 424 (Ala. Crim. App. 1988) (reversible error in murder case for trial judge to omit jury instruction on lesser included offense of manslaughter where there was evidence of intoxication); *Owen v. State*, 611 So. 2d 1126 (Ala. Crim. App. 1992) (trial court's failure in capital murder case to instruct jury on intoxication was reversible error). Jurors accepting this theory would have had a basis to acquit McWhorter of capital murder and instead convict him of the lesser included offense of felony murder. While McWhorter's trial counsel did not argue this particular theory, they did request an instruction on the lesser included offense, and McWhorter was entitled to have the jury consider it whether or not his lawyers argued in support of the theory.

In refusing to give a felony murder instruction, the court deprived the jury that convicted McWhorter of the "third option" of convicting McWhorter of unintentional homicide. *Wiggerfall*, 918 F.2d at 1549 (habeas relief granted where lesser included instruction was necessary to remedy "distorting effects of [an] 'all-or-nothing' scheme" like in *Beck*). Any juror who believed that McWhorter was too intoxicated to form the specific intent to kill, or otherwise caused Williams' death unintentionally, was forced to choose between convicting McWhorter of capital murder or setting him free. Yet no reasonable juror who believed that McWhorter caused the victim's death could have voted to acquit him of all charges. This is precisely the type of situation the U.S. Supreme Court recognized, in *Beck*, as likely to result in unwarranted capital murder convictions. As the Court reaffirmed in *Schad v. Arizona*, 501 U.S. 624, 645 (1991), *Beck*'s requirement of a lesser included offense instruction reflects the "fundamental concern" that juries not be forced to choose between these two unacceptable alternatives:

> [A] jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all.

(Doc. 1 at 59-63).

McWhorter unsuccessfully presented this claim on direct appeal. Both the Alabama Court of Criminal Appeals and the Alabama Supreme Court found the trial court did not err in failing to instruct the jury on lesser included offenses. *McWhorter v. State*, 781 So. 2d 257, 266-272 (Ala. Crim. App. 1999); *Ex parte McWhorter*, 781 So.2d 330, 333-343 (Ala. 2000). Respondent contends that the state courts properly applied clearly established federal law in denying this claim. (Doc. 14 at 53-62).

In denying relief on this claim, the Alabama Supreme Court found as follows:

II. *Lesser-Included-Offense Instructions*

McWhorter argues that he presented evidence indicating he was intoxicated at the time of the killing, that the trial court instructed the jury that evidence of voluntary intoxication can support a finding of a lack of the intent necessary to a finding of capital murder, and that the trial court therefore erred in

refusing to instruct the jury on manslaughter, felony murder, and "intentional murder" as lesser included offenses. This case raises the question of the quantum of proof sufficient to warrant a lesser-included-offense instruction based on the possibility that the jury may not find the intent necessary for a conviction of capital murder. McWhorter argues that the jury could have inferred from the evidence presented at trial that he was unable to form the intent to commit murder because, he says, he was extremely intoxicated at the time of the crime.

The evidence shows that McWhorter and his accomplices carefully planned and carried out the crime. McWhorter and Daniel Minor lay in wait for hours at the victim's home and, while waiting, manufactured and tested homemade silencers to use on weapons found in the victim's home. When the victim arrived home, McWhorter and Minor used these weapons to commit the killing. Then they gathered some of the victim's belongings, loaded them into the victim's pickup truck, and drove the truck to a previously agreed upon meeting place. There, they divided the property stolen from the victim. McWhorter took his portion of the weapons and the victim's other property and hid that property and the weapons at the home of a friend.

On February 19, 1993, the day after the crime, McWhorter gave a voluntary unsworn statement to Detective James Maze of the Albertville Police Department. Because McWhorter's claim that he was entitled to a charge on a lesser included offense is premised on his claim that at the time of the killing he was not aware of what he was doing, we quote his statement in its entirety:

Maze: This is February 19, 1993. It's now 11:40 a.m. Interview with Casey Allen McWhorter. And you're 18 years old? 19?

McWhorter: 18.

Maze: What's your date of birth?

McWhorter: 11-11-74.

Maze: 11-11-74. Now, just a moment ago, I advised you of the Miranda warning and your rights, and you understand that. Is that correct, Casey?

McWhorter: Yes, sir.

Maze: They do call you Casey?

McWhorter: Uh huh.

Maze: And you're waivering [sic] your rights at this time? Yes or no?

McWhorter: Yes.

Maze: Okay. All right. Now what we're gonna be talking about is Edward, Mr. Edward Williams that lives [sic] at 1202 Hyatt Street here in Albertville. Do you know him?

McWhorter: No, personally, no, I don't.

Maze: Okay. Do you want to tell me what happened last night after 6:15, between 6:30 and 8 o'clock?

McWhorter: I don't know nothing about him. I really don't.

Maze: Was you over at his house?

McWhorter: Not that I know of.

Maze: All right. Yesterday evening, who was you with?

McWhorter: I was by myself. I was at Carry's house.

Maze: At whose house?

McWhorter: Carry's.

Maze: Carry who?

McWhorter: Barnes.

Maze: Carry Barnes?

McWhorter: Uh-huh.

Maze: Is that the woman's name?

McWhorter: (Not audible)

Maze: Who was with you?

McWhorter: Just me. I was in the back room by myself thinking about everything.

113

Maze: In what respect, what was you thinking about?

McWhorter: My last girlfriend.

Maze: Who was your last girlfriend?

McWhorter: Tiffany.

Maze: Tiffany who?

McWhorter: Harper.

Maze: Where does she live at?

McWhorter: Ah, she just moved, and I ain't exactly sure where she lives.

Maze: What's her parents' name?

McWhorter: I don't know that.

Maze: Does she work anywhere?

McWhorter: Uh uh.

Maze: Does she go to school?

McWhorter: Uh huh.

Maze: Which school does she go to?

McWhorter: She goes to Albertville High School.

Maze: Tiffany Harper. When's the last time you seen Tiffany?

McWhorter: It's been, ah, a pretty good while.

Maze: Okay, what time did you get up yesterday morning up at [the] Barneses'? That'd be we're talking about Thursday morning now.

McWhorter: Ah, I got up, I guess, at about twelve or one.

Maze: Around noon?

McWhorter: Twelve or one o'clock, something like that.

Maze: All right, who was there when you got up?

McWhorter: There wasn't nobody there when I got up.

Maze: When did you last see Abraham [Barnes] that day?

McWhorter: That morning.

Maze: Approximately what time?

McWhorter: When he was leaving for school.

Maze: All right, Tommy, do you have anything? Also present is Chief Investigator Tommy Cole.

[Pause]

Maze: Okay, is there anything else that you want to say over on [sic] before we conclude here?

McWhorter: Lee and Daniel, they called me on the telephone and told me they was gonna go to his house, to Lee's dad's house, and they was gonna take everything out of it and they asked me if I wanted to go and I said 'I don't know' and then they convinced me into going and so –

Maze: This was on Wednesday evening?

McWhorter: So I got drunk Thursday.

Maze: Y'all were on a three-way telephone conversation, Lee was at his house, you was at your house, and Daniel was at his house. Is that correct?

McWhorter: Yes, sir.

Maze: Okay.

McWhorter: And then I got pretty much drunk and we went and did all this. I don't remember being at the house, I really don't, this I promise to God, I don't.

Maze: Okay, was it just you and Daniel in the house?

McWhorter: Yeah.

Maze: Just you and Daniel?

McWhorter: Just me and Daniel.

Maze: Okay, which one of you done the shooting, firing of the weapon?

McWhorter: I think Daniel did, to be absolutely honest with you.

Maze: Okay, who made the silencers to go around the pillow [sic]?

McWhorter: I did.

Maze: You did that?

McWhorter: Yeah.

Maze: For both guns?

McWhorter: Cause I told him Wednesday night how to do it.

Maze: Okay.

McWhorter: He told me to do that, so I did that.

Maze: Okay, did y'all take any money off him?

McWhorter: Uh uh. I did not take any money off him. Now, Daniel and Lee might've gotten money cause—

Maze: Was Lee in the house?

McWhorter: Uh uh. Daniel got his checkbook and it had all his credit cards and stuff in it.

Maze: Okay.

Cole: Did anything happen to one of the guns at the time that the shooting was going on to make it—did anything happen?

McWhorter: I don't know.

Maze: Like misfire, jamming?

McWhorter: I couldn't tell you.

Maze: Okay, so you think, to the best of your knowledge, that Daniel done all the firing?

McWhorter: Yes, sir.

Maze: You could have, but you don't remember it?

McWhorter: I could have, but I, I don't recollect cause I, I was drunk.

Maze: Okay, y'all was waiting at the house on, ah, Mr. Williams to come home. Is that correct?

McWhorter: Yes.

Maze: You and Daniel was in the house when he came home?

McWhorter: Cause Lee had asked us to—

Maze: Had asked y'all to, ah, rob him and, ah—

McWhorter: Yes, sir.

Maze: Murder him?

McWhorter: Yes, sir.

Maze: Okay, what did you do with the .22 rifles you left, ah, with—

McWhorter: Mark [Marcus] Carter has some of 'em.

Maze: What's Mark got?

McWhorter: He's got a .410, he's got a 12 gauge sawed-off which was mine, anyway it wasn't taken from the house, and he's got another .22.

Maze: Rifles or pistols?

McWhorter: Rifles.

Maze: Okay, what'd you do with the .22 rifle that you carried to the Barneses' or up thataway?

McWhorter: I don't remember what happened to it.

Maze: Did you throw it in the creek or did you hide it around the Barneses' house?

McWhorter: I don't really remember.

Cole: Now, son, we need to get to the bottom of this.

McWhorter: If I can remember what I did with it, I'll tell you, I promise. I just got to get it all to come back.

Cole: Okay.

McWhorter: As soon as I remember, I'll tell you.

Maze: What all else did y'all take out of the house that you can remember? Did you take some CDs?

McWhorter: Yeah.

Maze: How about some orange boxes?

McWhorter: Daniel's got all the CDs. He's got the orange boxes too.

Maze: What one of the silencers—what'd you use to make one of the silencers to go over the gun—what'd you use to make that with?

McWhorter: Pillow.

Maze: Wrapped in how?

McWhorter: Duct tape.

Maze: Gray duct tape?

McWhorter: Yeah.

Maze: Where's that at, do you know?

McWhorter: Uh uh.

Maze: All right, what did you use to make the other one?

McWhorter: Milk jug.

Maze: What was in the milk jug?

McWhorter: Napkins.

Maze: Okay, how did you fix it to the barrel of the gun?

McWhorter: Duct tape.

Maze: Okay, do you know where that jug's at?

McWhorter: No, sir, I sure don't.

Maze: Okay.

McWhorter: The last I seen it, it was at Daniel's house.

Maze: And after you and Daniel went to the house and, ah, took the stuff, the guns and checkbook and stuff, and shot Mr. Williams, y'all met Lee, his son, and another boy at, ah, a Carter boy at, ah, Albertville High School?

McWhorter: Yes.

Maze: Then what did y'all do, went and ditched the truck, yes or no?

McWhorter: Yes.

Maze: Okay, then what happened?

Cole: Did you take anything out of the truck?

McWhorter: We got, it was all the stuff out of the back of the truck.

Cole: Did you take any items from the truck itself, anything like the stereo from the truck?

McWhorter: Yeah, we got the stereo out of it.

Cole: What happened to it?

McWhorter: I'm not real sure. I put it in, ah, the floorboard of Mark's car.

Maze: Okay, where did Mark let you out at?

McWhorter: He brought me back up to Carry's, but he didn't go all the way to the house.

Maze: He let you out down there between the bridges?

Cole: You walked up the hill?

McWhorter: Yeah.

Maze: Is there anything else that you can remember about the shooting and robbery of Mr. Williams?

McWhorter: No.

Maze: Did, ah, Lee, his son, say why he wanted y'all to do this?

McWhorter: He just said that he was a bastard and, ah, couple of other choice words.

Maze: Did he at any time say that if y'all didn't do it there at the house that y'all better pop him while he was coming down the road?

McWhorter: Naw, he said shoot him when he comes in the door, he'll shoot you.

Maze: Okay.

McWhorter: And he said he was gonna give us money to do it.

Maze: Is there anything else, Casey, that you want to say about this?

McWhorter: No, sir.

Cole: At any time did you ever tell Lee Williams that his daddy didn't have as much money on him as he said he did or said he would have?

McWhorter: Lee said that he's got money on him at all times and Lee said for us to take that for doing it, and I said that he didn't have no money on him at all when I seen him later.

Maze: Is there anything else?

McWhorter: No.

Maze: This concludes the interview at 7:57 [sic; 11:57?].

[Pause]

Maze: Okay, we just went off there. I thought we was done, but Casey remembered some other information. Would you go over that again about y'all standing there and each one of you had a gun with a silencer on it when Mr. Williams come in?

McWhorter: I had the old .22. I don't know exactly how old it is, but it's older than the one Daniel had.

Maze: That's the one that's tube fed.

McWhorter: Yeah.

Maze: And one of 'em had the clip?

McWhorter: Daniel had the one with the clip.

Maze: Okay.

McWhorter: And then he come back there, he grabbed the gun, the end of Daniel's gun.

Maze: That's Mr. Williams grabbed the end of Daniel's gun in the hallway there beside the ladder?

McWhorter: Uh huh.

McWhorter: And then I was sitting there watching him and then he turned around and looked at me.

Maze: Where were you sitting?

McWhorter: Just right, the ladder was here, and I was right here.

Maze: Behind him?

McWhorter: Yeah, on in this other room with the door open.

Maze: In the living room part?

McWhorter: No, it was in the back.

Maze: Right straight across from the bathroom or right?

McWhorter: Behind the bath.

Cole: Where there was an aluminum ladder sitting in this little hallway?

McWhorter: I was in the room right behind that.

Maze: Okay, where there was a bed and some clothes in there?

McWhorter: Yeah.

Maze: In there where y'all tested, fired the guns into the mattress?

McWhorter: Yeah.

Maze: That's where you were sitting?

McWhorter: Yeah, and as he grabbed Daniel's gun he was gonna turn around, and I shot him in the leg, and he started screaming, and then I pulled the trigger again and it didn't work then. Then I just heard all sorts of firing, and that's pretty much it.

Maze: Okay, is there anything else that you might think of before we go off again?

McWhorter: Not that I recall.

Maze: Okay, this concludes the interview at 12 noon.

McWhorter's statement is riddled with internal inconsistencies. While at the outset McWhorter claims a lack of memory, on account of intoxication, and even denies being at the victim's house on the night of the crime, he then furnishes detailed information about how the crime was committed. In his statement, McWhorter admitted that he had made the silencers for the two guns, and he was able to describe in detail what he used to make the silencers. When asked who fired the guns, McWhorter stated that he could not recall who fired the guns because he was drunk, but then was able to recall exactly what kind of guns they took from the victim's home. McWhorter also stated that he shot the victim in the leg. He knew which gun he held while he and Minor were waiting for the victim to arrive home, and he described in detail the sequence of events that transpired when the victim entered his home. He remembered test-firing the guns, dividing and disposing of the victim's property, removing the stereo from the victim's truck, and where Marcus Carter dropped him off after the crime. His action on the night of the crime is wholly inconsistent with his self-serving statements suggesting he had a diminished capacity.

McWhorter argues that he was extremely intoxicated before, during, and after the crime. At the preliminary hearing, Detective Maze testified that Abraham Barnes had told him that McWhorter had tried to commit suicide the night after the killing by taking some pills and drinking some alcohol. According to Barnes, McWhorter had been taken to a hospital several hours after the killing, after, Barnes said, he had attempted to commit suicide by ingesting pills and alcohol. However, other than his statement, McWhorter does not point to any evidence indicating he was intoxicated at the time of the commission of the crime. Carter, who drove Minor and McWhorter to the victim's house and who met them later in the evening, testified that he saw no indication that McWhorter had been drinking alcohol either before or after the crime and that McWhorter was not intoxicated on that night. Carter testified that, after the crime, when he met Minor and McWhorter at the designated place, McWhorter did not appear to have been drinking. McWhorter's statements to others on the night of the crime indicate that he was aware of his actions. Barnes testified that, on the night of the crime, McWhorter told him that he unloaded a clip into the victim and that he and Minor stole the victim's truck. Detective Maze testified that at noon the next day, when the statement was given, McWhorter did not appear to be under the influence of drugs or alcohol, even though McWhorter said he had been admitted to a hospital

for an alcohol and drug overdose. No evidence in the record establishes when McWhorter ingested the alcohol that led to his hospitalization.

The only evidence indicating McWhorter was intoxicated was McWhorter's own statement to the police. The trial court found that evidence insufficient to warrant giving instructions on lesser included offenses.

### III. *Manslaughter*

McWhorter argues that the trial court erred in refusing to give a manslaughter instruction. An instruction on manslaughter would have been incompatible with McWhorter's defense. At trial, McWhorter did not argue that he was under the influence of alcohol or drugs at the time of the crime, and he did not request a voluntary-manslaughter instruction. Had an instruction been requested that would have conflicted with defense strategy, there is no error in the trial court's failure to give the instruction. *Bush v. State*, 695 So.2d 70, 113 (Ala.Crim.App. 1995). *See, also, Sockwell v. State*, 675 So.2d 4, 25 (Ala.Crim.App. 1993); *Gurley v. State*, 639 So.2d 557 (Ala.Crim.App. 1993). The Court of Criminal Appeals concluded that the trial court correctly refused to give the charge because, it concluded, the evidence suggested no reasonable theory that would support a manslaughter charge. [FN]

> [FN.] Under these circumstances, we conclude that, under the plain-error doctrine, the trial court's failure to give a voluntary-manslaughter instruction was not error. *See Williams v. State*, [Ms. CR–98–1734, Dec. 10, 1999] __ So.2d __ (Ala.Crim.App. 1999).

### IV. *Felony Murder and Intentional Murder*

McWhorter also argues that the trial court should have charged the jury on felony murder and intentional murder. He makes a two-pronged argument. First, he contends that the evidence supports a felony-murder theory because, he argues, he was a teenager and a jury could have reasonably concluded that, even if there was discussion of killing, he did not seriously believe that the victim would be killed. He argues that his statement supports the theory that Minor killed the victim and that McWhorter was only an accomplice. McWhorter argues that he has presented evidence that supports a felony-murder theory. He states that he intended only to rob the victim, not to kill him, and that he never thought the victim would be killed. Second, he contends that his evidence of intoxication justified a charge on the lesser included offenses of felony murder and intentional murder.

### A. *Entitlement to an Instruction Based upon Evidence Having to do with Matters other than Intoxication*

Putting to one side for the moment the issue of intoxication, we see no reasonable theory that would have supported a charge on felony murder. The evidence showed that Casey McWhorter, Lee Williams, and Daniel Minor carefully planned and carried out the crime. They had planned the crime at least three weeks before they carried it out. In addition, McWhorter and Minor lay in wait for hours at the victim's house and made silencers for the weapons while they waited for him to arrive home.

In addition, again putting to one side for the moment the issue of intoxication, we see no reasonable theory that would support a charge on the lesser included offense of intentional murder. As the Court of Criminal Appeals held, the evidence would support no theory on which the jury could have found an intentional murder but not a robbery. That court noted that McWhorter made no argument as to why the trial court should have charged the jury on intentional murder. Lee Williams had told McWhorter that the victim would have cashed his paycheck that day and therefore would have a large sum of money on his person and that, if McWhorter would kill him, McWhorter could have the money. In his statement, McWhorter said that Lee Williams told him that his father kept money on him at all times and that McWhorter and Minor could take the money for killing his father.

. . . McWhorter presented no evidence indicating that he did not intend to kill the victim. In fact, there was testimony indicating that McWhorter had agreed to kill the victim in exchange for any money the victim would have on his person that night. The evidence shows that McWhorter intentionally and consciously planned to rob and murder the victim. Therefore, McWhorter was not entitled to an instruction on felony murder, and the trial court did not err in refusing to give such an instruction, unless to refuse it was error in light of the issue of intoxication.

### B. *Entitlement to an Instruction Based upon Evidence of Intoxication*

While voluntary intoxication is not a defense to a criminal charge, it can negate the specific intent necessary for an intentional murder, reducing the offense to manslaughter. *McConnico v. State*, 551 So.2d 424 (Ala.Crim.App. 1988). Relying on *Owen v. State*, 611 So.2d 1126 (Ala.Crim.App. 1992), for the proposition that a trial court commits reversible error by failing to instruct a jury on intoxication, McWhorter argues that if the crime involves specific intent and any evidence presented at trial indicates that the defendant was intoxicated at the time of the crime, then the defendant is entitled to have the jury instructed on the lesser included crime of manslaughter.

> While voluntary intoxication is never a defense to a criminal charge, it may negate the specific intent essential to a malicious killing and reduce it to manslaughter. § 13A-3-2, Code of Alabama (1975) (Commentary). "'When the crime charged involves a specific intent, such as murder, and there is evidence of intoxication, the trial judge should instruct the jury on the lesser included offense of manslaughter.' *Gray v. State*, 482 So.2d 1318, 1319 (Ala.Cr.App. 1985)." *McNeill v. State*, 496 So.2d 108, 109 (Ala.Cr.App. 1986).

551 So.2d at 426. However, to negate the specific intent required for a murder conviction, the degree of the accused's intoxication must amount to insanity.

*Smith v. State*, 756 So.2d 892, 906 (Ala.Crim.App. 1997) (on return to remand). This Court, likewise, has held that the intoxication necessary to negate specific intent and, thus, reduce the charge, must amount to insanity. *Ex parte Bankhead*, 585 So.2d 112, 120–21 (Ala. 1991). *See, also*, *Crosslin v. State*, 446 So.2d 675 (Ala.Crim.App. 1983).

McWhorter argues that his case is similar to *Ashley v. State*, 651 So.2d 1096 (Ala.Crim.App. 1994). In Ashley, the Court of Criminal Appeals reversed a capital-murder conviction because the trial court had erred in refusing to give a manslaughter instruction after a witness testified that the defendant was intoxicated at the time of the crime. Ashley's ex-girlfriend testified that she had seen him at a bar approximately two hours before the stabbing and that he "looked like he was out of it" and "looked like he was on drugs." 651 So.2d at 1098. Another witness testified that Ashley looked "high" on the evening of the stabbing. *Id.*

This case is distinguishable from *Ashley*. McWhorter did not produce testimony regarding his alleged intoxication. In fact, his voluntary unsworn statement was the only evidence presented at trial regarding his intoxication. Although the trial court informed the jury that it could not convict McWhorter of capital murder if it found no specific intent, the evidence showed that the crime was carefully planned and carried out.

. . . .

"[A] defendant is entitled to a charge on a lesser included offense if there is any reasonable theory from the evidence that would support the position,"

*Fletcher v. State*, 621 So.2d 1010, 1019 (Ala.Crim.App. 1993) (quoting *Ex parte Oliver*, 518 So.2d 705, 706 (Ala. 1987)), regardless of how "weak . . . or doubtful in credibility" the evidence concerning the offense. *Chavers v. State*, 361 So.2d 1106, 1107 (Ala. 1978).

A trial court should give a charge on voluntary intoxication "if 'there is an evidentiary foundation in the record sufficient for the jury to entertain a reasonable doubt on the element of intent.'" *Windsor v. State*, 683 So.2d 1027, 1037 (Ala.Crim.App. 1994) (quoting *Coon v. State*, 494 So.2d 184, 187 (Ala.Crim.App. 1986)). In *Windsor*, the Court of Criminal Appeals found that there was no evidence that the appellant was intoxicated and that, although there was evidence that he had been drinking alcohol on the day of the murder, there was no evidence as to the quantity of alcohol consumed that day by the time of the murder. 683 So.2d at 1037. The court found that "[t]here was no 'reasonable theory' to support an instruction on intoxication because there was no evidence of intoxication." *Id*. The court held that the trial court did not err in not instructing the jury on intoxication and manslaughter, because there was no evidence indicating that the defendant was intoxicated when the crime occurred.

The evidence offered by McWhorter as to his alleged intoxication was glaringly inconsistent with his own statement giving detailed descriptions of the events occurring at the crime scene. No evidence substantiated his claim to have been intoxicated at the time of the killing, and, indeed, the other evidence as to his condition at the time of the crime was totally consistent with the proposition that he was sober. We hold that McWhorter's self-serving statements suggesting he was intoxicated at the time of the killing, statements made in his internally inconsistent interview by Detective Maze, is, as a matter of law, insufficient to satisfy the rigorous standard of showing that the intoxication relied upon to negate the specific intent required for a murder conviction amounted to insanity. As previously noted, that standard is that "the intoxication necessary to negate specific intent and, thus, reduce the charge, must amount to insanity." *Ex parte Bankhead*, 585 So.2d 112, 121 (Ala. 1991).

Although the trial court refused to charge the jury on lesser included offenses, it charged the jury on voluntary intoxication. The trial court stated:

> I charge you, members of the jury, that if you find from the evidence that the Defendant was voluntarily intoxicated to the extent he could not form the necessary specific intent to rob Edward Lee Williams then you cannot convict the Defendant of capital murder.

Because there was no substantial evidence indicating that at the time of the crime McWhorter was intoxicated to such a degree that the intoxication amounted

to insanity, the trial court's voluntary-intoxication charge was neither prejudicial nor necessary.

The Court of Criminal Appeals held that no reasonable theory would have supported a charge on the offense of intentional murder or felony murder. It found that the evidence presented at trial indicated either that McWhorter intentionally killed the victim in the course of a robbery or that he was not guilty. We hold that the trial court's failure to instruct the jury on felony murder and intentional murder was not error.

*Ex parte McWhorter*, 781 So.2d 330, 333-339 (Ala. 2000).

## 2. Analysis

McWhorter argues that the Alabama Supreme Court's decision involved an unreasonable application of *Beck v. Alabama*, 477 U.S. 625 (1980). (Doc. 20 at 49). The court disagrees.

In *Beck*, the Supreme Court held that a death sentence may not constitutionally be imposed "when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." 447 U.S. at 627. "[W]hen the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense – but leaves some doubt with respect to an element that would justify conviction of a capital offense – the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction" for a capital crime, because it "interjects irrelevant considerations into the factfinding process, diverting the jury's attention from the central issue of whether the State has satisfied its burden of proving beyond a reasonable doubt that the defendant is guilty of a capital crime." *Id*. at 637, 642. "[F]orcing the jury to choose between conviction on the capital offense and acquittal creates a danger that it will resolve any doubts in favor of conviction." *Id*. at 632.

"*Beck* held that due process requires that a lesser included offense instruction be given when the evidence warrants such an instruction. But due process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction." *Hopper v. Evans*, 456 U.S. 605, 611 (1982) (emphasis in original). The Court most recently explained its *Beck* decision as follows:

> The concern addressed in *Beck* was "the risk of an unwarranted *conviction*" created when the jury is forced to choose between finding the defendant guilty of a capital offense and declaring him innocent of any wrongdoing. 447 U.S., at 637, 100 S.Ct. 2382 (emphasis added); *Id.*, at 638, 100 S.Ct. 2382; *see also Spaziano v. Florida*, 468 U.S. 447, 455, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984) (explaining that the "goal of the *Beck* rule" is "to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence"); *Schad v. Arizona*, 501 U.S. 624, 646, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) ("Our fundamental concern in *Beck* was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all").

*Bobby v. Mitts*, 563 U.S. 395, 398 (2011).

McWhorter contends that "the Alabama Supreme Court's decision was an unreasonable application of clearly established law [for] at least five reasons." (Doc. 20 at 49). First, he argues that:

> the Court's finding that the "evidence offered by McWhorter as to alleged intoxication was glaringly inconsistent with his own statement giving detailed descriptions of the events," is improper. *Ex parte McWhorter*, 781 So. 2d at 342. The Court picked which part of McWhorter's statement it believed and which part it did not. Deciding which part of McWhorter's statement is credible was an issue for the jury and that is why there was a need for a lesser included instruction in this case. By rejecting the need for a manslaughter instruction, the Court invaded the province of the jury by making a finding of fact. *Schad*, 501 U.S. at 645 (*Beck* requirement rests on the "fundamental concern" that juries not be forced to choose between sentencing a capital defendant to death, and setting him free at all).

(Doc. 20 at 49-50).

Under Alabama law, "voluntary intoxication is never a defense to a criminal charge," but it "may negate the specific intent essential to a malicious killing and reduce it to manslaughter. § 13A-3-2, Code of Alabama (1975) (Commentary)." *McConnico v. State*, 551 So. 2d 424, 426 (Ala. Crim. App. 1988). "However, to negate the specific intent required for a murder conviction, the degree of the accused's intoxication must amount to insanity." *Whitehead v. State*, 777 So. 2d 781, 832 (Ala. Crim. App. 1999), aff'd, 777 So. 2d 854 (Ala. 2000) (quoting *Smith v. State*, 756 So. 2d 892, 906 (Ala. Crim. App. 1998), aff'd, 756 So.2d 957 (Ala. 2000)).

McWhorter maintains that the trial judge should have given an instruction about manslaughter, so the jury (rather than the court) could have decided whether to believe the portions of his statement in which he claimed to have been intoxicated during the crime. However, Alabama law provides that a defendant is entitled to a jury instruction on a lesser included offense only if there is a "reasonable theory from the evidence that would support" the lesser charge, *Smith v. State*, 246 So. 3d 1086, 1098 (Ala. Crim. App. 2017), and that rule "clearly does not offend federal constitutional standards," *Hopper*, 456 U.S. at 612.

The Alabama Supreme Court was not unreasonable in concluding there was no reasonable theory from the evidence to support a finding that McWhorter was intoxicated to the point of insanity and thus entitled to a manslaughter instruction. The only evidence that McWhorter was intoxicated at all was found in his voluntary, unsworn statement to police. The brief portion of the statement in which he claimed he was drunk at the time of the killing and did not even remember being at the victim's house was wholly inconsistent with the remainder of his statement in which he described, in detail, the other events that took place the night of the crime. Marcus Carter testified that he saw no evidence that McWhorter was intoxicated or had even

130

been drinking before or after the crime.[43] (Vol. 10 at 1491-92). Detective Maze testified that when he interviewed McWhorter the following day in the hospital, McWhorter appeared to understand what was going on, and did not seem to be under the influence of any drugs or alcohol. (Vo1. 9 at 1257). Further, despite having been in the hospital after the crime, there was no evidence indicating that McWhorter's admission to the hospital was in any way related to his claim that he was intoxicated during the crime.[44] McWhorter presented no medical records shedding light on the reason for his hospitalization and no expert testimony regarding his medical condition during his overnight hospital stay.[45]

Given these facts, it was not unreasonable for the Alabama Supreme Court to hold that there was no reasonable theory from the evidence capable of supporting the conclusion that McWhorter was intoxicated to the point of insanity during the killing. It follows that it was not unreasonable for the Alabama Supreme Court to affirm the state trial court's refusal to give a manslaughter instruction. The Alabama Supreme Court did not unreasonably apply *Beck*, and its conclusion that the "evidence offered by McWhorter as to alleged intoxication was glaringly inconsistent with his own statement giving detailed descriptions of the events" cannot be overturned on habeas review.

Second, McWhorter next claims that:

---

[43] Marcus Carter drove McWhorter to the victim's house the night of the crime, dropped him off there, then met him later—immediately after the crime was committed. (Vol. 10 at 1451-1540).

[44] Detective Maze testified at the preliminary hearing that Abraham Barnes told him McWhorter had overdosed on pills and alcohol the night after the crime, in an attempt to commit suicide, and that he was in the Boaz and Albertville Hospital. (Vol. 3, Tab 3 at 31-32).

[45] There was no testimony at trial concerning the reason for McWhorter's hospitalization. In fact, defense counsel objected to that portion of Detective Maze's testimony which mentioned the fact that McWhorter was hospitalized after the crime. (Vol. 9 at 1214-16).

> [W]ith respect to the trial court's failure to give a manslaughter instruction, the Alabama Supreme Court found that "[a]n instruction on manslaughter would have been incompatible with McWhorter's defense." *Ex parte McWhorter*, 781 So. 2d at 339. This finding is problematic because defense counsel never revealed on the record what its strategy was and, thus, the Court's finding has no basis in the record.

(Doc. 20 at 50). McWhorter is correct that defense counsel never specifically stated on the record at trial what his defense strategy was. However, defense counsel introduced nothing at trial tending to show that McWhorter was intoxicated at the time of the killing and made no argument that he was intoxicated during the killing. Rather, defense counsel focused on turning blame for the killing away from McWhorter and onto Marcus Carter. (Vol. 10 at 1555 - Vol. 11 at 1633, 1689-1711). And while defense counsel never specifically stated that their intention was to cast blame for the killing on Marcus Carter, it is clear from the record that was in fact the strategy employed. Thus, contrary to McWhorter's suggestion, it is not problematic at all that the state court found that a manslaughter instruction was incompatible with his trial strategy.

McWhorter's third argument that the Alabama Supreme Court unreasonably applied *Beck* is as follows:

> [T]he Court held that a manslaughter instruction was not requested. [*Ex Parte McWhorter*, 781 So. 2d at 339]. This is wrong. At trial, defense counsel specifically cited *Fletcher v. State*, 621 So. 2d 1010 (Ala. Crim. App. 1993), and informed the court that *Fletcher* was reversed because the trial court failed to instruct on the lesser included offense of manslaughter. Trial Tr. at 1665:1-1666:25. The trial court in this case made it clear to defense counsel at the time that they had properly preserved an objection to the Court's "refusal to charge anything other than capital murder and not guilty." Trial Tr. at 1664 (emphasis added).

(Doc. 20 at 50).

During the charge conference, defense counsel requested charges on the lesser included offenses of ordinary murder and intentional murder showing extreme indifference to the life of another person:

> THE COURT: . . .With the exception of the disagreement with the aiding and abetting portion, are there any serious problems with the charge as far as the Defense is concerned?
>
> Other than whatever it is you're going to request in this one more charge?
>
> (Discussion off the record between the Defense attorneys. In open court:)
>
> [DEFENSE COUNSEL]: Yes, sir. We would request charges on the lesser included offense of intentional murder.
>
> [DEFENSE COUNSEL]: Judge, that would be in accordance with 13A-6-2(a)(1) of the Code of Alabama.
>
> THE COURT: Which says?
>
> [DEFENSE COUNSEL]: I'll have to get the Code and read it to you, Judge.
>
> THE COURT: All right. Hang on a second and I'll see if I can –
>
> [DEFENSE COUNSEL]: I got the charge out of a book here, but I don't have the charge – code section.
>
> THE COURT: 13A-6-21?
>
> [DEFENSE COUNSEL]: Yes, sir. 2(a)(1).
>
> THE COURT: That is plain old straight up murder. "A person commits the crime of murder if with intent to cause the death of another person, he causes the death of that person or another person."
>
> In other words, in essence, you're asking for a charge of the lesser included offense of ordinary murder.
>
> [DEFENSE COUNSEL]: Yes, sir.
>
> [OTHER DEFENSE COUNSEL]: Yes, sir.

THE COURT: I don't believe that there is any reasonable theory under the evidence in which the Defendant could be guilty of that, although we're allowing some charges in which would seem to indicate that.

But I am content with the charges as they are if the state is.

[THE PROSECUTION]: Yes, sir.

THE COURT: You're [sic] request is denied, Counsel.

[DEFENSE COUNSEL]: Judge, I'd also like to ask for the charge of intentional murder showing extreme indifference to the life of another person under 13A-6-2(a)(2).

THE COURT: Same ruling and you have an exception.

[DEFENSE COUNSEL]: Judge, also request a charge as to the culpable mental state of the Defendant.

THE COURT: Counsel, I'll let you put that in a written requested charge.

[DEFENSE COUNSEL]: Thank you, sir.

[OTHER DEFENSE COUNSEL]: I don't have anything further at this time, Your Honor.

THE COURT: All right. It cuts us short, but let's try to be back in here at 1 o'clock. You all have whatever written you want and we'll take a look at it before we get into the argument at 1:15.

[DEFENSE COUNSEL]: Again, out of an abundance of caution, we are granted an exception to all the denials or refusals that the Court has given.

THE COURT: Counsel, if I've said so, you are. I – You know, I don't want to get blind-sided a year and a half down the road that –

[DEFENSE COUNSEL]: In case we haven't, Judge, at this point in time we would take – we would object and take exception to the refusal to grant the lesser included charges and the other charges refused.

THE COURT: I perceive you have properly taken an exception to my refusal to charge anything other than capital murder and not guilty.

[DEFENSE COUNSEL]: Thank you, Judge.

     (Lunch recess taken.)
     (Afternoon session. 1:14 p.m. Defendant appearing in open court
     with his attorneys of record.)
     (Assistant D.A. Jolley not present.)

THE COURT: Everybody is not here. Mr. Jolley is not here, but let's go ahead and see what you all have got in the way of written charges.

[DEFENSE COUNSEL]: (Indicating.)

THE COURT: Number 7 is a copy of Page 6-1 out of the state criminal charge book, intentional murder, under 13A-6-2(a)(1).

     Unless the State has totally changed their mind, I'm going to refuse that charge.

[THE PROSECUTION]: Yes, sir.

[DEFENSE COUNSEL]: Judge, would you hear one statement from the defense before you do that?

THE COURT: Absolutely.

[DEFENSE COUNSEL]: Judge, in the case of *Conley* versus the State which is 500 So. 2d 57, Alabama Criminal Appeals 1985, this case was reversed because the judge improperly failed to instruct the jury on the lesser included offense of murder in the capital robber/murder trial where there was evidence that could have supported the finding that the Defendant was guilty of simple murder.

     Also, in *Fletcher* versus the State which has just been released. It doesn't – I don't have a cite on it. It's just Alabama Criminal Appeal[s] 1993, again the case was reversed –

     (Mr. Jolley enters the courtroom.)

[DEFENSE COUNSEL]: – because of the trial judge's failure to instruct the jury on the lesser included offense of manslaughter was reversible error where there was evidence that the Defendant was under the influence of crack cocaine at the time of the crime.

     We would submit that even though there's no evidence of any cocaine, that there is evidence pertaining to the intoxication.

And that our cross examination this morning of the evidence technician, Sergeant Cartee, does contain sufficient theory that would allow a conviction of just simple murder rather than capital murder. So again, we'd ask for the lesser included offense.

THE COURT: Counsel, I'm still going to deny you on that. You have an exception.

[DEFENSE COUNSEL]: Thank you, sir.

(Vol. 11 at 1662-65).

McWhorter argues that it was wrong for the Alabama Supreme Court to hold that a manslaughter instruction was not requested because he "specifically cited *Fletcher v. State*, 621 So. 2d 1010 (Ala. Crim. App. 1993), and informed the court that *Fletcher* was reversed because the trial court failed to instruct on the lesser included offense of manslaughter." (Doc. 20 at 50). However, it is abundantly clear from the record of the charge conference that defense counsel requested charges only on intentional/ordinary murder and intentional murder showing extreme indifference to the life of another person. Although defense counsel cited *Fletcher*, a case involving a lesser included charge on manslaughter, a reading of the transcript makes clear that, in context, the request was for an intentional murder charge, not a manslaughter charge. Thus, it was neither an unreasonable application of clearly established law nor an unreasonable factual determination for the court to conclude that a manslaughter charge was not requested. And even if McWhorter had requested a manslaughter charge, it was not unreasonable for the state court to conclude that the evidence did not warrant such a charge for the reasons explained above.

McWhorter's fourth argument goes as follows:

[Another] problem with the Alabama Supreme Court's decision is in the finding that McWhorter "did not produce testimony regarding his alleged intoxication." *Ex parte McWhorter*, 781 So. 2d at 341. In other cases, the Alabama Supreme

Court held that a lesser included instruction was required even where the State presents the supporting evidence. *Ex Parte Pruitt*, 457 So. 2d 456, 457 (Ala. 1984). To hold otherwise undermines the core principle that the State has the burden of proof at a criminal trial. There was evidence before the jury that McWhorter was intoxicated at the time of the crime. It does not matter whether the prosecution or the defense presented such evidence. McWhorter should not have been forced to re-introduce evidence that was already before the jury in order for the court to permit the jury to consider it in his favor.

(Doc. 20 at 50-51).

McWhorter seems to imply that the Alabama Supreme Court discounted the portion of his statement in which he stated he was so drunk at the time of the killing that he did not even remember being at the victim's house, because the state introduced the statement into evidence rather than the petitioner himself. But that was clearly not the Alabama Supreme Court's position. In context, that court stated:

McWhorter did not produce testimony regarding his alleged intoxication. In fact, his voluntary unsworn statement was the only evidence presented at trial regarding his intoxication. Although the trial court informed the jury that it could not convict McWhorter of capital murder if it found no specific intent, the evidence showed that the crime was carefully planned and carried out.

*Ex parte McWhorter*, 781 So. 2d at 341. The point was that McWhorter's self-serving statement – that he was intoxicated – stood in direct contrast to the remainder of his statement, in which he described the events leading up to and after the killing in great detail. As previously discussed, there was nothing in evidence to indicate that McWhorter's alleged intoxication amounted to insanity so as to negate specific intent to kill. The Alabama Supreme Court's statement that McWhorter "did not produce testimony regarding his alleged intoxication" did not amount to an unreasonable application of *Beck*.

Sixth, McWhorter argues that:

137

[T]he Alabama Supreme Court's opinion improperly and unfairly minimizes the extent to which evidence of intoxication was before the jury. McWhorter consumed so much alcohol on the day of the crime that within hours of the shooting, he was treated for alcohol overdose in the intensive care unit of the Boaz-Albertville Hospital. Trial Tr. at 1438-39. The Court's opinion acknowledges this fact but brushes it aside because the "only evidence presented at trial regarding his intoxication" was from his "voluntary unsworn Statement." This analysis is problematic because it is irrelevant how the evidence was presented to the jury. Had the trial court granted the request for a lesser included instruction, defense counsel would have been able to argue to the jury that McWhorter's intoxication rendered him unable to form the specific intent to kill.

(Doc. 20 at 51).

McWhorter's argument finds no support in the record. Although he claims that he "consumed so much alcohol on the day of the crime that within hours of the shooting, he was treated for alcohol overdose in the intensive care unit of the Boaz-Albertville Hospital," (*id.*), there is nothing in the record indicating why McWhorter was hospitalized. The pages of the trial transcript cited by McWhorter are from part of Detective Maze's testimony where he was reading from McWhorter's statement. On those pages, Detective Maze read the portions of the statement in which McWhorter stated, "So I got drunk Thursday," and "then I got pretty much drunk and we went and did all this. I don't remember being at the house. I really don't this. I promise to God I don't." (Vol. 10 at 1438). There is no mention on the pages cited (*i.e.*, Vol. 10 at 1438-39) of the reason for McWhorter's hospitalization. In fact, there was no testimony in the entire trial indicating the cause of his hospitalization, and no medical records pertaining to his hospitalization were admitted or even referenced. Moreover, Detective Maze testified at the preliminary hearing that Abraham Barnes told him McWhorter was in the hospital because he tried to commit suicide *after* the killing. (Vol. 3, Tab 3 at 31-32).

Finally, McWhorter argues that if the trial court had granted his request for a manslaughter instruction, "defense counsel would have been able to argue to the jury that McWhorter's intoxication rendered him unable to form the specific intent to kill." (Doc. 20 at 51). However, he disregards the fact that there was no reasonable theory from the evidence to support the conclusion that at the time of the killing McWhorter was intoxicated to the point of insanity. Simply stated, there was no evidence to support a verdict convicting McWhorter of manslaughter (as opposed to capital murder).

For all these reasons, McWhorter has failed to show that the Alabama Supreme Court's ruling on this claim was an unreasonable application of *Beck*.

### F. McWhorter's Claim That the Trial Court Improperly Excluded a Venireperson from Serving on the Jury in Violation of *Witherspoon v. Illinois*, 391 U.S. 510 (1968)

After the initial qualification of all the jurors summoned for the week, but prior to *voir dire*, the trial judge invited all veniremembers to offer any excuses they had for not serving on a jury:

> THE COURT: All right. Ladies and gentlemen, in just a moment I will ask you if you have any excuses you should – would like to offer why you should not serve during this term.
>
> . . .
>
> All right. Those of you that would like to offer an excuse, come around at this time please and just stand there at the bar.

(Vol. 3 at 183-84). Several jurors approached the judge to offer their excuses. (Vol. 3 at 183 - Vol. 4 at 227). When juror Susie McLain approached the judge, the following conversation took place:

> THE COURT: Yes, ma'am.

JUROR McLAIN: I just don't believe in capital punishment.

THE COURT: All right, ma'am. You can serve though on a regular case.

JUROR McLAIN: Civil, uh-huh (Yes).

THE COURT: What about a regular criminal case not having a capital murder involved?

JUROR McLAIN: Well, if it's not involving, you know, killing somebody, something like that.

THE COURT: I understand. Okay. Thank you, Ms. McLain. Appreciate it.

JUROR McLAIN: Thank you.

(Vol. 4 at 207).

The record does not indicate that McLain was excused by the trial court, but her name was not on the list of veniremembers from which McWhorter's jury was selected (Vol. 4 at 238), and no further mention of her appears in the record.

### 1. The Parties' Arguments

McWhorter claims that the trial court violated his rights to due process and to a fair trial by excusing McLain "simply because she expressed an opinion against the death penalty." (Doc. 1 at 66). He explains that by excusing Ms. McLain without asking her "any questions regarding her ability to follow the law," the trial court deprived him of a fair and impartial jury. (*Id.*).

Respondent answers that McWhorter is not entitled to relief because the Alabama Court of Criminal Appeals properly applied clearly established federal law in denying this claim. (Doc. 14 at 63-65). In denying the claim, the Alabama Court of Criminal Appeals found:

> The appellant argues that the trial court improperly excluded a venireperson from serving on his jury in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The appellant submits that the

potential juror was excused without any follow-up questioning by the trial court because she expressed a fixed opinion about the death penalty.

The record indicates that, before the *voir dire* questioning, but following the initial qualification of the venire, the trial court said that if any members "would like to offer an excuse," then they should approach the bench. A number of potential jurors presented excuses of undue hardship, including the potential juror cited by the appellant in his argument. . . . Thereafter, the potential juror the appellant now argues should not have been excluded identified herself to the trial court and the following transpired:

> JUROR: I just don't believe in capital punishment.
>
> THE COURT: All right, ma'am. You can serve though on a regular case.
>
> JUROR: Civil, uh-huh. (Yes).
>
> THE COURT: What about a regular criminal case not having a capital murder involved?
>
> JUROR: Well, if it's not involving, you know, killing somebody, something like that.
>
> THE COURT: I understand. Okay. Thank you, . . . . I appreciate it.
>
> JUROR: Thank you.

The trial court then continued with taking the veniremembers' excuses. The record does not indicate that this potential juror was excused by the trial court; however, no further mention of her appears in the record. This juror was not struck for cause by one of the parties. Rather, she was removed by the trial court pursuant to its discretion under § 12-16-63, Ala.Code 1975. This statute states the following concerning a trial court's excusing of prospective jurors from service when they are not disqualified:

> (b) A person who is not disqualified for jury service may be excused from jury service by the court only upon a showing of undue hardship, extreme inconvenience or public necessity, for a period the court deems necessary, at the conclusion of which the person may be directed to reappear for jury service in accordance with the court's directions.

*See also* §§ 12-16-60, 12-16-63(a). The trial court is vested with broad discretion in excusing potential jurors from service under this section. *See Giles v. State*, 632 So.2d 568, 574 (Ala.Cr.App. 1992). Trial courts have properly excused jurors pursuant to this section for a myriad of reasons. *See Madison v. State*, 718 So.2d 90, 100 (Ala.Cr.App. 1997) (potential juror excused because mother had recently undergone surgery and suffered with Alzheimer's disease; another potential juror excused because juror's mother was terminally ill); *Allen v. State*, 683 So.2d 38, 42 (Ala.Cr.App. 1996) (eight potential jurors were excused, most of whom were students at the University of Alabama with pending final exams); *Knotts v. State*, 686 So.2d 431, 480 (Ala.Cr.App. 1995) (veniremember excused by a "court strike" because there was an odd number of veniremembers remaining); *Giles v. State*, supra, at 574 (black potential juror properly excused because she was sole caretaker of an infant and a five-year-old child). *See also Gwin v. State*, 425 So.2d 500, 504 (Ala.Cr.App. 1982) (appellant's claim that judge had arbitrarily excused potential jurors was without merit). Moreover, a trial court is not required to ask follow-up questions or to have potential jurors elaborate on any possible preventions of their hardships. *See Madison v. State*, supra, at 100.

The rationale behind allowing the trial court to excuse jurors lies in the predecessors to this statute, although the general terminology for the justifications for the excuses differed. As opposed to "undue hardship, extreme inconvenience, or public necessity," the earlier statutes called for removal beyond disqualification or exemption "for any other reasonable and proper cause to be determined by the Court." Code 1940, Tit. 30, § 5. This statute was construed to enable a trial court "in its discretion to excuse jurors 'for reasonable and proper cause.'" *Blackmon v. State*, 246 Ala. 675, 679, 22 So.2d 29 (1945) (a juror was excused because he had a fixed opinion).

> The Court's exercise of discretion in excusing jurors from duty in the trial of a capital case must be founded within reason, justice, and in consonance with the defendant's constitutional rights. The Court does not have the right to excuse a regular or special juror from service in a capital case capriciously, or for no reason at all.

*Blackmon v. State*, 246 Ala. at 679, 22 So.2d 29.

> Under this section, a trial court is given much discretion in attempting to provide a jury panel free of any member who might be biased or prejudiced in the slightest degree. *Calhoun County v. Watson*, 152 Ala. 554, 44 So. 702. Nor is this discretion limited in its exercise to the enumerated statutory grounds for challenge, but is general. *Louisville & Nashville R.R. Co. v. Young*, 168 Ala. 551, 53 So. 213.

Over three centuries ago Lord Coke in capsule form gave a comprehensive answer to the question we're now considering when he wrote that to be considered impartial a juror must "be indifferent as he stands unsworn." *See* Co. Litt. 155b.

In *Burdine v. Grand Lodge of Alabama*, 37 Ala. 478, Justice Stone with his usual clarity of expression wrote:

> . . . This rule is necessary as a protection to the public interest, and as a guaranty of that purity and integrity in the administration of the law, which alone can inspire respect for, and confidence in our judicial tribunals.

The action of a trial court in excusing a juror for other than statutory causes presents on review a mixed question of law and fact, and the findings of the trial court on the facts ought not be set aside by a reviewing court unless the error is manifest. *Reynolds v. United States*, 98 U.S. [(8 Otto)] 145, 25 L.Ed. 244.

*Cooper v. Magic City Trucking Service, Inc.*, 288 Ala. 585, 588-89, 264 So.2d 146 (1972). This policy was carried over to § 12-16-5, Ala.Code 1975.

> The right to excuse jurors is given to the Court by statute, T. 30, § 5, Code of Alabama 1940, Recomp.1958; Code of Alabama 1975, § 12-16-5. The statute mandates that the trial court may excuse any juror if that juror is disqualified or exempt, or in the determination of the trial judge some reasonable cause or purpose exists for excusing the juror. Further, under this section [no] abuse of discretion is shown when jurors are excused without defense consent. *Mullins v. State*, 24 Ala.App. 78, 130 So. 527.
>
> The record clearly indicates that the trial judge in exercising his discretion to excuse jurors, was fulfilling his duty to provide both the State and the defendant with a fair and impartial jury. In doing so, he did not abuse the wide discretion granted to him for this purpose. *Biggs v. State*, 20 Ala.App. 449, 103 So. 706.

*Rogers v. State*, 365 So.2d 322, 331 (Ala.Cr.App. 1978).

Thus, under these guidelines, it was proper for a trial court to "ex mero motu" excuse a juror who had stated during his qualification that he would not convict on circumstantial evidence. *Williams v. State*, 241 Ala. 348, 349-50, 2 So.2d 423 (1941). *See also Coker v. State*, 144 Ala. 28, 31, 40 So. 516 (1906) (a

trial court properly excused a juror who indicated that he would not "hang a man on circumstantial evidence" in a capital case). This Court also indicated in dicta that where a potential juror indicated during *voir dire* that he had spoken to a party before the trial, a trial court would be required to excuse such a juror in order to ensure a fair and impartial trial. *Baxley v. State*, 18 Ala.App. 277, 278-79, 90 So. 434 (1921).

In the present case, the appellant did not object to excusing this potential juror, and no plain error occurred. It is, moreover, clear that the appellant suffered no prejudice because of the removal of this juror; the juror could have properly been struck for cause by the State based on her views against capital punishment.

To the average juror, who is unfamiliar with legal terms and concepts, *voir dire* questioning may be confusing and complicated.

"[T]he proper standard for determining when a prosecutive juror may be excluded for cause because of his . . . views on capital punishment is . . . whether the juror's views would 'prevent or substantially impair the performance of his duties as juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)). It is not required that a prospective juror's bias in this regard be proved with "unmistakable clarity." *Id*., 469 U.S. at 424, 105 S.Ct. at 852.

[M]any veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. [T]his

> is why deference must be paid to the
> trial judge who sees and hears the
> juror.
>
> *Id.*, at 421-26, 105 S.Ct. at 852-53 (footnote
> omitted).

*Coral v. State*, 628 So.2d 954, 969-70 (Ala.Cr.App. 1992).

*Boyd v. State*, 715 So.2d 825, 842 (Ala.Cr.App. 1997). This potential juror was properly excused.

*McWhorter*, 781 So. 2d at 272-275.

## 2.    Analysis

McWhorter argues that the Alabama Supreme Court's decision was contrary to and involved an unreasonable application of *Witherspoon v. Illinois*, 391 U.S. 510 (1968) and *Wainwright v. Witt*, 469 U.S. 412 (1985). In *Witherspoon*, the Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed it was chosen by excluding potential jurors for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. at 522. As the Court explained:

> The most that can be demanded of a venireman in this regard is that he be willing to consider all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings.

*Id.* at 522 n.21.

> This legal standard was later clarified in *Witt*:

> We therefore take this opportunity to clarify our decision in *Witherspoon*, and to reaffirm the above-quoted standard from *Adams* [*v. Texas*, 448 U.S. 38, 45 (1980)] as the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment. That standard is whether the juror's views would "prevent or substantially impair the

performance of his duties as a juror in accordance with his instructions and his oath." We note that, in addition to dispensing with *Witherspoon*'s reference to "automatic" decisionmaking, this standard likewise does not require that a juror's bias be proved with "unmistakable clarity." This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror.

*Witt*, 469 U.S. at 424-26 (footnotes omitted).

In *Uttecht v. Brown*, 551 U.S. 1 (2007), the Court reviewed its *Witherspoon-Witt* line of opinions and identified "four principles of relevance":

First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. *Witherspoon*, 391 U.S., at 521, 88 S.Ct. 1770. Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes. *Witt*, 469 U.S., at 416, 105 S.Ct. 844. Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible. *Id*., at 424, 105 S.Ct. 844. Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts. *Id*., at 424-434, 105 S.Ct. 844.

*Uttecht*, 551 U.S. at 9.

"Reviewing courts owe deference to a trial court's ruling on whether to strike a particular juror 'regardless of whether the trial court engages in explicit analysis regarding substantial impairment; even the granting of a motion to excuse for cause constitutes an implicit finding of bias.'" *White v. Wheeler*, 136 S. Ct. 456, 460 (2015) (quoting *Uttecht*, 551 U.S. at 7). "The

judgment as to 'whether a venireman is biased . . . is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province. Such determinations [are] entitled to deference even on direct review; the respect paid such findings in a habeas proceeding certainly should be no less.'" *Uttecht*, 551 U.S. at 7 (quoting *Witt*, 469 U.S. at 428). "A trial court's 'finding may be upheld even in the absence of clear statements from the juror that he or she is impaired.'" *Wheeler*, 136 S. Ct. at 460 (quoting *Uttecht*, 551 U.S. at 7).

Further, in cases such as McWhorter's, where we must review the state court's ruling under the constraints imposed by AEDPA, this court "must accord an additional and 'independent, high standard' of deference." *Id*. (quoting *Uttecht*, 551 U.S. at 10). "As a result, federal habeas review of a *Witherspoon-Witt* claim – much like federal habeas review of an ineffective-assistance-of-counsel claim – must be 'doubly deferential.'" *Id*. (quoting *Burt v. Titlow*, 571 U.S. 12, 15 (2013)).

The critical question related to this claim is whether the Alabama Court of Criminal Appeals' decision to affirm the trial court's excusal of McLain from the venire was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Wheeler*, 136 S. Ct. at 461 (quoting *White v. Woodall*, 572 U.S. 415, 420 (2014)). The trial court, who was in the best position to judge McLain's demeanor, apparently believed that her statement that she did not believe in capital punishment warranted excusing her from the venire from which McWhorter's jury was chosen. A fairminded jurist could conclude that the trial judge considered McLain's request to be excused from any capital jury, and that the court was fair in exercising its "broad discretion" in deciding to excuse her. *Id.* McLain's statements were at least ambiguous as to whether she would be able

to give appropriate consideration in a case which involved the potential for imposition of the death penalty. Because there was "ambiguity in the prospective juror's statements," the trial court was "entitled to resolve it in favor of the State." *Uttecht*, 551 U.S. at 7 (quoting *Witt*, 469 U.S. at 434). Thus, the Alabama Court of Criminal Appeals' finding that McLain was properly excused was neither contrary to nor an unreasonable application of *Witherspoon* and *Witt*.

### G. McWhorter's Claim That the Trial Court Improperly Coerced the Jury into Returning a Death Sentence after the Jury Was Deadlocked

#### 1.    The Parties' Arguments

McWhorter argues that the trial court violated his right to a reliable sentencing determination by coercing the jury into recommending that he be sentenced to death. (Doc. 1 at 67). Specifically, he alleges that during the sentencing phase of the trial, when the jury informed the judge that it was unable to reach a verdict, "[i]nstead of instructing the jurors to keep deliberating and trying to reach agreement without surrendering their conscientiously-held positions, the trial court pressured the jury by unnecessarily discussing the cost and wastefulness of a potential retrial." (*Id.*).

In particular, McWhorter objects to the portion of the supplemental jury instruction in which the court stated as follows:

> Ladies and gentlemen, I can't help you on the facts in this case. That's for you. All of the parties want you to decide this case if you can. The State of Alabama, the defense, and the court system have gone to considerable expense for this trial.
>
> If you can't decide this case, I'll have to declare a mistrial and it will have to be all done over again. Not the guilt phase, but the sentencing phase. But basically we would have to go through substantially the same procedure for selecting a jury. Substantially all of the guilt evidence would have to be presented again since this jury would not have heard that evidence. The jury again would have to be sequestered and put up in a motel. Time will have passed. Recollections will have dimmed. Some witnesses may not be available and more expense will be incurred.

(*Id.* at 68) (quoting Vol. 12, Tab 29 at 1848).

Petitioner maintains this instruction suggested that the jury reach a "particular verdict," "essentially" telling the jury that "their failure to achieve ten votes for death, or seven for life, was socially unacceptable." (*Id.* at 68, 69). He argues that it was improper for the court to instruct the jury about what would occur after a mistrial and to instruct the jury that it should consider the financial cost of another trial. (*Id.* at 69-70). He further asserts that the speed of the jury's decision after it received the supplemental instruction proves that the instruction was coercive.[46] (*Id.* at 70) (citing *Lowenfield v. Phelps*, 484 U.S. 231, 240 (1988) ("We are mindful that the jury returned with its verdict soon after receiving the supplemental instruction, and that this suggests the possibility of coercion.")).

Respondent argues that McWhorter is not entitled to relief, pointing out that he unsuccessfully raised this claim on direct appeal. (Doc. 14 at 66-69). In denying the claim, the Alabama Court of Criminal Appeals found as follows:

> The appellant argues that the trial court improperly coerced the jury into returning a death sentence after the jury had told the court that it was unable to reach a verdict. Specifically, the appellant argues that when, during the sentencing phase of his trial, the jury informed the trial court that it was unable to reach a verdict, the court should have declared a mistrial pursuant to § 13A-5-46(g), Ala.Code 1975. The trial court then charged the jury that it should continue deliberations; the appellant argues that this resulted in error on three grounds: that the charge included incorrect and misleading statements that coerced the jury into arriving at a death verdict; that the charge emphasized the cost of another trial and that doing so coerced a death verdict; and that the trial court's action in failing to declare a mistrial coerced the jury into arriving at a death verdict.

---

[46] The jury began deliberations at approximately 3:15 p.m. (Vol. 12, Tab 29 at 1846). At 4:35 p.m., the bailiff notified the trial judge that the jury wished to return to the courtroom. (*Id.* at 1847). The judge issued a supplemental instruction, then the jury returned to continue deliberations. (*Id.* at 1847-51). The jury reached a verdict at 5:40 p.m. (*Id.* at 1851).

The record indicates that approximately an hour and one-half after the jury had begun deliberations in the sentencing phase of the appellant's trial, the bailiff notified the trial court that the jury wished to return to the courtroom. The trial court instructed the parties that the jury had apparently been unable to reach a verdict and that the trial court intended to bring them back into courtroom and "see if I can help them on the law, explain to them, of course, I can't help them on the facts, but impress upon them the desirability of them reaching a verdict on this phase of this trial and what would occur if they did not." The jury was then brought into the courtroom and the trial court asked the foreperson if there were any questions concerning the law from the jury. The foreperson responded that no one had raised any such questions and the trial court then stated:

THE COURT: All right. Ladies and gentlemen, I can't help you on the facts in this case. That's for you.

All of the parties want you to decide this case if you can. The State of Alabama, the defense, and the court system have gone to considerable expense for this trial.

If you can't decide this case, I'll have to declare a mistrial and it will have to be all done over again. Not the guilt phase, but the sentencing phase.

But basically we would have to go through substantially the same procedure [for] selecting a jury. Substantially all of the guilt evidence would have to be presented again since this jury would not have heard that evidence. The jury again would have to be sequestered and put up in a motel.

Time will have passed. Recollections will have dimmed. Some witnesses may not be available and more expense will be incurred.

A new jury may not have as much evidence as you have today to base a verdict on. And it's highly unlikely that a new jury would have any more or any better evidence than you ladies and gentlemen have before you.

It's your duty to agree on a verdict if you can do so without violating your conscience or convictions based on the evidence in this case.

You should deliberate patiently and long if necessary. You should have a full and free interchange of views with each other,

and you should consider the issues submitted to you without prejudice or preformed bias.

Ladies and gentlemen, cultivate a spirit of harmony and tolerance and arrive at a verdict if you can possibly do so.

Look closely and weigh the testimony of the witnesses solely with the view of finding the truth shutting your eyes as to any personal results of your findings. Apply the facts as you find them to the law given to you by the Court.

No jury out of – no juror out of pride of his own opinion should refuse to agree nor stand out in an unruly, obstinate, or unreasonable way. On the other hand, no juror should surrender their conscientious views founded on the evidence and the law declared by the Court.

I ask humbly that you let each juror re-examine the grounds of their opinion and reason with the other jurors concerning the facts and with an honest desire to arrive at the truth and to render a true verdict according to the evidence.

Ladies and gentlemen, lay aside all pride of opinion and judgment. Examine any difference of opinion that the[re] may be among you with a spirit of fairness. Reason together, talk over your differences, harmonize them if possible so that this case can be justly disposed of.

Now, ladies and gentlemen, it's not my purpose to force or coerce you to reach a verdict in this case. What I've said to you mustn't be taken as any attempt on my part to require any of you to surrender your honest and reasonable convictions founded on the law and the evidence in this case.

My sole purpose is to impress on you your duty and the desirability and importance of your reaching a verdict if you can conscientiously do so.

On behalf of the parties and the court system, I respectfully ask you to deliberate longer and reach a verdict if possible.

Following this charge, defense counsel objected, stating that "[i]n spite of the Court's cautionary language, I think the overall effect of the charge is to give the jury an indication that the Court favors the imposition of the more serious

penalty." The jury then retired to continue deliberations and, approximately an hour later, returned with an advisory verdict of death by a vote of 10-2.

The appellant first argues that the trial court used incorrect and misleading statements to coerce the jury into a death verdict. The appellant argues that by announcing that it was unable to reach a verdict, the jury had essentially informed the judge that at least 10 jurors would not vote for a death sentence, and because Alabama law requires 10 votes for the imposition of the death sentence, the jury was effectively recommending a sentence of life imprisonment without parole. The appellant further argues that, because the trial court could have properly considered this to be a recommendation of a sentence of life imprisonment without parole, because there must have been less than 10 votes for death, the trial court's instruction that a mistrial would have to be declared if the jurors were unable to decide the case was an incorrect statement of the law. The appellant further alleges an inaccuracy in the trial court's instruction by his statement that, "[a]ll parties want you to decide this if you can. The State of Alabama, the defense, and. . . ." The appellant argues the defense should not have been included because he objected following this charge. However, when this statement is viewed in the context of the entire instruction, it is clear that the trial court was referring to the parties' efforts involved in trying the case and the parties' wanting the jury to reach a proper verdict for sentencing if possible. The appellant's objection referred to the trial court's charge as being coercive. However, the trial court's comments were clearly made to ensure and promote judicial efficiency and judicial economy.

Moreover, the appellant's argument that the jury was essentially returning an advisory verdict of life imprisonment without parole is without merit. The record indicates that the jury never revealed the number of votes for death or for life imprisonment without parole when it returned to the courtroom. It is not clear whether every juror had reached a decision. There is also no indication that there were seven jurors who were voting for life imprisonment without parole as required by § 13A-5-46(f), Ala.Code 1975. The indication from the record is that the jury was unable to reach any verdict; therefore, it would not have been proper for the trial court to have treated the jury's return as a verdict for life imprisonment without parole.

> "The general rule in Alabama has been that it is not improper for the trial court to urge upon the jury the duty of attempting to reach an agreement or verdict as long as the judge does not suggest which way the verdict should be returned." *King v. State*, 574 So.2d 921, 927-28 (Ala.Cr.App. 1990), quoting *McMorris v. State*, 394 So.2d 392 (Ala.Cr.App. 1980), *cert. denied*, 394 So.2d 404 (Ala. 1981), *cert. denied*, 452 U.S. 972, 101 S.Ct. 3127, 69 L.Ed.2d 983 (1981). An *Allen v. United States*, 164

U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), charge, also known as a "dynamite charge," is permissible if the language of the charge is not coercive or threatening. *Grayson v. State*, 611 So.2d 422, 425 (Ala.Cr.App. 1992); *King v. State*, 574 So.2d at 928.

*Gwarjanski v. State*, 700 So.2d 357, 360 (Ala.Cr.App. 1996). In *Ex parte Slaton*, 680 So.2d 909 (Ala.1996), the jury, after it had begun its sentence-stage deliberations, sent the following question to the trial court: "What happens if we cannot come up with enough numbers to go either way?" The trial court responded by instructing them that "it would be highly desirable and important if there is any way possible that a verdict be reached. The instructions emphasized harmony and consistency with conscience, and informed the jury that, if it was unable to reach the necessary numbers, "I think you know what the Court will have to do. I would have to declare a mistrial and the case might have to be tried again as far as the sentencing phase that you are in at this time." The Alabama Supreme Court held that such instructions were proper and stated:

> This Court has held that "a trial judge may urge a jury to resume deliberations and cultivate a spirit of harmony so as to reach a verdict, as long as the Court does not suggest which way the verdict should be returned and no duress or coercion is used." *Showers v. State*, 407 So.2d 169, 171 (Ala. 1981) (citation omitted). The trial judge urged the jury to "resume deliberations" and to "cultivate a spirit of harmony." The trial judge did not ask the jury what its vote was; he did not suggest which way the verdict should be returned; and he made no threat or coercion to suggest the jury had to return a verdict. The trial court did not violate Slaton's rights in giving this supplemental charge.

680 So.2d at 926. The trial court's instruction that it would have to declare a mistrial if the jury was not able to arrive at a proper sentencing verdict is a correct statement of law. This argument by the appellant is without merit.

Moreover, the appellant's argument that the charge was coercive because it instructed the jury to consider the financial cost of another trial is also unfounded. "It is not error for the trial court to call the jury's attention to the time and expense a new trial would entail. *Poellnitz v. State*, 48 Ala.App. 196, 263 So.2d 181 (1972); *Watson v. State*, 398 So.2d 320 (Ala.Cr.App. 1980); *Galloway v. State*, 416 So.2d 1103 (Ala.Cr.App. 1982)." *Wiggins v. State*, 429 So.2d 666, 669 (Ala.Cr.App. 1983) (wherein the trial court instructed the jury during the *Allen* charge that "as you know there's a considerable expense attached to any trial. I just want y'all to think about it . . ."). Similarly, in *Miller v. State*, 645 So.2d 363, 365 (Ala.Cr.App. 1994), the trial court gave the jury a supplemental charge on the second day of deliberations to urge it to fulfill its oath and to render

a fair verdict. In doing so, the Court stated that it did not wish to know the numerical division of the jury but noted that the majority might "consider that these other folks are as intelligent as you are, they've heard the same evidence in the case, and reconsider your position." The trial court also charged, "also remember that trials are expensive. It costs money to put this case on. Some jury will have to do it, it won't go away. It will have to be handled." *Id.*, at 365. The appellant in *Miller* objected on the grounds that the trial court's instructions implied to the jury that the Court "'expected' a verdict" and thereby "coerced" the jury. *Id.*, at 366. This Court found no error in the trial court's instructions in that they were neither threatening nor coercive. This Court stated:

> As this court stated in *McMorris v. State*, 394 So.2d 392 (Ala.Cr.App. 1980), *writ denied*, 394 So.2d 404 (Ala. 1981), *cert. denied*, 452 U.S. 972, 101 S.Ct. 3127, 69 L.Ed.2d 983 (1981), "The general rule in Alabama has been that it is not improper for the trial court to urge upon the jury the duty of attempting to reach an agreement or verdict as long as the judge does not suggest which way the verdict should be returned." 394 So.2d at 403. An "*Allen* Charge" or "Dynamite Charge" is permissible if it is not coercive. *See Franklin v. State*, 502 So.2d 821 (Ala.Cr.App. 1986), writ quashed, 502 So.2d 828 (Ala. 1987). The trial court may also make reference to the expense of a new trial. *See Wiggins v. State*, 429 So.2d 666 (Ala.Cr.App. 1983).

*King v. State*, 574 So.2d 921, 927-28 (Ala.Cr.App. 1990). Whether an "*Allen* Charge" is coercive must be evaluated in the "whole context" of the case. *Ex parte Morris*, 465 So.2d 1180, 1183 (Ala. 1985). In this case, the trial judge did not set any deadline for reaching a verdict. *See Adair v. State*, 641 So.2d 309 (Ala.Cr.App. 1993); *McGilberry v. State*, 516 So.2d 907, 910 (Ala.Cr.App. 1987). "Under Alabama law, 'a trial judge may urge a jury to resume deliberations and cultivate a spirit of harmony so as to reach a verdict, as long as the court does not suggest which way the verdict should be returned and no duress or coercion is used.' *Showers v. State*, 407 So.2d 169, 171 (Ala. 1981)." *Ex parte Giles*, 554 So.2d 1089, 1093 (Ala. 1987). "The Supreme Court and this court have held on numerous occasions that the 'Allen' or 'dynamite' charge is not error unless the language used is threatening or coercive." *Grayson v. State*, 611 So.2d 422, 425 (Ala.Cr.App. 1992), and cases cited therein.

*Miller v. State*, supra, at 366. Thus, the trial court did not err by emphasizing the cost of another trial.

Finally, the appellant alleges that the trial court erred in failing to declare a mistrial and that its failure to do so coerced the jury into a death verdict. In his brief on appeal, the appellant raises a "catch-all" argument that essentially argues the cumulative effect of error by having given this charge to the jury. However, we have found no error in this charge; it was not improper. In *Bates v. State*, 659 So.2d 201, 204-05 (Ala.Cr.App. 1994), this Court noted that such an instruction was not a "dynamite" charge and that it was in no way coercive or threatening as it was similar in its points made to the jury to the pattern jury instructions for Alabama.

The preferable instruction for a "hung jury" is set forth in Alabama Pattern Jury Instructions - Criminal, Instruction I.8, Hung Jury:

Members of the jury, I am sorry to hear that you are unable to reach a verdict. The Court cannot release you at this time. You should make further efforts to arrive at a verdict. Each juror is entitled to his or her opinion of the evidence, but I know that you do not wish to put the State to the expense of another trial if it can be avoided. If you cannot agree, a mistrial would be declared and this case would have to be tried again. There is no reason to believe that another jury would have better or clearer evidence than has been presented to you.

This does not mean that you surrender an honest conviction as to the weight or the effect of any evidence solely because of the opinion of other jurors or because of the importance of arriving at a decision. But you should give respectful consideration to each other's views and talk over any difference of opinion in a spirit of fairness and candor. If possible, you should resolve any differences and come to a common conclusion so that the case may be completed.

I would be happy to give you an explanatory charge on the law.

It is natural that differences of opinion will arise. When they do, each juror should not only express his opinion but the facts and reasons upon which he bases that opinion. By reasoning the matter out it may be possible for all jurors to agree. What I have said to you must not be taken as an attempt on the part of the Court to acquire or force you to surrender your honest and reasonable convictions founded upon the law and the evidence in this case. My sole purpose is to impress upon you your duty and the desirability and importance of reaching a verdict if you can conscientiously do so.

You may retire and continue your deliberations.

*Bates v. State*, supra, at 204-05.

The trial court's instructions to the jury, urging them to arrive at a proper verdict, during the sentencing phase of the appellant's trial were also similar in substance to the pattern instructions and were neither coercive, threatening, nor improper.

*McWhorter v. State*, 781 So. 2d 257, 275-80 (Ala. Crim. App. 1999).

## 2. Analysis

McWhorter argues that the Alabama Court of Criminal Appeals' denial of his claim "was contrary to, and involved an unreasonable application of, clearly established U.S. Supreme Court precedent." (Doc. 1 at 71). The court disagrees. The clearly established law against coercive jury instructions is "sparse." *Wong v. Smith*, 562 U.S. 1021, 131 S.Ct. 10, 11 (2010) (Alito, J., dissenting).[47] At the time of McWhorter's direct appeal, *Lowenfield v. Phelps*, 484 U.S. 231, 237 (1988) was the only Supreme Court decision addressing the constitutional rule against coercive jury instructions. *See Wong,* 131 S. Ct. at 11. In *Lowenfield*, the Supreme Court held that "[a]ny

_____

[47] In *Wong*, the Court summarily denied the prison warden's petition for writ of certiorari. Justice Alito, joined by Chief Justice Roberts and Justice Scalia, issued the only written opinion, dissenting from the denial of certiorari.

criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfield*, 484 U.S. 241. The review of an allegation that the jury was improperly coerced requires the court to "consider the supplemental charge given by the trial court 'in its context and under all the circumstances.'" *Id*. at 237 (quoting *Jenkins v. United States*, 380 U.S. 445, 446 (1965) (per curiam)). As Justice Alito noted in his dissent in *Wong*:

> As a result, the clearly established law in this area provides very little specific guidance. About all that can be said is that coercive instructions are unconstitutional, coerciveness must be judged on the totality of the circumstances, and the facts of *Lowenfield* (polling a deadlocked jury and reading a slightly modified *Allen* charge) were not unconstitutionally coercive. *See* 484 U.S., at 237-241, 108 S.Ct. 546.

*Wong*, 562 U.S. at 11-12. This general standard gives state courts "wide latitude for reasonable decisionmaking under AEDPA." *Id*. at 12 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.")).

McWhorter has not met the heavy burden of demonstrating that the Alabama Court of Criminal Appeals' decision was contrary to or an unreasonable application of *Lowenfield*. He first argues that when the jury informed the judge that it was unable to reach a verdict, the trial court "pressured the jury" rather than "instructing the jurors to keep deliberating and trying to reach agreement without surrendering their conscientiously-held positions." (Doc. 1 at 67). However, contrary to his assertion, the judge went out of his way to explain to the jurors that they were not expected to surrender their conscientious views to reach a verdict. Indeed, the trial judge expressly instructed the jury that "no juror should surrender their conscientious views"; "[w]hat I've said to you mustn't be taken as any attempt on my part to require any of you to surrender your honest and reasonable convictions"; and "[m]y sole purpose is to impress on you

your duty and the desirability and importance of your reaching a verdict if you can conscientiously do so." (Vol. 12, Tab 29 at 1848, 1850).

McWhorter next argues that the jury instruction suggested that the jury reach a "particular verdict," "essentially" telling the jury that their failure to reach a verdict was "socially unacceptable." (Doc. 1 at 68-69). Yet, he points to nothing in the supplemental jury charge which even remotely suggests that any particular verdict should be reached. Nor is there anything in the instruction indicating that it would be unacceptable for the jury not to reach a verdict. Rather, the court simply urged the jury to "deliberate longer and reach a verdict if possible." (Vol. 12, Tab 29 at 1850).

McWhorter also challenges the portion of the supplemental jury charge in which the court stated: "[i]f you can't decide this case, I'll have to declare a mistrial and it will have to be done over again." (Vol. 12, Tab 29 at 1848). He claims that it was "improper," "speculative," "cumulative," and "wrong" for the court to instruct the jury about what would occur after a mistrial. (Doc. 1 at 69 and n.7). He points out that pursuant to Ala. Code § 13A-5-46(g)(1975), if a mistrial is declared in the penalty phase, it is "possible" that "both parties with the consent of the court may waive the right to have an advisory verdict from a jury, in which event the issue of sentence shall be submitted to the trial court without a recommendation from a jury." (Doc. 1 at 69, n.7; Ala. Code § 13A-5-46(g)(1975)).

McWhorter argues that courts "routinely find improper jury instructions about what will occur after a mistrial." (Doc. 1, at 69). However, he cites only *United States v. Johnson*, 432 F.2d 626 (D.C. Cir. 1970) in support of his argument that it is an "unfortunate fiction" to instruct a jury that a new trial will occur after a mistrial, because the question of whether a mistrial will or

will not be followed by a new trial is "so speculative." (*Id*.). But this argument is without merit. The Supreme Court has held that circuit court precedent "does not constitute 'clearly established Federal law, as determined by the Supreme Court.'" *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (quoting *Renico v. Lett*, 559 U.S. 766, 779 (2010)). Therefore, *Johnson* cannot form the basis for habeas relief under AEDPA. *Id.* McWhorter has pointed to no clearly established Supreme Court precedent finding it unconstitutional for the trial court to instruct the jury that a case would be retried after a mistrial.

McWhorter further challenges the portion of the supplemental jury instructions mentioning the expense of the current trial and the potential expense of a retrial. In the supplemental instruction, the trial judge indicated that the parties and the court had "gone to considerable expense for this trial," and "more expense [would] be incurred" if the jury could not reach a verdict. (Vol. 12, Tab 29 at 1848). McWhorter contends that it was "entirely improper for the trial court, at the moment the jury was struggling with whether [he] should live or die, to instruct the jury that it should consider the financial cost of another trial." (Doc. 1 at 70). He argues that the cost of another trial has "absolutely nothing to do with the jury's sentencing decision." (*Id*.). In support of this contention, McWhorter cites *United States v. Thomas*, 449 F.2d 1177, 1183-84 (D.C. Cir. 1971) for the proposition that instructing the jury about the expense of a retrial was coercive. In *Thomas*, the D.C. Circuit held that the trial court's supplemental jury instruction, which included a declaration that he was "not going to declare a mistrial, and thereby require a retrial of this case before some other jury," was coercive. *Thomas*, 448 F.2d at 1183-84. *Thomas* does not help McWhorter for two reasons. First, a D.C. Circuit decision does not constitute clearly established Federal law, as determined by the Supreme

Court, so it provides no basis for habeas relief. And second, *Thomas* is, in any event, distinguishable. The supplemental jury instruction in *Thomas* did not mention the financial cost of a new trial. McWhorter has pointed to no clearly established Supreme Court law finding it coercive for the trial court to mention the financial cost of a potential retrial.

Finally, McWhorter argues that the coerciveness of the supplemental instruction is demonstrated by the fact that the previously deadlocked jury reached a decision in less than an hour. (Doc. 1 at 70). While the speed with which a jury returns a verdict after receiving a supplemental charge may suggest the possibility of coercion, it is not necessarily indicative of it. *See Lowenfield v. Phelps*, 484 U.S. 231, 240 (1988). After careful review of the trial court's supplemental charge to the jury, the court concludes that it was not coercive.

The supplemental instruction did not threaten the jury; it did not set a deadline; it did not give the jury the impression that they had to surrender their conscientiously held beliefs; it did not suggest to the jury that they reach a particular verdict; and it did not imply that failure to reach a verdict was unacceptable. Further, the trial court's brief reference to the possibility of and cost of a potential retrial did not place undue emphasis on those factors when considered in the context of the entire instruction. Rather, the supplemental instruction explained what would happen if the jury could not reach a verdict, asked the jurors to reexamine the evidence and their opinions, and stressed the importance of the jury reaching a verdict if they could conscientiously do so.

The Alabama Court of Criminal Appeals found the trial court's supplemental jury charge was not coercive, threatening, or improper. This finding was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

160

### H. McWhorter's Claim That the Trial Court Improperly Directed Prospective Jurors to Give a Specific Answer to a Crucial *Voir Dire* Question

The prospective jurors for McWhorter's trial were divided into five separate panels.

During the *voir dire* questioning of the second panel, the trial judge stated to the panel:

> [I]f you were asked would you – If you convicted the Defendant of capital murder, would you automatically apply the death penalty, well, you know from what I've just told you that, no, you wouldn't automatically vote for the death penalty. You would have to weigh the aggravating against the mitigating circumstances to determine what was appropriate.

(Vol. 5 at 434).

During the *voir dire* questioning of the third panel, the trial judge stated:

> [I]f somebody – one of the attorneys were to ask you, would you automatically vote for the death penalty, you now know, no, that you would have a job of weighing to do as to what to recommend.

(*Id.* at 515).

During the *voir dire* questioning of the fourth panel, the trial judge stated to the panel:

> [I]f somebody said, if the Defendant was convicted of the capital offense, would you automatically vote for death? Well, now knowing what you know, would you certainly know that the answer would be no. That under the law as the Judge would give it, that you would first weigh those factors one against the other and no vote would be automatic in the sentencing phase.

(Vol. 6 at 624). McWhorter claims the trial judge's remarks essentially directed the jurors on those panels to answer a question in a certain way. That assertion is wide of the mark.

### 1. The Parties' Arguments

McWhorter argues that these statements "instructing jurors how to answer the question," denied defense counsel a meaningful opportunity to ask jurors if they would automatically impose the death penalty upon conviction, in violation of his rights to due process and a fair trial. (Doc. 1 at 71-72). He adds that:

By directing jurors to say that they would not automatically impose the death penalty, the trial judge violated McWhorter's rights under *Witherspoon* [*v. Illinois*, 391 U.S. 510 (1968)] and *Morgan* [*v. Illinois*, 504 U.S. 719 (1992)]. Instructing jurors to give a specific answer to a crucial *voir dire* question effectively precluded McWhorter from asking jurors whether they would automatically impose the death penalty.

(*Id*. at 72).

Respondent counters that McWhorter is not entitled to relief, because the Alabama Court of Criminal Appeals properly applied clearly established federal law in denying this claim. (Doc. 14 at 69-72). In denying the claim, the Alabama Court of Criminal Appeals found:

The appellant argues that the trial court improperly directed prospective jurors to give a specific answer to a *voir dire* question; specifically, the appellant argues that the trial court improperly instructed the jury in such a manner that the jurors believed they had to say that they would not automatically impose the death penalty. The appellant cites instructions given by the trial court during *voir dire* questioning of prospective jurors, wherein the trial court stated:

[I]f somebody said, if the Defendant was convicted of the capital offense, would you automatically vote for death? Well, now knowing what you know now, you would certainly know that the answer would be no.

No objection was made to this charge; therefore, it is reviewable under the plain-error standard. Rule 45A, Ala.R.App.P. The excerpt cited by the appellant has been taken out of context. A review of the entire *voir dire* examination of the jurors indicates that they were fully informed that a finding of guilt as to capital murder was not an automatic verdict for the death penalty, rather that they would be required to weigh the aggravating and mitigating circumstances in order to make this determination. Before giving the instruction cited by the appellant, the trial court fully explained to the potential jury what would be entailed in the trial stages, including the guilt and sentencing phases. He then instructed the jury that he had given it such information so that it would be better prepared to answer the *voir dire* questioning of the attorneys. He stated:

Now, I have told you all that so that some of the questions the attorneys I think will probably ask you will make sense to you and you would be able to answer them intelligently. For example, if someone said, if the defendant was convicted of the capital offense, would you automatically vote for death? Well, now

knowing what you know, you would certainly know that the answer would be no. That under the law as a judge would give it that you would first weight those factors one against the other and no vote would be automatic in the sentencing phase.

. . . Now, couple of other things I want you to understand in answering these questions. You have every right to have unpopular or different opinions from somebody else. . . .

Don't hesitate in these questions if you think that something you think or believe or feel is unpopular, don't hesitate to say so. There is nothing wrong with having a bias or prejudice because of a particular thing.

The trial court also instructed the jurors that they should freely admit any problems, biases, or fixed opinions that they may have and that, if they so chose, they could inform the court of such problems or feelings privately. The appellant initially asked the veniremembers if they would automatically vote for the death penalty; no one answered that he or she would do so. Thereafter, defense counsel asked, "[L]et's suppose that you find the defendant to be guilty and let's suppose that you find that person to be guilty of capital murder, is there anyone here who did not understand the statement, instructions from the judge that a finding of guilty of capital murder is not an automatic death penalty?" No potential jurors indicated that they did not understand that instruction. Defense counsel thereafter asked individual veniremembers similar questions on *voir dire*. On several occasions he reemphasized that if the appellant were to be found guilty of capital murder the death penalty was not automatic.

"In construing a jury instruction, we do so in the context of the charges as a whole. *Haney v. State*, 603 So.2d 368, 411 (Ala.Crim.App. 1991), *aff'd*, 603 So.2d 412 (Ala. 1992), *cert. denied*, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993); *Baker v. United States*, 412 F.2d 1069 (5th Cir. 1969), *cert. denied*, 396 U.S. 1018, 90 S.Ct. 583, 24 L.Ed.2d 509 (1970)." *Slaton*, 680 So.2d at 896. "It is the charge in its totality and not some 'magic words' that must determine whether the defendant's rights have been protected or error committed." *Slaton*, 680 So.2d at 892, quoting *Finley v. State*, 606 So.2d 198, 201 (Ala.Cr.App. 1992). Although, looked at in isolation, the instruction given by the trial court may appear to direct the jury to a specific answer, this was clearly not the intent of the instruction.

Looking to the entire oral charge, we find that the objectionable character of the portion objected to was cured and that the objection advanced on appeal is not well taken. The misleading quality of the court's instruction is self-correcting when considered

in the context of the entire oral charge when the charge is considered as a whole. And when each instruction is considered in connection with the others. We think it a reasonable assumption that the jury took a common sense view of the instruction and gave to them their plainly apparent meaning.

*Austin v. State*, 555 So.2d 324, 329 (Ala.Cr.App. 1989), quoting *Harris v. State*, 412 So.2d 1278, 1281 (Ala.Cr.App. 1982).

Considering the *voir dire* as a whole, there is no reasonable likelihood that the venire applied these instructions improperly.

*McWhorter*, 781 So. 2d at 280-81.

## 2. Analysis

McWhorter argues that the Alabama Supreme Court's decision was contrary to and involved an unreasonable application of *Witherspoon v. Illinois*, 391 U.S. 510 (1968) and *Morgan v. Illinois*, 504 U.S. 719 (1985). The Constitution does not "dictate a catechism for *voir dire*," but it does require that a defendant be afforded an impartial jury. *Morgan*, 504 U.S. at 729.

[P]art of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors. *Dennis v. United States*, 339 U.S. 162, 171-172, 70 S.Ct. 519, 523-524, 94 L.Ed. 734 (1950); *Morford v. United States*, 339 U.S. 258, 259, 70 S.Ct. 586, 587, 94 L.Ed. 815 (1950). "*Voir dire* plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosales-Lopez v. United States*, 451 U.S. 182, 188, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981) (plurality opinion). Hence, "[t]he exercise of [the trial court's] discretion, and the restriction upon inquiries at the request of counsel, [are] subject to the essential demands of fairness." *Aldridge v. United States*, 283 U.S. 308, 310, 51 S.Ct. 470, 471-472, 75 L.Ed. 1054 (1931).

*Id.* at 729-30. In *Morgan*, the Court held that a capital defendant is entitled to ask prospective jurors, even prior to the state's case-in-chief, whether they have predetermined views on the

death penalty that would disqualify them from serving on the jury. *Id.* at 731-36 (citing *Witherspoon*).

McWhorter contends that his "opportunity to question the potential jurors" was foreclosed by the trial judge's "repeated, prior instructions to these potential jurors on how to answer that exact question." (Doc. 20 at 58). That is, he claims that the

> potential jurors' lack of an affirmative response to defense counsels' question indicates only that they understood the trial judge's instruction on how to answer any inquiry into their beliefs on the death penalty: with uniform silence that gave McWhorter no chance to determine whether his prospective jurors held such "dogmatic beliefs about the death penalty" that they were incapable of "uphold[ing] the law." *Morgan*, 504 U.S. at 735-36.

(*Id.* at 58-59). McWhorter argues that when the potential jurors were asked whether they would automatically vote for the death penalty if he were convicted, they answered those questions in the negative—but that was only because of the judge's statements. However, this assertion is based purely on speculation.

The record plainly reflects that McWhorter had ample opportunity to question the potential jurors on their opinions about the death penalty. (Vol. 4 at 366-397; Vol. 5 at 398-427, 543-595; Vol. 6 at 641-706, 723-736; Vol. 7 at 823-882). McWhorter had ample opportunity to ask prospective jurors whether they had predetermined views on the death penalty that would disqualify them from serving on the jury, which is what *Morgan* requires. There is nothing in the record to indicate that any juror answered the defense's questions untruthfully, whether due to the comments made by the judge or for any other reason. In fact, a fair reading of the record indicates that the judge's comments were not made for the purpose of directing the potential jurors as to how to answer the parties' questions about whether they would automatically impose the death penalty, but rather informed them of what their obligations as jurors would be.

165

McWhorter's argument that the judge's comments directed the prospective jurors about how to respond to *voir dire* questions is simply not supported by the record.

The Alabama Court of Criminal Appeals' found that considering the *voir dire* as a whole, there was no reasonable likelihood that the venire took the court's statements as instructions that they were to answer no when asked if they would automatically vote for the death penalty if McWhorter were convicted. This finding was neither contrary to nor an unreasonable application of *Witherspoon* or *Morgan*.

## VI.  CONCLUSION

For all these reasons, and after careful review, the court concludes that McWhorter's petition (Doc. 1) is due to be denied. A separate order will be entered.

**DONE** and **ORDERED** this January 22, 2019.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE